**EDWIN H. NORDLINGER (EN-6258)**
**Acting Regional Director**
**Northeast Regional Office**
**SECURITIES AND EXCHANGE COMMISSION**
**233 Broadway**
**New York, New York 10279**
**(646) 428-1630**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| -against- | : |
| | : |
| **SYMBOL TECHNOLOGIES, INC.,** | : |
| **TOMO RAZMILOVIC, KENNETH JAEGGI,** | : |
| **LEONARD GOLDNER, BRIAN BURKE,** | : |
| **MICHAEL DEGENNARO, FRANK BORGHESE,** | : |
| **CHRISTOPHER DESANTIS, JAMES** | : |
| **HEUSCHNEIDER, GREGORY MORTENSON,** | : |
| **JAMES DEAN, and ROBERT DONLON,** | : |
| | : |
| **Defendants.** | : |
| | : |

Civil Action No.

**COMPLAINT**

---

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against

defendants Symbol Technologies, Inc. ("Symbol"), Tomo Razmilovic ("Razmilovic"), Kenneth

Jaeggi ("Jaeggi"), Leonard Goldner ("Goldner"), Brian Burke ("Burke"), Michael DeGennaro

("DeGennaro"), Frank Borghese ("Borghese"), Christopher DeSantis ("DeSantis"), James

Heuschneider ("Heuschneider"), Gregory Mortenson ("Mortenson"), James Dean ("Dean") and

Robert Donlon ("Donlon"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      From at least 1998 until as recently as February 2003, Symbol and the individual

defendants, together with other former Symbol executives, engaged in a wide array of fraudulent

accounting practices and other misconduct that had a cumulative net impact of over $230 million

on Symbol's reported revenue and over $530 million on its reported pre-tax earnings.  Symbol is

a leading supplier of mobile information systems that employ handheld computers and wireless

networks for barcode and other data capture technology.  Defendant Razmilovic, Symbol's

former president and CEO, and others at the company fostered an aggressive "numbers driven"

corporate culture obsessed with meeting financial projections.  To boost Symbol's stock price,

Razmilovic imposed and demanded compliance with unrealistic revenue and other targets, and

other executives knew that he expected them to achieve those figures by any means necessary.

2.      The fraudulent practices through which Symbol manipulated its reported financial

results included:  (a) a so-called "Tango sheet" process through which fraudulent "topside"

accounting entries were made to conform the unadjusted quarterly results to management's

projections; (b) the fabrication and misuse of restructuring and other non-recurring charges to

artificially reduce operating expenses, create "cookie jar" reserves and further manage earnings;

(c) channel stuffing and other revenue recognition schemes, involving both product sales and

customer services; and (d) the manipulation of inventory levels and accounts receivable data to

conceal the adverse side effects of the revenue recognition schemes.  Along with defendants

Jaeggi, Symbol's former CFO, and Burke, a former chief accounting officer at Symbol and later

the head of worldwide operations, Razmilovic signed Symbol's periodic reports with knowledge

that those reports and the corresponding press releases misrepresented Symbol's financial results.

2

3.      While the accounting fraud was occurring, defendant Goldner, Symbol's former general counsel, manipulated stock option exercise dates without regard to the stated terms of Symbol's stock option plans to enable certain senior executives, including himself, to profit unfairly at the company's expense. Capitalizing on the extended period in effect before July 30, 2002 for filing the forms on which executives were required to report stock purchases, Goldner "cherry picked" the exercise date during this period so as to reduce the cost of the exercise to the executive. Rather than using the actual exercise date as defined by the option plans, Goldner instituted, without board approval or public disclosure, a practice of using a more advantageous date chosen from a 30-day "look-back" period to calculate the cost of the exercise. Under this fraudulent practice, the exercise was usually deemed to have occurred on the date with the second most advantageous market price during the "look-back" period, though Razmilovic sometimes received the date with the most advantageous price.

4.      Each defendant besides Goldner played a prominent role in Symbol's fraudulent accounting practices. Jaeggi and Burke directed the "Tango sheet" process, and Razmilovic approved proposed adjustments to reserves and other items that were set forth in schedules that they and others at Symbol referred to as "Tango sheets." These adjustments lacked any factual basis, grossly violated generally accepted accounting principles ("GAAP") and were made for the purpose of manipulating the raw data to match the forecasts given to analysts and Symbol's board of directors. Defendant DeGennaro, Symbol's senior vice president of corporate finance during the latter part of the fraud, was also involved in the quarterly Tango sheet process.

5.      Jaeggi, Burke and DeGennaro also directed the manipulation and fabrication of restructuring charges and reserves. Symbol took large non-recurring charges in connection with an acquisition and the relocation of its manufacturing operations that were fraudulent because

they contained fictitious costs, improperly included numerous unrelated operating expenses and otherwise violated GAAP. Symbol also created a number of "cookie jar" reserves by overstating inventory write-offs and inflating accrued expenses when actual operating costs fell below the quarterly forecast. Symbol reversed these excess reserves when necessary to increase earnings in future periods. Defendant Dean, an operations finance director, carried out these schemes at the direction of Jaeggi, Burke and DeGennaro and knew that their purpose was to manage earnings by artificially reducing operating expenses and creating improper "cookie jar" reserves.

6.      Defendant Borghese, Symbol's former head of sales, spearheaded the revenue recognition fraud. Whenever actual sales fell short of Razmilovic's target, Borghese stuffed the distribution channel by granting resellers return rights and contingent payment terms in side agreements that he negotiated or authorized. In some quarters, he used three-way "round trip" transactions involving both resellers and distributors, known at Symbol as "candy" deals, to create additional phony revenue. In addition, Borghese employed multiple schemes for claiming revenue before it was earned, such as shipping the wrong product when the product ordered by the customer was unavailable. Defendants DeSantis, Mortenson and Donlon worked under Borghese and, together with other sales executives, implemented his revenue recognition schemes. In a related scheme that Burke originated, Mortenson and Donlon also caused revenue to be recognized in several quarters on shipments that did not occur until the next quarter. To conceal this premature recognition of revenue, Mortenson and Donlon, acting at the direction of Borghese and others, secured backdated phony "bill and hold" letters from the customers.

7.      Razmilovic, Jaeggi and DeGennaro were also directly involved in the revenue fraud. Jaeggi participated in negotiating an extensive warehousing arrangement with a large foreign distributor that served as a vehicle for improperly recognizing several millions of dollars

4

of revenue over multiple quarters, and he approved payments made to resellers to induce them to participate in Borghese's three-way "candy" deals.  With DeGennaro's assistance, Razmilovic negotiated a quarter-end "swap" transaction whereby Symbol exchanged multi-million dollar wire transfers and products with a software company to boost sales revenue.  When Symbol's "days sales outstanding" ("DSO") figure -- a measure of how rapidly a company collects cash from customers -- increased as a result of its fraudulent revenue recognition practices, Jaeggi and DeGennaro directed a scheme to reduce outstanding accounts receivable, including the undisclosed reclassification of past due trade receivables into notes receivable.

8.      Defendant Heuschneider, finance director for Symbol's customer service division, artificially inflated the service revenue reported by Symbol.  He reacted to the pressure from senior management by directing subordinates to make multimillion dollar fraudulent entries that improperly accelerated revenue recognition on existing service contracts.  Heuschneider also fabricated revenue by improperly "renewing" dormant or cancelled service contracts without the customer's approval.

9.      Jaeggi, Burke and DeSantis also engineered the schemes to suppress Symbol's reported inventory levels, a carefully watched metric for manufacturers like Symbol.  Among other things, they directed employees to refrain from scanning new components or returned goods into the automated accounting system.  Burke and DeSantis also directed an employee to make fictitious accounting entries eliminating inventory accruals.  In addition, Burke arranged transactions with third parties to make it appear that Symbol had sold inventory when, in fact, Symbol retained possession of the goods.

10.     The fraudulent accounting practices and manipulation of stock option exercise dates had a material impact on Symbol's reported financial results.  Symbol recently restated

most of the financial results it originally reported from 1998 through September 30, 2002, including its annual financial statements for 2000 and 2001.  The restatement touched upon virtually every single line item of the annual and quarterly financial statements at issue.

      11.    In addition to committing securities fraud, some of the defendants interfered with two internal investigations into Symbol's accounting practices and impeded the Commission's investigation.  After the Commission began its investigation, Jaeggi directed subordinates to discard copies of Tango sheets and other incriminating documents.  During the same relevant period, DeGennaro rigged the revenue recognition data provided to the forensic accountants involved in the first internal inquiry, instructed subordinates to withhold or delay providing information to subsequent internal investigators, and directed an employee to sanitize key portions of schedules that the employee intended to provide to the investigators.

      12.    By virtue of the foregoing conduct, each of the defendants, directly or indirectly, singly or in concert, has engaged in acts, practices and courses of business that constitute violations, or give rise to liability for violations, of the federal securities laws and rules and regulations thereunder, as follows:

      (a)    Symbol violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2) and 78n(a)] and Rules 10b-5, 12b-20, 13a-1, 13a-13, 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, 240.14a-3 and 240.14a-9];

      (b)    Razmilovic violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2]; and

he is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding

and abetting Symbol's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and he is further liable, pursuant to Section 20(a)

of the Exchange Act [15 U.S.C. § 78t(a)], as a controlling person for Symbol's violations of

Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)] and Rules

12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13];

   (c)  Jaeggi violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and

Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules

10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1

and 240.13b2-2]; and he is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C.

§ 78t(e)], for aiding and abetting Symbol's violations of Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and he is further liable,

pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], as a controlling person for

Symbol's violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78m(a)

and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20,

240.13a-1 and 240.13a-13];

   (d)  Goldner violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and

Sections 10(b), 13(b)(5) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and

78p(a)] and Rules 10b-5, 13b2-1 and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and

240.16a-3]; and he is also liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C.

§ 78t(a)], as a controlling person for Symbol's violations of Sections 13(a), 13(b)(2), and 14(a) of

the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2) and 78n(a)] and Rules 12b-20, 13a-1 and

13a-13, 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.14a-3 and 240.14a-9];

(e)     Burke violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1 and 240.13b2-2]; and he is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting Symbol's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and he is further liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], as a controlling person for Symbol's violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13];

(f)     DeGennaro violated Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2]; and he is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting Symbol's violations of Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78(m)(b)(2)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13]; and

(g)     Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon each violated Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2-1]; and each one of them is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and

abetting Symbol's violations of Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78(m)(b)(2)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13].

13.    Unless the defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

<u>**JURISDICTION AND VENUE**</u>

14.    The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and seeks to restrain and enjoin the defendants from engaging in the acts, practices, transactions and courses of business alleged herein.  The Commission also seeks an order:  (a) requiring the defendants to disgorge the ill-gotten gains received as a result of the violations for which they are liable and, where indicated, pay prejudgment interest on those amounts; (b) requiring the defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, as to Razmilovic, Jaeggi, Goldner and Burke, also pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and (c) prohibiting Razmilovic, Jaeggi, Goldner, Burke, DeGennaro and Borghese from acting as an officer or director of a public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and, as to Razmilovic, Jaeggi, Goldner and Burke, also pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)].

15.    This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

16.     The defendants, directly and indirectly, have made use of the means or instrumentalities of, or the means or instruments of transportation or communication in, interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices and courses of business alleged herein.  Some of these transactions, acts, practices and courses of business occurred in the Eastern District of New York.

## THE DEFENDANTS

17.     During the time of the transactions and events alleged herein, **Symbol** was, and remains:  (a) a Delaware corporation with principal offices in Holtsville, New York; (b) engaged in the design, manufacture, marketing and servicing of mobile information systems using bar code scanners and similar devices; and (c) a public company whose common stock is traded on the New York Stock Exchange and registered with the Commission pursuant to Section 12(b) of the Exchange Act.

18.     **Razmilovic**, age 62, was Symbol's President and Chief Operating Officer from 1995 through June 2000.  From July 2000 until his resignation in February 2002, Razmilovic was President and Chief Executive Officer.  He was also a member of the Board of Directors from 1995 until his departure.

19.     **Jaeggi**, age 58, was Symbol's Chief Financial Officer from 1997 until his forced resignation in December 2002.

20.     **Goldner**, age 56, was Symbol's Secretary and General Counsel from 1990 until his resignation in June 2003.  In June 2001, he was also promoted to Executive Vice President from Senior Vice President.  Before joining Symbol, he was a partner for ten years at a major corporate law firm.

21.     **Burke**, age 57, was Symbol's Corporate Controller from December 1988 through at least March 2000.  Beginning in May 1997, he was also the Chief Accounting Officer and was promoted to Senior Vice President.  During 2000, Burke became Symbol's Senior Vice President of Worldwide Operations and General Manager.  From October 2001 until his departure in April 2002, Burke was Senior Vice President for Corporate Development.

22.     **DeGennaro**, age 39, is a certified public accountant and was Symbol's Senior Vice President of Finance from October 2000 until his forced resignation in September 2002. Before joining Symbol, DeGennaro was an audit partner at the accounting firm that served as Symbol's outside auditor ("Auditor") during the time of the events alleged herein.  DeGennaro was a member of the Auditor's Symbol audit team for the years 1993 through 1999.

23.     **Borghese**, age 49, was employed at Symbol from 1988 through his resignation in December 2001.  He was Vice President of Sales from 1993 through 1999, and beginning in January 1999, he headed Symbol's The Americas Sales and Service ("TASS") division.  In January 2001, he was promoted to Senior Vice President of Worldwide Sales and Services.

24.     **DeSantis**, age 38, was Symbol's Vice President of Sales Finance from February 2001 through his termination in January 2002.  DeSantis was Senior Director of Sales Finance from January 1999 through February 2001, and served as Operations Controller from October 1995 through January 1999.

25.     **Heuschneider**, age 47, was an analyst and manager in customer service finance for TASS from 1993 until January 2000, when he became the Director of Customer Service Finance.  Heuschneider was terminated in January 2003.

26.     **Mortenson**, age 38, was employed at Symbol from 1997 until his termination in February 2003.  He began as a finance analyst and in January 1999, he became senior manager in

11

Sales Finance.  In February 2001, Mortenson was promoted to Director of Finance for TASS, and he was named Senior Director in December 2002.  Mortenson passed the CPA exam in 1994 but was never licensed.

27.     **Dean**, age 34, is a certified public accountant and worked in Symbol's operations finance department from November 2000 until his termination in June 2003.  He began as a manager, was promoted to senior manager in June 2001 and was named Director of Operations Finance in December 2002.  Before joining Symbol, he was an auditor at two accounting firms, including the Auditor.

28.     **Donlon**, age 37, was employed at Symbol from 1989 until his termination in March 2003.  He held numerous positions in sales and related areas, including manager of the Customer Response Team.  From April 2000 until his departure, Donlon was the Senior Manager and then Director of Sales Operations for TASS.

### OTHER RELEVANT PERSONS

29.     **Robert Asti** ("Asti"), age 46, was Vice President of Sales Finance for Symbol's TASS division from mid-1999 until his resignation in March 2001.  On March 25, 2003, the Commission filed an action in this Court against Asti for his role in some of the fraudulent practices alleged herein, and he also pled guilty to parallel criminal charges brought by the United States Attorney's Office for the Eastern District of New York ("USAO").

30.     **Robert Korkuc** ("Korkuc"), age 41, was Vice President and Chief Accounting Officer at Symbol from July 2000 until his resignation in March 2003.  From 1997 until July 2000, he was the Director of Corporate Accounting.  On June 19, 2003, the Commission filed an action in this Court against Korkuc for his role in some of the fraudulent practices alleged herein, and he also pled guilty to parallel criminal charges filed by the USAO.

## BACKGROUND

### Symbol's Corporate Culture

31.     During the latter part of the 1990s, Symbol reported rapid growth along with the rest of the technology sector.  Symbol continued to report growth and tout its ability to satisfy market expectations even after the technology "bubble" burst in 2000, claiming that its business was largely unaffected by the economic downturn.  In the first quarter of 2001, Symbol reported revenues and earnings, excluding non-recurring expenses, that matched or exceeded consensus Wall Street estimates for the thirty-second consecutive quarter.  In the press release announcing Symbol's results for that quarter, Razmilovic stated as follows:  "Symbol had an outstanding first quarter as our business results remained strong despite an increasingly challenging I[nformation] T[echnology] market."  Razmilovic further stated that "unlike many technology companies that are reporting dramatic revenue fall-offs, we expect to produce robust year-over-year revenue and EPS growth for 2001 and beyond."  The truth is that Symbol made its numbers through fraud.

32.     Razmilovic established the financial performance targets that drove or mirrored Wall Street expectations, and he aggressively enforced those targets.  During his tenure, one of management's primary functions was to make sure that the company's reported results matched those figures, and there was often a mad scramble at the end of reporting periods to "hit the number."  Razmilovic and other members of senior management made it clear to executives and employees at all levels that they were expected to do whatever it took to satisfy his demands.  Many Symbol employees succumbed to the pressure and participated in the fraud.

### Symbol's Internal Control Deficiencies

33.     Symbol's lack of adequate internal controls exacerbated the situation.  Among other problems in the control structure, each area of the company performed its own finance

function that fed directly into the financial reporting done at the corporate level.  The so-called "sales finance" function had a significant impact on the revenue recognition process at the end of financial reporting periods, and the "operations finance" function had a similar impact on the recognition of expenses and use of reserves.  For example, Symbol's sales and service finance groups reported to Borghese, yet they had the authority to decide, in the first instance, whether and when purchase orders and service contracts were booked for revenue recognition purposes.  Moreover, the various finance groups had virtually unfettered access to Symbol's general ledger through its automated accounting system, known as SAP.  As a result, the sales finance group, for instance, also exercised significant control over the issuance of credits for product returns and the aging of accounts receivable.

## THE FINANCIAL FRAUD SCHEME

34.    The defendants charged in this section engaged in a fraudulent scheme to inflate revenue, earnings and other measures of financial performance in order to create the false appearance that Symbol had met or exceeded its financial projections.  The scheme resulted in material misstatements of revenue, earnings and other financial information reported by Symbol for annual and quarterly reporting periods from at least 1998 through the fourth quarter of 2002. With blatant disregard for GAAP and their financial reporting obligations, these defendants used a variety of fraudulent practices to align Symbol's reported financial results with market expectations.  The fraudulent accounting practices at Symbol involved all levels of the company and included, among other things, patently improper topside adjustments, a multitude of revenue recognition schemes, the manipulation of non-recurring charges and "cookie jar" reserves to manage earnings, and other clear violations of GAAP.  Razmilovic, Jaeggi, Burke, DeGennaro

14

and Borghese directed the fraud, while DeSantis, Heuschneider, Mortenson, Dean and Donlon implemented the schemes.

**Fraudulent "Tango Sheet" Adjustments**

35.     Razmilovic, Jaeggi, Burke and DeGennaro each had a key role in the "Tango sheet" process used to manipulate reserves and make other fraudulent post-closing, or "topside," adjustments to Symbol's raw financial data.

36.     During and prior to the period covered by Symbol's restatement, it was a regular practice within the corporate finance department each quarter to prepare documents known at Symbol as "Tango sheets." The Tango sheets compared the raw financial data to the forecast that management had provided to the board of directors and identified adjustments that would conform the raw numbers to the forecast, which reflected market expectations. Burke instituted this practice during his long tenure as Symbol's controller. During the relevant period, Korkuc was responsible for preparing the Tango sheets, first under Burke's direction and then under Jaeggi's direction.

37.     As part of the Tango sheet process, Jaeggi and Burke showed the Tango sheets to Razmilovic and briefed him on the proposed adjustments. Korkuc then made or caused others to make the adjustments authorized by Razmilovic, Jaeggi and Burke. In many cases, Razmilovic, Jaeggi and Burke directed Korkuc, without any regard for GAAP or other financial reporting requirements, to make adjustments in addition to, or instead of, those that were identified in the Tango sheet he prepared or to alter his proposed adjustments to achieve even more advantageous results. After joining Symbol in late 2000, DeGennaro also attended Tango sheet meetings and otherwise participated in the process through which Tango adjustments were reviewed, discussed and approved.

38.     Jaeggi signed off on the Tango sheet entries made during his tenure as CFO. Before doing so, Jaeggi, accompanied at times by Korkuc and either Burke or DeGennaro, walked Razmilovic through each adjustment and explained its impact on Symbol's financial statements. The nature and size of the improper adjustments varied each quarter depending upon the variance between the raw results and the forecast and the opportunities for manipulation that the participants in the Tango sheet process were able to identify.

39.     As a result of these fraudulent topside adjustments, Symbol understated expenses and overstated revenue, earnings and other financial data in periodic reports and press releases. Despite their carefully calibrated impact on reported results, Symbol did not disclose the Tango sheet adjustments to the public in the relevant periodic reports or press releases.

40.     The undisclosed topside adjustments made by Symbol through the Tango sheet process included the following manipulations:

**Deferral Of FICA Expenses**

(a)     At a Tango sheet meeting for the first quarter of 2000, Burke suggested to Jaeggi and Korkuc that they "defer" $3.5 million in FICA insurance costs that Symbol had incurred that quarter for bonuses paid to employees. Under GAAP, such expenses must be recognized in the period in which they are incurred, and Symbol was therefore required to recognize this $3.5 million expense in the first quarter of 2000. Jaeggi, Burke and Korkuc instead deferred the entire $3.5 million FICA expense to a later reporting period in order to boost Symbol's net income in the first quarter of 2000. As a result of this deferral, Symbol reduced its sales, general and administrative expenses that quarter by $3.5 million. There was no basis in GAAP for the deferral. This adjustment alone inflated net income by 7.5 percent that quarter.

### Adjustments Relating To The "Credit Memo Reserve"

(b)     Symbol maintained a "credit memo reserve" purportedly to account for the impact of anticipated product returns from customers. Increases to this reserve decreased reported revenue by a corresponding amount. Symbol's corporate finance personnel did not calculate the credit memo reserve in accordance with GAAP. Senior management dictated what the reserve would be to achieve particular revenue targets. The Tango sheet adjustments to the reserve were also based on the desired "optics" of Symbol's financial statements, and not on accounting principles. For example, in the first quarter of 2000, the initial Tango sheet prepared by Korkuc included a proposed adjustment increasing the credit memo reserve by $13.7 million, which would "achieve revenue of $316.8 million" according to the Tango sheet. Jaeggi, however, instructed Korkuc to increase the reserve by only $10.5 million so that the revenue figure would be $320 million. The later Tango sheet explained this entry as follows: "[I]ncrease credit memo accrual $10.5 M @ 42.5% to achieve revenue of $320M." Symbol reported $320 million in revenue that quarter.

(c)     In the first quarter of 2002, Jaeggi directed Korkuc to reduce the credit memo reserve by $2 million in order to make Symbol's reported revenue figure "begin with a 3." Without this adjustment, Symbol's reported revenue that quarter would have been $299.3 million. As a result of this adjustment, Symbol reported $301.3 million in revenue. Symbol also reported earnings-per-share ("EPS"), before a non-recurring charge, that were right in line with Wall Street estimates.

(d)     Jaeggi also manipulated the recovery value of the inventory included in the credit memo reserve in order to increase gross profit and net income. Whenever an adjustment was made to increase the credit memo reserve, a corresponding adjustment was needed to increase

17

the inventory account and decrease cost of sales by an amount reflecting the recovery value of the product that would be returned.  The recovery value of inventory, stated in percentage terms, determined the impact of the credit reserve on gross profit and net income.  In the second quarter of 2000, Jaeggi directed Korkuc to increase the recovery value from 58% to 65% in order to reduce cost of sales, and thereby inflate gross profit and net income, by $1.84 million.  This adjustment alone boosted net income for the quarter by 3.4%, and Symbol narrowly exceeded both the board forecast and consensus EPS estimate.

### Manipulation Of Retirement Plan Reserves

(e)     Razmilovic and other senior executives participated in a Senior Executive Retirement Plan ("SERP") to which Symbol made contributions for their benefit.  In accordance with GAAP, Symbol created reserves to accrue for the expenses associated with the SERP contributions.  In 1999 and 2000, some of the senior executives elected to swap their SERP benefits for a "split" life insurance policy.  In the event of a swap, Symbol was no longer obligated to make the SERP contributions, leaving millions of dollars in unnecessary reserves that could be released into income.  Rather than establish a regular schedule for the release of these reserves as GAAP required, Symbol used the unneeded SERP reserves as "opportunities" to bridge earnings gaps in five quarters from 1999 through 2001.  In at least one instance, Symbol released SERP reserves into income even in the absence of a swap.  In the third quarter of 2000, Symbol released $2 million of accrued expenses into income on the basis of Razmilovic's purported election to swap his SERP interest when, as he well knew, he had not made such an election.  This entry alone increased reported earnings by $1.36 million, or 3.4%.  Once again, Symbol narrowly exceeded the board forecast and the consensus EPS estimate.  In a

press release announcing the results, Razmilovic boasted of "another record quarter." The SERP expense was re-accrued in the following quarter.

### Release Of "Cookie Jar" Reserves

(f)      In the fourth quarter of 2001, Razmilovic authorized a $16.5 million Tango sheet adjustment that improperly converted a loss into a hefty profit.  DeSantis had purposely created an excessive inventory reserve in an operations account that Burke and DeGennaro used as a "cookie jar" reserve that could be tapped to meet forecasts.  At the 2001 year-end Tango sheet meetings, DeGennaro and Korkuc brought this reserve to Jaeggi's attention.  At that time, this reserve had an excess "cushion" of over $10 million.  The raw results showed a $2.5 million loss for the fourth quarter, and Jaeggi seized on the reserve as an opportunity to inflate earnings and "save" the quarter.  Jaeggi and DeGennaro then informed Razmilovic of this opportunity, and he authorized them to release $10 million from the inventory reserve and another $6.5 million from two other "cookie jar" reserves into income.  By making these and other entries, Symbol falsely reported net income of $13.4 million rather than a $2.5 million loss, and hit the quarterly EPS forecasts right on the nose.

41.      While participating in the fraudulent Tango sheet process, Razmilovic, Jaeggi, Burke and DeGennaro also knew that the raw results they were manipulating had already been inflated through fraudulent revenue recognition practices and other accounting schemes, because each of them either directed or participated in those schemes as well.

### Fraudulent Revenue Recognition Schemes

42.      From 1999 through 2001 and at other relevant times, Razmilovic, Jaeggi, Burke, DeGennaro, Borghese, DeSantis, Mortenson and Donlon engaged in multiple fraudulent schemes

to inflate Symbol's reported sales revenue and income in order to create the false appearance that Symbol had met or exceeded its financial projections.

43.    Borghese's job was to make sure that Symbol achieved Razmilovic's aggressive revenue targets.  Borghese and Burke developed a variety of schemes to accelerate and fabricate sales revenue.  DeSantis, Mortenson and Donlon handled the logistical details involved in getting the orders processed and booked in accordance with those schemes.  At the end of the reporting period, Symbol's corporate finance department downloaded the data that they and others entered into SAP and consolidated the data to generate the financial statements.  Razmilovic, Jaeggi and DeGennaro not only knew about these schemes, but they also actively directed, and sometimes participated in, some of the more egregious transactions.  Razmilovic and Jaeggi both negotiated large quarter-end transactions designed to pump additional revenue into the financial statements without regard to GAAP.  DeGennaro had a role in at least one improper transaction.  Regardless of their roles or formal accounting expertise, the defendants involved in the revenue recognition schemes all understood, at a minimum, that they were engaged in deceptive practices designed to artificially enhance the sales revenue reported by a publicly traded company and acted in blatant disregard for GAAP and Symbol's stated revenue recognition policies.

### June 2001 "Swap" Transaction With A Software Company

44.    At the end of the second quarter of 2001, Razmilovic negotiated an artificial "swap" transaction with a software company on which Symbol improperly recognized $4.25 million in revenue that quarter.  Symbol simultaneously purchased software from the software company for $8.5 million and sold product to the software company for $4.25 million in a purported "bill and hold" transaction, which means that Symbol retained possession of the

product.  Symbol paid the $8.5 million and received the $4.25 million by wire transfer on June 29 and June 30, 2001, respectively.

45.     It was improper for Symbol to recognize revenue on this transaction for several reasons.  The amounts and timing of the two transactions demonstrate that Symbol, in effect, provided the funds that the software company used to "purchase" Symbol product.  In a side agreement that negated the terms of the parties' written contract, Razmilovic also granted the software company 100% "stock rotation" rights, i.e. unlimited return rights, for an indefinite duration.  Under this side agreement, the software company was allowed to "exchange," at no cost and without regard to the terms of the written contract, the product listed on the purchase order for current Symbol product if and when the software company located an end user.  The software company exchanged nearly $2 million of the unwanted product for new product in this manner long after the stock rotation rights set forth in the written contract had expired.

46.     In addition, Symbol never used the software for which it paid $8.5 million, and it remained packed up in a box in an employee's office for years after the transaction.  No one at Symbol researched the price of the software or made any attempt to determine its fair market value before Razmilovic agreed on the price.  Instead, he pressured his staff to finalize the deal by the end of the quarter, making it impossible to perform any price analysis.

47.     The transaction also failed to satisfy the criteria under GAAP for recognizing revenue on "bill and hold" sales.  There was neither a fixed delivery schedule nor a substantial business purpose for the software company to purchase the goods on a "bill and hold" basis.  In fact, the software company had no real use at all for the goods identified in the purchase order.  In addition, the requisite "bill and hold" letter from the purchaser was backdated and was not

executed, as GAAP requires, at the time of the transaction.  The letter was dated June 27, 2001,
but it was not signed until July 10, 2001.

48.    DeGennaro accompanied Razmilovic in the negotiations with the software
company and directed Symbol's improper accounting for the transaction.  DeGennaro also
directed subsequent efforts to conceal the transaction's true terms.  After a second internal
investigation began at Symbol in 2002, DeGennaro directed Mortenson, who was in charge of
the sales finance function at that time, to handle the software company's exchanges "off line" by
surreptitiously "cycling" the original product back into Symbol's inventory rather than process
so-called "zero dollar" returns, as had previously occurred.  DeGennaro told Mortenson to
handle the returns in this manner, which avoided the posting of a "return material authorization"
("RMA") on Symbol's books and records, so that the original transaction would be less likely to
attract attention from investigators and auditors.

**Warehousing Arrangement With A South American Distributor**

49.    Jaeggi and Borghese together spearheaded a fraudulent warehousing arrangement
between Symbol and a distributor located in South America.  Through this arrangement, Symbol
improperly recognized a total of over $16 million in revenue from the end of 1999 through the
first quarter of 2001.  This distributor placed multimillion orders at the end of multiple quarters
for whatever products Symbol had available at the time, even though the distributor had no use
for the ordered products.  Symbol did not ship the products to the distributor in South America or
to any of its customers.  Instead, Symbol moved the product to a warehouse in New York and
retained the risk of loss and other indicia of ownership.  Jaeggi, Borghese and others agreed on
Symbol's behalf that the distributor did not have to pay for the warehoused product and could

"return" or "exchange" the warehoused product at no cost when it placed new orders for product it actually needed.

50.     Donlon implemented this arrangement by preparing a spreadsheet identifying the available inventory, and the spreadsheet was sent to the distributor indicating the products and quantities that it should order.  Donlon did this to ensure immediate revenue recognition, because he knew that Symbol's accounting system (SAP) would not generate an invoice unless the order met certain criteria.  Among other things, the system interfaced with the inventory database and matched orders up with available inventory.  If the ordered product was not currently available, SAP put the order on hold, and would not authorize shipment or generate an invoice until the product appeared in inventory.  While engaged in the fraud, Donlon referred to the process of matching orders to existing, and often surplus or obsolete, inventory as "bowling for dollars."

51.     The sole purpose of the warehousing arrangement was to enable Symbol to inflate its revenue figures.  In May 2000, one of the distributor's executives copied Jaeggi and others on a letter to a member of Borghese's staff that addresses several issues regarding the arrangement. The letter refers to multiple discussions with Jaeggi and candidly states that "in the last week of December, Symbol had asked us to advance some orders to improve Symbol's 1999 figures, and we have ordered at that time 2,000 units that are still in USA."

52.     At the end of the March 2001, Borghese induced the distributor into placing yet another order designed solely to inflate Symbol's revenue even though the distributor initially resisted placing additional phony orders for product it did not need.  In a March 2001 email to the distributor, a member of Borghese's sales staff candidly conveyed the fraudulent nature of these transactions:

> Frank [Borghese] talked to me today and he wants you . . . to think
> about giving him an order of US$ 7 million with a revenue of . . .

> US$ 5 Million. He needs for you to take it and put it in a
> warehouse that is not Symbol. He is prepared to pay you for the
> storage fees by you invoicing us some form of consulting fees to
> hide the fact that [it] is storage fees. The factory created for me a
> list of product mix which they would like the order to be
> constructed as. I realize this is a bit crazy . . . but he needs as usual
> all he can get.

53.     After direct discussions with Borghese, the distributor ultimately placed a $5

million order in March 2001. Borghese agreed to the usual unlimited return rights and that

Symbol would bear the expense and risk of storing the product. Symbol invoiced the distributor,

and improperly recognized revenue, in the amount of $5 million. However, Symbol shipped the

product to a domestic reseller, who eventually returned the product to Symbol.

### Three-Way "Candy" Deals

54.     Borghese, Burke, Jaeggi and Donlon also participated in the three-way "round

trip" transactions, known at Symbol as "candy" deals, that were used to "stuff" the distribution

channel. In these transactions, Symbol paid off resellers to "purchase" large volumes of Symbol

product from a distributor at the end of a quarter so that Symbol could induce the distributor to

place a corresponding order with Symbol to increase inventory to meet this illusory demand.

55.     This fraudulent scheme had the following essential components. Borghese and

Asti, then the head of sales finance, first arranged for a reseller to order a specified volume of

Symbol product from a distributor. In exchange, Borghese and Asti agreed that Symbol would

cover the cost of the reseller's purchase from the distributor, which also included a substantial

markup, and pay the reseller an additional amount -- the "candy" -- equal to 1% of the purchase

price. Once the reseller placed its purchase order with the distributor, Borghese or Asti solicited

an order from the distributor to fill the reseller's order or restock the distributor's supply. The

price that Symbol charged the distributor was lower than the cost of repurchasing the product from the reseller, which included both the distributor's mark-up and the "candy" payment.

56.    During 2000, Borghese and Asti arranged "candy" transactions on which Symbol improperly recognized approximately $10 million in revenue and in which the improper payments to the resellers totaled approximately $15 million.  Symbol's recognition of revenue on the corresponding purchase orders placed by the distributors was fraudulent and misleading. Symbol did not actually make any money -- and, in fact, lost money -- on these sham three-way transactions.  Moreover, Symbol did not disclose that it generated this revenue by buying back its own products at a higher price and paying a bribe.

57.    Burke and Jaeggi were involved in and approved payments made to the resellers. Among other things, Burke signed two $1.9 million check request forms prepared by Asti in April 2000, and Jaeggi signed both checks to the resellers.

58.    As he did in the warehousing arrangement with the South American distributor, Donlon supplied spreadsheets identifying the inventory that was available at distributors so that the resellers knew what to order.  Donlon also handled the returns when the product came back to Symbol, making sure that the RMAs were processed and booked as "zero dollar" returns that would have no adverse impact on income.

### Other "Channel Stuffing" Schemes

59.    In addition to the "candy" deals, Symbol also systematically engaged in more traditional "channel stuffing" schemes with its domestic resellers to inflate reported revenue and earnings during the relevant period.  To help meet Razmilovic's financial targets, Borghese counted on a group of resellers to submit, at his or his staff's request, large "purchase" orders for product that Symbol had available and could ship before the end of the quarter.  Borghese, Asti,

25

DeSantis (Asti's successor as head of sales finance) and other members of the sales staff arranged these transactions to make it appear that Symbol was selling the product to these resellers, while they simultaneously eliminated the resellers' obligation to pay for it. Because of Borghese's relationship with these resellers, they were known at Symbol as "friends of Frank" and their quarter-end orders were called "Frank specials."

60.    These resellers typically did not need and often could not even afford to pay for the product they ordered, but Borghese, DeSantis and others negated any risk to the resellers by granting them contingent payment terms and unconditional return rights. The resellers did not have to pay Symbol unless and until they resold the product and received payment from an end user. The resellers also had the right to return any unsold product to Symbol at no cost. These special terms did not appear anywhere in the purchase orders or resulting invoices, which simply recited Symbol's standard "net 45 day" payment terms. The side agreements also superseded the stock rotation terms that Symbol normally granted to channel partners in its standard contracts, which did not permit unlimited returns and provided for a restocking fee in many circumstances.

61.    Although the specific contingent payment terms and return rights varied from transaction to transaction, in each case they nullified the purported buyer's obligation to pay for the product. By recognizing revenue on such transactions as though they were genuine sales, Symbol violated both its own stated accounting policies and GAAP. Razmilovic and Jaeggi were aware of these side agreements and their impact on revenue recognition when they signed Symbol's periodic reports.

62.    The typical "Frank specials" had the following additional common features that Borghese, DeSantis, Donlon and others put into place: (i) the resellers received substantial price discounts, guaranteeing a huge profit in the rare event of a resale to an end user, or direct cash

payments disguised as rebates, marketing credits or storage fees; (ii) the resellers were required to order only those products that Symbol could immediately ship, without regard to whether the resellers had any use for them; and (iii) because these resellers were thinly-capitalized and their orders generated large receivables, the automated credit limits imposed by SAP were manually overridden to release the orders for shipment.

63.     After Asti left the company, DeSantis took over his role in approving certain side agreements and structuring the transactions to ensure that revenue in the full amount of the order would be recorded on Symbol's books in the desired quarter.  DeSantis was also instrumental in overriding the SAP credit holds, either by temporarily raising the credit limit or coercing credit personnel into releasing the order.  Although credit personnel sometimes raised questions with Jaeggi about these practices, Jaeggi ignored their concerns and agreed to lift the credit holds.

64.     Donlon worked closely with Borghese, Asti and DeSantis on these transactions. In addition to creating spreadsheets of available inventory to convey to the resellers, he also regularly overrode credit limits.  In some cases, he obtained the SAP passwords belonging to credit personnel and released orders on his own.  On occasion, he also solicited quarter-end orders from the resellers to help Borghese meet the revenue target.  In one instance, he signed Asti's name to a side letter promising the reseller a 1% "staging fee" for placing a phony order when, in fact, there was no product staging that needed to be done.

65.     The following are examples of the types of reseller transactions described above that were reversed in Symbol's restatement because the recognition of revenue was improper:

(a)     In 2000 and 2001, Symbol recognized more than $18 million in revenue on improper transactions with a certain reseller ("Reseller A").  For example, in June of 2000, Borghese induced Reseller A to place a $2 million order by promising Reseller A that it would

27

soon receive an order from a large end user and could make a profit by ordering the product now and then selling it to the end user. Borghese agreed that Reseller A could return the product if the end user did not materialize, and that Reseller A was not obligated to pay unless and until it received payment from the end user. To reduce the risk of detection, Borghese preferred to keep these side agreements oral, but in this case the reseller requested and received documentation of the true terms to ensure that it incurred no risk. Reseller A was thinly capitalized. In December 2001, for example, its credit limit was zero. Nevertheless, Donlon caused a further $1.8 million order to be released on December 28, 2001 by falsely advising credit personnel that Reseller A had a valid purchase order from an end user.

(b)     At the end of December 2000, Borghese induced another reseller ("Reseller B"), which had been a reseller for a competitor that Symbol had just acquired, to place a large order for product that the reseller did not need and could not afford at that time. Borghese promised Reseller B a quick risk-free profit because, Borghese claimed, an end user would soon be placing an order. Borghese agreed that Reseller B could return whatever product it was unable to sell at no cost. Reseller B memorialized the existence of this side agreement with Borghese by noting on the purchase order: "Terms as discussed per conversations with . . . Frank Borghese per meetings 12/28/00 and 12/29/00." Symbol recorded $5.5 million in revenue in December 2000 on the basis of this purchase order. Reseller B returned most of the product two quarters later. Borghese's channel stuffing arrangement with Reseller B continued until at least the second quarter of 2001. Over the course of 2000 and 2001, Symbol invoiced Reseller B for a total of $48 million in purported sales even though Reseller B's net worth was less than $2 million and its total sales in 2000 were approximately $18 million. To enable these orders to be released and invoiced, DeSantis pushed through unjustified increases to Reseller B's original $300,000 credit

limit. For example, the credit limit was raised from $2.5 million to $12 million on March 27, 2001, and then raised again two days later to $20 million. The credit limit was returned to $2.5 million on April 4, 2001, after the quarter had ended and Symbol had shipped -- and recognized revenue on -- orders totaling $16 million.

(c)     A third reseller ("Reseller C") whose credit limit never exceeded $300,000 placed quarter-end orders totaling over $10 million dollars in 2000 and 2001. Reseller C's president regularly received quarter-end calls from Borghese soliciting large orders where Borghese explained, in substance, that he was "short for the quarter" and "needed to make his numbers." Borghese agreed that Reseller C could return any product that it was unable to resell at no cost. In exchange for placing these orders, Reseller C also received compensation, in the form of cash credits, to cover the additional costs it incurred in storing excess amounts of Symbol product.

(d)     In 2000, Borghese convinced a small reseller ("Reseller D") that initially only placed orders to fulfill actual end-user orders to place large "stocking" or "inventory" orders that were not earmarked for any identified end-users. Borghese made the transactions risk-free for Reseller D by, among other things, granting the reseller unlimited return rights. Borghese also caused Symbol to compensate Reseller D for placing these orders, under the guise of "stocking" fees, rebates and price concessions. From March 2000 through March 2001, Symbol improperly recognized over $10 million in revenue on these "stocking" orders placed by Reseller D.

### Manipulating Receivables To Conceal Channel Stuffing

66.     Symbol's channel stuffing practices substantially increased the age of past due accounts receivable and, as a result, caused Symbol's DSO figure, which measures the average time it takes to collect payment, to balloon. A growing DSO figure is often a telltale sign that a company's receivables are impaired due to channel stuffing or other revenue recognition issues.

Symbol's DSO figures increased steadily in 2000 and then spiked dramatically in 2001, peaking at 119 days in the second quarter. Symbol took an $11 million charge that quarter attributed to "reduced collectability of accounts receivable." Without this charge, Symbol's DSO for that quarter would have been even higher.

67.       In the third quarter of 2001, Symbol's DSO figure dropped to 89 days. Jaeggi, DeGennaro and other defendants engineered this reduction by artificially reducing the amount of outstanding accounts receivable, principally through the undisclosed reclassification of trade receivables from channel partners into notes receivable. At a series of meetings in June 2001, Jaeggi and DeGennaro decided to reduce the DSO figure by requiring channel partners with large outstanding receivables to sign promissory notes for those amounts. DeSantis prepared a spreadsheet for these meetings that identified over $80 million in unpaid channel partner receivables and discussed the reasons for the "uncollectability" of those receivables with the others in attendance, which also included Borghese, Mortenson and Donlon. This document described receivables attributable to channel stuffing transactions with the South American distributor and domestic resellers who were well-known "Friends of Frank." At the meetings, Jaeggi and DeGennaro stated that the notes would change the obligation from a trade receivable to a note receivable and would not be included in the DSO calculation.

68.       Mortenson and other members of the sales and finance staffs obtained notes from resellers totaling more than $40 million. Although the notes were written to make it appear that there was an actual payment obligation, in many cases Symbol allowed the reseller simply to return the product in satisfaction of the note. At the direction of Jaeggi and DeGennaro, Korkuc then caused a reclassification entry to be made to the general ledger through the Tango sheet process converting over $30 million of trade receivables into notes receivable, which were then

excluded from the DSO calculation.  The sole purpose of this reclassification was to manipulate Symbol's DSO figure.

69.    In a conference call with analysts following the announcement of Symbol's results for the third quarter of 2001, Razmilovic touted the supposed reduction in DSO.  Neither Razmilovic nor Jaeggi disclosed the reclassification of receivables in the conference call or in Symbol's Form 10-Q for that quarter, which they both signed.

### Revenue Acceleration Schemes

70.    Burke, Borghese, DeSantis, Mortenson and Donlon also employed numerous schemes to accelerate revenue that should have been recorded in later periods, if at all.

### Recognizing Revenue Before Shipment

71.    Burke devised a fraudulent practice of recognizing revenue on purchase orders that were processed in one quarter but not shipped until the following quarter.  From the third quarter of 1999 through the first quarter of 2001, Symbol recorded revenue on orders when they attained "post goods issued" ("PGI") status on SAP, which indicated that the order was being processed by the factory but had not yet been shipped.  Because the shipments did not occur until the next quarter, the practice of accruing revenue based on an order's PGI status prematurely added revenue to Symbol's reported financial results.  Through this practice, Symbol improperly accelerated at least $24 million in revenue during the relevant period, in amounts ranging from $4.4 to $6.9 million per quarter.  This practice violated both GAAP and Symbol's stated revenue recognition policy, which provided that sales revenue was recognized when goods were shipped.

72.    After the end of the quarter, Donlon and his staff downloaded a report from SAP listing the orders in the PGI category and provided the report to others in sales finance.  Using Donlon's report, Mortenson and his staff then made manual journal entries to the general ledger

recording revenue in the total amount of the PGI orders. When making these entries, Mortenson

falsely described the transactions on the journal entry input sheets. For example, on the input

sheet for the first quarter of 2000, Mortenson described the entry as related to "bill and hold"

sales even though he knew that the product was not being held at the customer's request and

would be shipped out early the next quarter. In a true "bill and hold" sale, revenue may properly

be recognized before shipment occurs if, among other requirements, the purchaser asks the seller

in writing to hold the product temporarily for genuine business reasons and agrees to take title,

and pay for the product, before shipment.

73.     After the first quarter of 2001, some of the defendants attempted to conceal the

PGI scheme by obtaining letters falsely reciting "bill and hold" terms from the customers whose

orders were included in that quarter's PGI download. At a Tango sheet meeting in April 2001,

Korkuc explained to Razmilovic and Jaeggi that the prior quarter's results included $6.4 million

in PGI revenue on goods that had not been shipped before the end of the quarter. Razmilovic

and Jaeggi decided that the sales group should get so-called "bill and hold" letters to make the

PGI revenue falsely appear to be the result of legitimate "bill and hold" transactions. By then,

Symbol had already shipped the goods.

74.     Borghese and DeSantis directed the effort to obtain phony "bill and hold" letters,

with the active involvement of Donlon, Mortenson and others. They told the customers that

Symbol's auditors needed the letters and asked the customers to backdate the letters to March

2001. They eventually received backdated letters from at least seven customers whose orders

had been among the largest on the PGI download. Although these letters all bore a March 2001

date, the customers did not sign and return the letters to Symbol until months later. In one case,

Borghese effectively extorted the backdated letter from a reseller that initially had refused to

32

cooperate. He withheld a marketing fee that was due to the reseller until it signed and delivered the letter.

75.    In the first and second quarters of 2001, Burke also directed operations personnel to accelerate revenue on so-called "drop shipments." In these instances, Symbol prematurely invoiced customers for product that was supposedly shipped to the customer that quarter by Symbol's third-party manufacturer. In fact, the shipments did not occur until the next quarter. In one instance, Symbol invoiced a reseller for a drop shipment when the product had not yet been assembled. On this invoice alone, Symbol improperly recognized $4.8 million of revenue in the first quarter of 2001. Burke directed Mortenson to record a 30% profit on the transaction. The reseller received a full credit in the next quarter.

### Making Premature Shipments

76.    Toward the end of most quarters, Donlon and his staff engaged in another form of what he coined "bowling for dollars," by generating lists of orders scheduled for shipment early in the next quarter. At Borghese's direction, Donlon and his staff employed various tactics to "pull in" these orders to the current quarter so that revenue could be recognized in that quarter. At times, the customer agreed to accept an early shipment, but at other times, Donlon had the product shipped prematurely to customers who had not given their consent or had not even been consulted. In order to release the product for early shipping and generate the desired invoice date, Donlon and his staff altered the requested ship date previously entered in SAP.

77.    Some customers acquiesced in the early shipment (aided sometimes by price and other incentives), but more often the customer reacted with anger and returned the product. Despite the adverse impact on customer relations, Borghese and others jokingly referred to these as "boomerang transactions." For example, Symbol nearly lost a large end-user customer with

an unwanted early shipment made for the sole purpose of improperly accelerating revenue from 2001 to 2000.  In December 2000, Borghese directed his staff to ship $3.5 million in product to the customer even though the customer had expressly advised the sales staff that it did not need, and did not want, the product until the third quarter of 2001.  The customer promptly returned the premature shipment and later threatened to sever its relationship with Symbol.

78.     At other times, Borghese and Burke directed Donlon and his staff to ship the product on what they called a "slow boat" or a "slow truck" to ensure that the product, though shipped and invoiced in the current quarter, arrived closer in time to the requested date in the following quarter.  Donlon accomplished this by using ground freight or a local carrier rather than the overnight delivery service called for by the sales contract.  On some occasions, the local carrier picked up the product in one quarter and held it well into the next quarter period before forwarding it to the customer via an overnight service.

79.     Borghese also "parked" product with resellers to accelerate revenue on sales to end users when the product the end user wanted was not yet available or the end user was not yet ready to accept shipment.  For example, Borghese directed a $3 million shipment to a reseller in December 2000 of product designed for an end user that did not need the product until March 2001.  Borghese directed this premature shipment without the reseller's advance knowledge or consent.  After the reseller complained about trucks unloading Symbol product at its warehouse, Borghese told the reseller that it did not have to pay Symbol until the end user paid.  The reseller acquiesced.

80.     Donlon played a key role in a similar transaction on which revenue was recorded in the second quarter of 2000.  To recognize revenue that quarter, Donlon and others arranged a $3.8 million shipment to a reseller at the end of June 2000, because the version of a product that

an end user planned to purchase was not due to be ready until July 2000. Donlon and the others arranged for the reseller to order an equivalent amount of the existing version of the product in June 2000 with the understanding that the reseller's order would be cancelled and replaced by a genuine order from the end user in the following quarter for the newer version.

## Deliberately Shipping Incorrect Product

81.     On occasions when the ordered product was unavailable, Donlon and his staff, acting at the direction of Borghese and Burke, deliberately shipped the wrong product without the customer's approval and manipulated the accounting system to capture the revenue that quarter. To enable the invoice to be generated -- and revenue to be recognized -- Donlon and his staff did one of two things. They either altered the order information on SAP to reflect product that was available or they improperly "cycled" excess inventory into the system as the ordered product. When the desired product later became available, Donlon processed a "zero dollar" return of the unwanted product, which left the original transaction intact and caused the expense associated with the return not to be recognized. In some cases, the unwanted product was more expensive than the ordered product. In those cases, Donlon manipulated the accounting system to keep the total price of the order the same, thereby reducing Symbol's actual profit.

## Recognizing Revenue On Shipments Between Symbol Facilities

82.     Symbol also improperly recognized revenue before the goods were shipped to the customer and while Symbol still retained the risks of ownership. Under GAAP, delivery of goods to the buyer generally must take place for revenue to be realized or realizable and earned. If delivery to the buyer has not occurred, revenue still may be recognized, but only where, among other things, the risks of ownership have passed to the buyer. The risk of loss is one of the prime indicia of ownership. During the relevant period, Symbol recognized revenue on large

transactions with end users as soon as the goods were shipped to an interim Symbol location known as a staging area even though Symbol retained the risk of loss until the end user received the product. Mortenson and Donlon approved or arranged some of these transactions, and Jaeggi knew that Symbol routinely recognized revenue upon shipment to its staging facilities without regard to whether the customer had assumed the risk of loss.

83. Symbol often had to perform what were called "staging" services for a customer before the product was ready for use. Symbol performed these services, such as the loading of software and other customer-specific product configurations, at its own staging facilities, and the cost was usually included in the price of the product. Although Symbol typically invoiced the customer upon shipment to the staging facility, some customers declined to assume the risks of ownership until they received the product and were not obligated to pay until final installation. With large orders requiring significant work, the staging process often continued into the next quarter. In such cases, Symbol artificially treated title to the goods as if it were a matter separate from risk of loss in order to circumvent revenue recognition rules and make it falsely appear that the sales process was complete in the quarter in which the product was sent to staging. Symbol also took advantage of the staging process to facilitate premature and incorrect shipments.

84. In one "boomerang" transaction, Symbol induced an end user to advance a $1 million order to the fourth quarter of 2001 even though the customer did not need the product until 2002. The order required extensive staging. In December 2001, Symbol shipped the goods to one of the customer's stores that was located near a Symbol staging facility. Two weeks later, in January 2002, the customer shipped the goods to the staging facility at Symbol's expense. A side letter, labeled a "storage agreement," expressly provided that Symbol would bear the risk of loss while the product was at the staging location. At this time, Mortenson was responsible for

reviewing and approving revenue recognition on all sales over $500,000, and he approved this transaction despite knowing its true terms. Even after internal auditors detected the transaction, DeGennaro and Mortenson refused to reverse the revenue, and instead added the transaction to Symbol's so-called "credit memo" reserve.

85.     In September 2000, Donlon capitalized on the fact that a $6 million order for another large end user required staging in order to ship incorrect product without the customer's knowledge and recognize revenue that quarter. Because the product ordered by the end user was not yet available, Donlon directed an order administrator to access SAP to change the product specified in the order to whatever product was available for immediate shipment. Donlon then had the incorrect product shipped to a staging facility, where it remained until the correct product became available. Donlon then had the products swapped, and the correct product was staged and shipped to the end user in the next quarter.

### Manipulating Product Returns And Credits

86.     The revenue recognition schemes led to large and frequent returns accompanied by customer credit requests. Borghese and his staff used their control over the processing and crediting of product returns to further manipulate the financial reporting process. Together with others, Donlon enforced a virtual ban on returns and credits in the first and last two weeks of a quarter.

87.     At Borghese's direction, Donlon issued a memorandum in April 2000 instructing TASS executives that, absent prior approval by sales finance, "[t]here will be no processing of credit requests or return authorizations on the last two days and the first two days of a month, and the last two weeks and the first two weeks of a new quarter." Borghese insisted that Donlon and others carefully manage the issuance of credits, which reduced net income, to ensure that

they did not interfere with earnings targets at the last minute.  They deferred processing returns and credits during the first two weeks of a quarter to avoid raising "red flags" for auditors.  As a practical matter, this blackout period often lasted much longer, and Donlon sometimes delayed credits for months.  Razmilovic was also aware of and encouraged this practice, and he once told Donlon not to process any returns at all in a certain quarter.

88.     In a related effort to avoid issuing suspect credits that could attract attention in audits or quarterly reviews, Symbol cancelled numerous invoices.  In July 2001, for example, DeGennaro directed information technology personnel to delete invoices from SAP that had been issued and recorded in the prior quarter.  These invoices totaled approximately $40 million.  Mortenson was also involved in some of the cancellations.  Many of the deleted invoices related to channel stuffing and other improper transactions.  Because these invoices were deleted before the books were closed for the prior quarter, the revenue was not recognized, but no credits were ever issued.

**Fraudulent Manipulation Of Inventory Levels**

89.     Unusually high inventory levels were another consequence of Symbol's efforts to fabricate and accelerate revenue.  The high level of returns threatened to increase inventory totals and reduce Symbol's inventory turnover ratio, which measures how quickly inventory is sold and is considered indicative of a company's overall financial health.  In most cases, a higher turnover ratio is more favorable.  In 2000 and 2001, Jaeggi, Burke, DeSantis and others engaged in a host of fraudulent schemes to suppress Symbol's reported inventory levels.

90.     In the fourth quarter of 2000, Jaeggi and Burke formed and led an "Inventory Reduction Team" that met regularly to devise and implement methods artificially to reduce inventory.  To facilitate these efforts, DeSantis and his staff prepared a written "Inventory

Reduction Plan" that identified many of the improper practices they employed to manipulate inventory levels. These practices were discussed at the meetings and included the following:

(a)      The warehouse personnel received a "hot list" of materials that were needed to fill quarter-end orders. Unless they were needed for quarter-end shipments, returned goods and new supplies were purposely left on the receiving docks and not scanned into inventory until the next quarter. In some instances when customers tried to make returns during the "blackout" period, trucks carrying unneeded product were turned away or parked off-site until the quarter ended. DeSantis' written plan indicated that operations would "[l]imit material receipts to only those items that are required for Q4 revenue (12/18-12/31)."

(b)      Accounts payable personnel were directed to delay recording invoices from suppliers of inbound materials that were being shipped "F.O.B. Origin" -- meaning that Symbol took title and assumed risk of loss when the shipment left the supplier's facility -- until the following quarter.

(c)      The value of inventory that was set aside for inspection by Symbol's Materials Review Board ("MRB"), a quality control procedure, was improperly reduced to zero, and DeSantis directed that parts awaiting MRB review either be sent back to the vendor or released immediately for use in filling orders.

(d)      At Burke's direction, operations personnel made entries in SAP that lowered inventory by making it appear that certain inventory had been returned to the vendor when, in fact, the inventory was still in Symbol's possession. In June 2001, these phantom return entries artificially reduced Symbol's reported inventory by $5.1 million. Those entries were reversed in the next quarter.

91.     Another manifestation of these schemes was a fictitious accounting entry that reduced inventory by $32 million as of December 31, 2000.  In January 2001, an operations employee reversed an earlier, and appropriate, entry in that amount to accrue for inventory in transit as to which Symbol had already assumed title and risk of loss.  The reversing journal entry falsely states that it was made because "mat[eria]l [was] not shipped."  The employee made this entry because Burke and DeSantis instructed him to reverse every accrual for inventory that had not yet been scanned into SAP, without regard to whether Symbol had nevertheless received or otherwise taken title to the material.

92.     Burke also engineered transactions with third parties to manipulate reported inventory levels.  For example, Burke and another executive caused Symbol to enter into two agreements with a local vendor on December 29, 2000.  In one agreement, Symbol purportedly sold approximately $9 million in inventory to the vendor.  In the second agreement, Symbol undertook to "repurchase" the inventory after a few months and retained the risk of loss.  Burke signed both agreements.  Symbol did not record revenue on the supposed sale and the inventory never left Symbol's facilities.  However, Symbol recorded the transaction as a reduction to inventory and an increase in receivables.  In or around April 2001, Symbol "repurchased" the inventory from the vendor and it again became part of Symbol's reported inventory.  Symbol paid the vendor a fee based on how long it was carried on the vendor's books.

**Fraudulent Restructuring Charges And "Cookie Jar" Reserves**

93.     Jaeggi, Burke, DeGennaro, DeSantis and Dean repeatedly manipulated Symbol's non-recurring charges and reserves to improperly reduce operating expenses and further inflate earnings by creating "cookie jar reserves" for use in later periods.  During 2000 and 2001, they overstated and misused one-time charges purportedly taken by Symbol to:  (a) account for costs

associated with a corporate acquisition; (b) write off obsolete inventory; and (c) account for a transfer of manufacturing operations to new facilities. These bogus charges furthered the fraud because, among other things, Symbol's press releases announcing quarterly earnings, and the targeted earnings estimates, excluded non-recurring charges.

### Manipulation Of The Acquisition Charge

94.     In December 2000, Symbol recorded $185.9 million in charges in connection with the acquisition of Telxon Corporation ("Telxon"), a competitor, to account for a restructuring of operations, impairment of assets and merger integration costs. Although he had just recently joined Symbol, DeGennaro directed the accounting for the Telxon merger. The $185.9 million in charges included: (a) a $146.7 million restructuring charge attributed to workforce reduction, asset impairment and lease termination costs; and (b) $39.2 million attributed to integration costs, consisting primarily of professional service and consulting fees and similar expenses. These amounts were inflated, because DeGennaro, Burke and Dean used the Telxon charge to reduce current and future operating expenses by including unrelated and, in some cases, fictitious or prospective expenses in violation of GAAP.

95.     Pursuant to GAAP in effect at the time, a company could recognize restructuring and other expenses associated with the elimination and reduction of business units at the time the decision is made to restructure operations, and before the expenses are incurred, if two basic requirements are met. First, before the end of the reporting period at issue, management having a sufficient level of authority must commit the company to a restructuring or exit plan that "specifically identifies all significant actions to be taken to complete the exit plan" and includes a timetable indicating that significant changes to the plan are not likely. Second, the recognized costs must not be associated with the generation of future revenue and must not have future

41

economic benefit. The Telxon charge did not meet either requirement. Symbol lacked a written restructuring plan that met these standards, and the charge included numerous unrelated items in contravention of the second principle.

### Inclusion Of Fictitious Severance Expenses

96.     The $146.7 million restructuring component included a $14.1 million charge attributed to workforce reduction costs purportedly arising from the planned termination of 225 employees as a result of the merger. This severance charge was fraudulent, because most, if not all, of the employees included in the charge were either previously terminated for other reasons or were not being terminated at that time. To justify the charge, Burke, DeGennaro and Dean created and purported to rely on bogus severance letters that were backdated to December 31, 2000 and never distributed to the named employees. Those employees had not been identified and notified of their termination benefits as of December 31, 2000, as required by GAAP.

97.     On multiple occasions, Dean reminded DeGennaro and Burke, both orally and in writing, that GAAP required that employees to be terminated as a result of the merger had to be given notice by the end of the year for the severance costs to be included in the restructuring charge. DeGennaro, Burke and Dean knew that such notice was not given before the end of the year. Burke and Dean therefore directed human resource personnel to fabricate and backdate over 200 form severance letters for Burke to show to the Auditor. DeGennaro knew about and approved their use of these bogus severance letters to support the charge.

### Inclusion And Misuse Of Unrelated Inventory Charges

98.     DeGennaro also buried unrelated inventory charges in the Telxon restructuring charge. According to Symbol's Form 10-K for 2000, the restructuring charge included a $63.9 million write-off "relating to management's decision to eliminate redundant and discontinued

products and product lines principally due to the Telxon acquisition." This inventory impairment charge was overstated because at least $23 million of the charge related to products that were discontinued for other reasons and inventory that had become obsolete in the ordinary course of business. Under GAAP, Symbol was required to recognize these costs as ordinary operating expenses in the period in which they were incurred. In addition, DeGennaro directed Dean to conceal $1.8 million of routine inventory charges in the $14.1 million severance charge.

99.     DeGennaro also used a portion of the $63.9 million inventory impairment charge as a "cookie jar" reserve. DeGennaro authorized the operations group to use up to $40 million of that charge for future inventory write-offs, and he retained control over the balance for future use as an impermissible "corporate" reserve. After December 2000, Symbol improperly charged $27 million against the "operations" portion of this reserve for obsolete inventory costs that had nothing to do with the Telxon merger, including $22.5 million of inventory that was not even included in the Telxon restructuring charge. In the first quarter of 2001, Symbol also reduced the "corporate" reserve by $5 million. DeGennaro directed this adjustment to boost earnings.

100.     DeGennaro later directed Dean to make false statements to the Auditor about the use of this corporate "cookie jar" reserve. When Dean gave DeGennaro a schedule intended for the Auditor that showed the true use of the reserve, DeGennaro directed Dean in an email to falsify the schedule to "show the utilization of all inventory to" a company that often bought scrap from Symbol and to "foot the schedule" -- *i.e.* reduce the account balance -- "down to a couple [of] hundred thousand dollars." Although Dean knew that the reference to the scrap sale was fiction, he made those changes. The original version of the schedule showed the $5 million "corp[orate] "adjustment" that DeGennaro made to boost earnings in the first quarter of 2001 and a balance of $20.8 million. The sanitized version hid the corporate adjustment under the label

"scrap" and showed a $20.2 million scrap sale in April 2001, leaving a purported balance of $426,130. At DeGennaro's direction, Dean gave the sanitized schedule to the Auditor.

### Other Improper Asset Impairment Charges

101.    DeGennaro, Burke and Dean improperly included other asset impairment charges that were unrelated to the merger, including a $2.3 million charge pertaining to a facility that purportedly was to be abolished in connection with the merger. At the time of this charge, Symbol had no plan to vacate the facility. In fact, Symbol is still using the facility.

### Unrelated Costs Added To The Integration Charge

102.    The $39.2 million merger integration component of the Telxon charge also included a number of costs that were unrelated to the merger or were incurred after December 2000. The integration charge improperly included the following items: (i) $10 million in annual performance bonuses paid to Symbol personnel, which GAAP required Symbol to record instead as operating expenses; (ii) $11.8 million in consulting fees for work that either began in 2001 or was never performed; and (iii) $4.25 million in investment expenses and related fees paid in connection with investment strategies implemented after the merger.

### Manipulation Of The June 2001 Inventory Write-Off

103.    In the quarter ended June 30, 2001, Symbol recorded a one-time charge of $110 million purportedly to write off inventory consisting of "radio frequency infrastructure" and related "raw materials," commonly known within the company as "palm and radio" inventory. According to the Form 10-Q, the "write down was recorded as a result of lower demand" for these products and "technological obsolescence due to planned introductions" of newer versions. These statements were false and misleading, as the amount of the charge was purposely inflated to create opportunities for earnings manipulation. Jaeggi and DeGennaro dictated the amount of

44

the charge without regard to proper accounting methodology in order to provide a cushion for future operating expenses and create "cookie jar" reserves. At least $30 million of the charge was not even related to "palm and radio" inventory.

104.    DeGennaro directed Dean to calculate the write-off in a manner that matched the predetermined amount. Dean originally calculated an $80 million markdown for the inventory and was unable to justify a higher amount. Jaeggi and DeGennaro, however, demanded that the write-off be $110 million. DeGennaro instructed Dean to arrive at the desired result by adding $30 million to the write-off in a manner that lacked a factual basis and which they both knew was contrary to GAAP.

105.    Contrary to its stated purpose, the charge was used as a general reserve for excess and obsolete ("E&O") inventory in violation of the prohibition against general reserves, and the excess amount was used as a "cookie jar" reserve to increase earnings. Of the $50 million that Symbol recorded against the charge through September 2002, approximately $15 million related to entries that had nothing to do with palm and radio inventory. These unrelated entries included an improper $5 million "reclassification" entry that Dean made at DeGennaro's direction at the end of 2001, which became part of the $16.5 million Tango sheet adjustment described above in paragraph 40(f).

106.    In September 2002, Jaeggi transferred $55 million of the remaining balance into an inventory reserve unrelated to palms and radios, with the untenable justification that reserves are fungible. After DeGennaro was fired in September 2002, Symbol concluded that the palm and radio reserve was overstated by $55 million and that the E&O reserve was understated by $48 million. In its Form 10-Q for the third quarter of 2002, Symbol adjusted these accounts by

reversing $55.2 million of the remaining palm and radio reserve and recording a $48.5 million charge to increase its E&O inventory reserve.

### Fabrication Of The September 2001 Restructuring Charge

107.    In the third quarter of 2001, DeGennaro also used a fraudulent restructuring charge to conceal operating expenses, create a cushion for future costs and manage earnings. According to the Form 10-Q, Symbol recorded a $59.7 million charge that quarter related to the transfer of manufacturing operations to foreign locations. This statement was false and misleading, and the charge violated GAAP in several ways. Symbol never established the requisite restructuring plan, and the charge consisted almost entirely of expenses that were either fictitious or unrelated to the transfer of manufacturing operations.

### Fictitious Severance Expenses

108.    The restructuring charge included $11 million attributed to severance expenses that purportedly related to the termination of 375 manufacturing and other employees. Of this amount, $8 million was attributed to direct termination costs and $3 million was allocated to outplacement costs. These amounts were false and lacked any factual basis, because DeGennaro rigged the accounting "analysis" to arrive at a predetermined result.

109.    In October 2001, DeGennaro directed a human resources executive to calculate severance costs based on the hypothetical termination of randomly selected operations personnel. No determination had yet been made to terminate the employees used in this calculation, and no such communication was made to any of them before October 2001. This calculation yielded a severance cost of only $2.8 million, and DeGennaro told the human resources executive that he wanted the charge to create an $8 million reserve. DeGennaro then instructed the executive to recalculate the cost without regard to the employees' actual length of service and pretend instead

that all of them had been at Symbol long enough to receive maximum severance benefits. This

fictitious amount turned out to be $7.3 million. To pump that figure up to the desired $8 million,

DeGennaro factored in unrealistically generous outplacement services and increased the number

of employees in his hypothetical sample. At the end of the process, DeGennaro told the human

resources executive to discard his copy of the relevant file.

### Fraudulent Asset Impairment Charges

110.    DeGennaro also included $16.2 million in charges that he falsely attributed to the

disposition of two leased properties and one owned property. To further inflate the restructuring

charge, DeGennaro arbitrarily wrote off 75% of the value of these properties. This write-off was

improper because, as DeGennaro knew, at the time the charge was recorded, a plan for disposing

of the facilities had not been established and a plan to vacate the facilities had not been adopted.

In fact, no decision to exit the leased properties was made until later in 2001 or early 2002, and

Symbol still occupies the owned property.

111.    DeGennaro also improperly included a total of nearly $30 million in charges

related to various inventory assets, including $14 million relating to the palms and radios that

were purportedly written off in June 2001. As DeGennaro knew, these inventory charges were

unrelated to a transfer of manufacturing operations, and they were not supported by the requisite

impairment analysis. In fact, Symbol still uses many of the assets that DeGennaro included in

this inventory charge.

### Other Charges Unrelated To Restructuring

112.    In addition, DeGennaro improperly included a host of miscellaneous charges

totaling $7.7 million. As DeGennaro knew, these charges included additional inventory that

became obsolete in the ordinary course of business and other items that had nothing to do with a

transfer of operations.  In fact, virtually none of the $59.7 million charge created by DeGennaro related to the restructuring described in Symbol's periodic reports.  Symbol later used at least $7 million of the excess reserves created through this charge to cover additional unrelated expenses, such as Borghese's termination in November 2001.

113.   At DeGennaro's direction, Dean made some of the improper entries described above in paragraph 112.  Dean knew that those entries violated GAAP.

### The Fraudulent Operations Reserve

114.   DeGennaro, Burke and Dean used their control over the operations group's books to create a fraudulent "cookie jar" reserve in an operations account that they strategically used to boost quarterly earnings.  They concealed surpluses in operations in an inventory reserve account known as "Account 9106."  When quarterly expenses in operations were lower than the forecasted amount, DeGennaro and Burke directed Dean to inflate accrued expenses and credit the surplus amount to this account.   DeSantis also participated in this practice when he served as director of operations finance.  In this way, these defendants gradually amassed cost accrual cushions that were drawn down to offset poor financial results in later quarters.  For example, Razmilovic, Jaeggi and  DeGennaro used $10 million from Account 9106 to inflate reported earnings in the fourth quarter of 2001 through the fraudulent Tango sheet adjustment described above in paragraph 40(f).

### Fraudulent Accounting Practices In The Service Division

115.   While serving as Director of Customer Service Finance, Heuschneider employed numerous improper practices to inflate Symbol's service revenue and earnings.  In both 2001 and 2002, Symbol initially recorded over $160 million in customer service revenue.  During those

48

years, Heuschneider used his control over the customer service division's financial reporting functions to overstate revenue and understate expenses.

116.    Under both GAAP and Symbol's stated policy, repair and maintenance services provided under a service contract are required to be recognized over the life of the contract. A portion of the contract's value could properly be recognized as revenue each month, with the remaining portion treated as deferred revenue. Symbol used a separate system to track service contracts that automatically calculated the amount of revenue earned that month for each contract and the amount that should remain deferred. Because this system was not linked to SAP, customer service personnel were required to make manual entries to recognize revenue. Heuschneider directed subordinates to make manual entries to SAP that improperly recognized deferred revenue before it had been earned or that artificially increased revenue in other ways.

117.    In December 2001, Heuschneider directed a subordinate to make an entry that improperly shifted $3 million from a deferred revenue account to a recognized revenue account. In March 2002, Heuschneider again directed the subordinate to book an improper entry to inflate revenue by nearly $3 million. In June 2002, Heuschneider directed the subordinate to make an improper entry that inflated service revenue by $5.5 million that quarter. In each instance, there was no support at all for the entry and Heushcneider misrepresented the reason for the entry to the subordinate.

118.    In some cases, Heuschneider manipulated the computer system so that the full amount of a contract was falsely deemed payable in the first month. In other cases, he falsely billed a contract customer on a time-and-material basis, because the computer system recorded all the revenue up front when repair work was performed and billed on that basis. In December 2001, he fraudulently booked nearly $2 million in revenue through these means.

119.    Heuschneider also repeatedly directed employees to renew and bill for service contracts without a purchase order or any other form of customer authorization.  For example, he used data from cancelled or expired contracts that Symbol inherited from Telxon to unilaterally "renew" those contracts without the customers' consent.  He told employees to copy the product serial numbers, pricing and other data into new contracts.  Heuschneider then issued invoices to the former Telxon customers, and improperly recognized revenue, on the basis of the fabricated contracts.  Automatic contract renewal violated stated company policy absent some indicia of customer assent, and most of the former Telxon customers later complained and received credits.

120.    In 2002, Heuschneider also boosted net earnings by improperly deferring over $4 million in costs associated with his department's excess and obsolete inventory.  Heuschneider failed to accrue for the cost of scrap and other worthless inventory for the entire year, because the charge would increase cost of sales and reduce the division's net income.  In June 2002, he further reduced operating expenses by $3 million by improperly depleting an already deficient inventory reserve account.

121.    In addition, Heuschneider used junk material to fabricate inventory for the 2002 physical count.  Inventory that he was carrying on the books at $4 million had inadvertently been discarded and, although it was scrap whose value was vastly overstated, he did not want anyone to know that inventory valued at $4 million no longer existed.  He directed warehouse employees to find random junk to replace the discarded inventory.  The random junk was then mixed with functional parts placed at the top of each crate to conceal the true contents.  Heuschneider then attributed a $4 million value to this "new" inventory by selecting the most expensive part in each crate and valuing each crate as if it contained only those parts.

## THE MANIPULATION OF STOCK OPTION EXERCISE DATES

122.    In addition to the fraudulent accounting practices, Goldner devised and directed a

fraudulent practice in the administration of Symbol's executive stock option program.  Without

board approval or public disclosure, Goldner ignored the written terms of the stock option plans

to enable select senior executives, including himself, to profit unfairly at company expense when

acquiring stock through option exercises.  The relevant option plans, as disclosed to the public,

provided that option exercises occurred on the date that notice of the intent to exercise and full

payment for the exercise were both transmitted to the company.  Instead, Goldner defrauded

Symbol's shareholders by calculating the cost of the exercise in accordance with a date, chosen

from among the preceding 30 days on the basis of the market price, that was more advantageous

to the executive than the actual exercise date.  To create the false appearance that these exercises

actually occurred on the selected dates, Goldner's staff, at his direction, backdated the requisite

transactional documents and used the phony exercise dates in the forms on which the executives

reported their acquisitions to the Commission and the public.

123.    Goldner employed this so-called "look-back" practice with the two methods used

at Symbol for exercising executive stock options when the executive held the stock he acquired.

An executive could pay Symbol for the option cost and taxes with cash or with shares of Symbol

stock.  The latter method was known at Symbol as a "stock swap."  In a "stock swap" exercise,

the number of shares needed to pay for the option cost and taxes was determined by dividing the

total cost by the closing market price of the stock on the exercise date.  A higher market price

meant that the executive needed to use fewer shares to pay for the exercise.  Whether payment

was by cash or stock, a taxable gain occurred and was measured by the difference between the

option exercise price and the closing market price on the exercise date. A lower market price reduced the executive's tax liability and was therefore advantageous when cash was used.

124.    To exercise an option using these two methods, the applicable stock option plans required the executive to provide Symbol with written notification of the intent to exercise a specific number of options and tender full payment of the exercise cost, either in cash or stock. In a stock swap, payment could be made by delivery of endorsed stock certificates or irrevocable instructions to deliver stock certificates to Symbol. Under the Plan, the exercise was effective when Symbol received both the notice and payment. The executive's delivery of the requisite documents and tender of payment constituted his or her irrevocable election to exercise. As defined in the plans, the exercise date was the date on which Symbol received the last of the necessary documents and payment.

125.    The vast majority of the stock options that were exercised using the "look back" practice during the relevant period were granted under Symbol's 1997 Employee Stock Option Plan ("Plan"). Goldner began the "look back" practice before 1997, but the relevant provisions of prior executive stock option plans were identical. According to the Plan, the compensation committee of the board of directors had full authority to interpret and implement the terms of the Plan and, subject to certain limitations, determine the terms of options awarded under the Plan.

126.    Symbol's shareholders approved the Plan and later amendments. Goldner signed and participated in the preparation of each of the proxy statements used to obtain shareholder approval. Symbol filed the original proxy statement on March 11, 1997, and three other proxy statements were filed in conjunction with amendments to the Plan on the following dates: May 10, 1999, April 5, 2001 and May 21, 2001. In addition to setting forth or summarizing the terms of the Plan, Goldner represented in the proxy statements that Symbol's officers complied with

the requirements of Form 4 -- on which officers were required to disclose transactions in Symbol securities -- and other reporting requirements of Section 16(a) of the Exchange Act.

127.    The full text of the Plan, as amended, was also attached as an exhibit to two of Symbol's registration statements on Form S-8, filed on May 10, 1999 and November 13, 2001, and was incorporated by reference in Symbol's annual reports on Form 10-K for 1998 through 2001.  Both registration statements included legal opinions signed by Goldner as exhibits and stated that he reviewed all legal matters affecting the offered securities.  In both legal opinions, Goldner represented that, among other things, he prepared or examined the registration statement and its exhibits, which included the Plan.  Goldner also participated in preparing the registration statements and the annual reports and transmitted them to the Commission for filing.

128.    Goldner did not disclose the existence or impact of the "look-back" practice in any of the public documents described above in paragraphs 125-127.  As a result, each of those documents, and Goldner's statements in those documents, were materially false and misleading.

129.    Goldner developed the practice of selecting an exercise date that was earlier, and more advantageous, than the actual exercise date as a favor to a select group of officers and other senior executives.  To reduce either the number of shares that these executives had to tender in a stock swap or the amount of their liability in a cash purchase, Goldner directed his staff to use an exercise date from as far back as thirty days before the executive expressed a desire to exercise options.  In most instances, the executive received an exercise date with either the second highest or the second lowest market price during the "look-back" period.  On some occasions, however, Goldner gave Razmilovic the best price.  When ordinary employees and executives outside this select group exercised options, Goldner applied the written terms of the Plan.

130.    Goldner and the other executives benefited from the "look-back" practice at the shareholders' expense.  In the case of stock swaps, the executives paid less consideration to Symbol than they would have if the exercise had been handled in accordance with the Plan.  In the case of cash purchases, the use of an artificially lower market price reduced the company's tax deduction for the exercise, which is identical to the amount of the executive's taxable gain.  It also rendered the company liable as the primary obligor for the additional amount of tax that it did not collect from the executive as result of the improper reduction in the executive's tax liability.

131.    In addition, Goldner often permitted long delays in payment by the executives.  While some delay between the phony exercise date and the true payment date was inherent in the "look-back" practice, Goldner condoned situations where, for example, the executive did not pay Symbol for a cash purchase until long after he received his stock certificates.  In either scenario, the executive's failure to pay for the exercise on the "exercise" date was tantamount to receiving an undisclosed, interest-free loan from Symbol.

132.    Goldner's staff prepared the requisite transactional and legal documents for the executives, and he had his staff backdate those documents to conform to the fake exercise date.  Thus, the executive's exercise notice and either his check or, in the case of a stock swap, the instructions to the transfer agent bore the phony exercise date, and not the later date on which the documents were actually signed and transmitted.  In addition, the executives' Forms 4 recited the bogus exercise date.  Goldner supervised the preparation of the Forms 4, and they were filed with the Commission under his signature.

133.    Goldner continued the "look-back" practice until the Sarbanes-Oxley Act of 2002 was enacted into law on July 30, 2002.  The legislation's new two-day deadline for filing Forms

4 and the prohibition on company loans to officers and directors rendered the practice unfeasible. Under prior law, Forms 4 could be filed as late as the tenth day of the month following the month in which the transaction occurred.

134.    In addition to improperly benefiting certain executives at shareholder expense, Goldner's regular use of the fraudulent "look back" practice caused Symbol to misstate stock option expenses by material amounts in violation of GAAP. In its recent restatement, Symbol retroactively applied variable plan accounting, as required by GAAP, to all options affected or potentially affected by the prior availability of this practice. As a result, the restatement includes a cumulative net increase of $229 million in stock option expenses from 1998 through July 30, 2002.

135.    Goldner himself used the improper "look back" practice when exercising options, including the following transactions:

(a)    On August 28, 2000, Goldner filed a Form 4 stating that on August 11, 2000, he acquired 50,000 shares of Symbol stock through an option exercise. In fact, the exercise did not occur until much later, when the market price was more than 15% higher. The exercise notice, wire transfer instructions and transfer agent instructions were all dated August 11, 2000. He did not receive the shares, however, until August 23, 2000, and the funds used to pay Symbol were not wired from his bank account until September 29, 2000. On August 11, 2000, Symbol stock closed at $37.06 per share, the second lowest price that month. On August 23, 2000, the stock closed at $43 per share. By treating the exercise as though it occurred on August 11, 2000 rather than on August 23, 2000 or thereafter, Goldner artificially reduced his taxable gain by at least $297,000. Goldner also profited by, in effect, obtaining an interest free loan from Symbol for 36 days in the amount of $845,802, the amount of the option exercise cost and related taxes.

(b)     On August 9, 2002, Goldner filed a Form 4 stating that he acquired 75,000 shares of Symbol stock by exercising options on July 11, 2002. The option exercise, as defined in the Plan, did not occur until more than two weeks later, when the price was over 35% higher. The exercise notice, transfer agent instructions and the two checks used by Goldner were all dated July 11, 2002. Symbol's files for this transaction also contain a printout dated July 17, 2002 showing Symbol stock price data for the prior 30 days. This printout shows that the July 11, 2002 closing price ($6.90) was the second lowest during that period. Symbol did not receive Goldner's checks until July 29, 2002, when the stock closed at $9.35 per share. By using the July 11 closing price instead of the July 29 price, Goldner artificially reduced his taxable gain by $183,750.

## FURTHER MISCONDUCT DURING THE INVESTIGATION

136.    Jaeggi, DeGennaro and Mortenson took steps both to cover up the fraud and interfere with government and internal investigations. Their efforts included lying to internal investigators, destroying and withholding documents and sanitizing reports prepared for internal investigators. These efforts substantially delayed the Commission's investigation in this matter. In addition, Mortenson manipulated the books for the fourth quarter of 2002 after significant elements of the fraud had already been exposed and new management was in place.

137.    After the Commission began its investigation and while outside counsel was conducting an internal investigation for the company, Jaeggi instructed Korkuc to collect and destroy the Tango sheets and other sensitive documents, and to instruct others to do the same. Korkuc relayed these instructions to other employees involved in the Tango process, resulting in the destruction of some of the Tango sheets.

138.   DeGennaro made numerous attempts to derail the investigations. Together with others, DeGennaro sanitized key portions of schedules that an employee had prepared to assist investigators. The schedules reflected a reconciliation analysis of manual adjustments to revenue in 2000 and 2001, and included the improper entries through which Symbol recognized "PGI" revenue. At the direction of DeGennaro, Korkuc and Mortenson, the employee created revised summaries of the schedules in which these entries did not appear at all or were falsely attributed to "bill and hold" transactions.

139.   DeGennaro also instructed employees to withhold other incriminating information and documents from investigators. When one of his subordinates created spreadsheets analyzing transactions that involved revenue recognition improprieties, DeGennaro instructed the employee not to provide the analysis to the internal investigators. DeGennaro also told him not to store the spreadsheets on Symbol's computer network, to which the internal investigators had access. In addition, DeGennaro instructed subordinates not to tell the internal investigators about the "text header" field in SAP, which contained valuable evidence about improper transactions.

140.   DeGennaro also rigged the results of an earlier internal investigation that another law firm conducted shortly after the Commission began its investigation, which initially focused on revenue recognition in the fourth quarter of 2000. As part of that internal investigation, the forensic accountants assisting the law firm wanted to analyze the ten largest sales invoices issued that quarter, but they relied on DeGennaro to identify the relevant invoices. To thwart their review, he omitted several improper transactions that were among the ten largest invoiced that quarter and substituted smaller and less problematic transactions. Based on this skewed sample, the law firm informed the Commission's staff that the forensic accountants concluded that there was no evidence of systemic revenue recognition problems at Symbol that quarter.

141.   After Jaeggi and DeGennaro were fired and new management was installed, the cover-up began to unravel. Mortenson, however, engaged in further misconduct. After the end of the fourth quarter of 2002, he manipulated Symbol's reported results for that quarter in order to conceal a material difference between actual and forecasted results for TASS. In Symbol's February 13, 2003 press release announcing unaudited fourth quarter and year-end results for 2002, the net income figures were overstated by approximately $9 million because Mortenson had, among other things, improperly reduced certain TASS expense accruals and transferred balances from an unrelated corporate reserve account to a TASS accrual account. He made these improper adjustments after he learned that the fourth quarter operating expenses for TASS had far exceeded the forecasted amount. Mortenson tried to hide these improper adjustments by creating misleading documents and attempting to enlist others to do the same. After other employees reported Mortenson's conduct to internal auditors, Symbol issued a corrective press release and fired Mortenson.

## SYMBOL'S INFLATED FINANCIAL RESULTS

142.   During the relevant period, Symbol distributed information concerning its quarterly and annual financial results to the public that was materially false and misleading.

143.   Symbol issued press releases announcing its purported financial results for 1998, 1999, 2000 and 2001, and for interim periods within those years and within 2002. In many of these press releases, Symbol touted, among other things, dramatic increases in revenue and net income. Symbol also filed periodic reports with the Commission on Form 10-K for the foregoing fiscal years and on Form 10-Q for the foregoing interim periods. Razmilovic, Jaeggi and Burke each signed one or more of these periodic reports on Symbol's behalf. Due to the

conduct of all the defendants, the revenue, net income and other amounts contained in the foregoing press releases and periodic reports were materially misstated.

144.    Symbol has restated virtually all the financial results it issued during the relevant period. In its Form 10-K/A for 2002, filed in February 2004, Symbol restated:  (i) selected financial data for 1998 and 1999, including revenue and net income; (ii) the annual financial statements for 2000 and 2001; and (iii) selected quarterly data, including revenue and net income, for 2001 and the first three quarters of 2002.  The restatement affected almost every line item of the original financial statements and included the following material adjustments:

(a)    Revenue for 1998 through September 30, 2002 was reduced by a net total of $234.2 million.  These reductions include a $72.3 million reduction in 1999, a 6% decrease from the amount originally reported, and a $236.2 million reduction in 2000, a 16% decrease.  Due to the many revenue acceleration schemes, the revenue figures for 2001 and 2002 were increased by $34.8 million and $72.1 million, respectively.

(b)    Operating expenses for 1998 through September 30, 2002 were increased by a total of $425.5 million, which included the adjustments required to correct for the creation and misuses of the improper restructuring and other reserves and the timing and amounts of improper entries to accrual accounts.  This increase also included a $229 million adjustment to reported stock option expenses for the period from January 1998 through July 31, 2002 to account for the impact of Goldner's fraudulent "look back" practice during this period.

(c)    Pre-tax net income for 1998 through September 30, 2002 was reduced by a net total of $535.5 million.  Excluding the impact of the variable plan accounting adjustments to stock option expenses, the previously reported pre-tax net loss of $79.5 million for 2000 was

increased by $102 million, and the previously reported pre-tax loss of $79.1 million for 2001 was increased by $31.1 million.

(d)     Shareholders' equity as of September 30, 2002 was reduced from $1.171 billion to $946.3 million, a 19% decrease.

145.    The quarterly results were misstated to similar degrees.  For example, revenue for the quarter ended March 31, 2001 was reduced by $25.7 million, a 6% decrease.  Net income for that quarter, excluding the stock option expense adjustment, was reduced by $11.1 million, a 40% drop.

146.    Symbol's restatement arose from the internal investigation it began in 2002 at the request of the Commission's staff.

### THE USE OF FALSE PERIODIC REPORTS TO REGISTER SECURITIES

147.    In addition to signing Symbol's periodic reports during the period covered by the restatement, Razmilovic, Jaeggi, and Burke also signed registration statements in which one or more of those false and misleading periodic reports were incorporated by reference.

148.    In connection with the Telxon acquisition, Symbol filed a registration statement on Form S-4 in August 2000 to register approximately twelve million shares of Symbol stock to be issued to Telxon shareholders.  The Form S-4, as well as two subsequent amendments, incorporated by reference Symbol's Form 10-K for 1999 and the available Forms 10-Q for subsequent quarters.  Razmilovic and Jaeggi signed the three registration statements.  These registration statements also included a proxy statement and prospectus through which Symbol solicited shareholder proxies for the merger.  The proxy statement and prospectus incorporated by reference the same periodic reports as the registration statements.

149.     From May 1999 through June 2002, Symbol filed several registration statements on Form S-8 to register millions of shares of stock in conjunction with various executive and employee stock option plans. The first Form S-8, filed in May of 1999 and amended shortly thereafter, incorporated by reference Symbol's 1998 Form 10-K, and the Form 10-Q for the quarter ending March 31, 1999. Razmilovic, Jaeggi and Burke signed both of the registration statements.

150.     In May 2000, Symbol filed another registration statement on Form S-8 to register 750,000 shares in connection with its 2000 Directors' Stock Option Plan. The Form S-8, as well as an amendment filed one week later, incorporated by reference Symbol's Form 10-K for 1999 and Form 10-Q for the quarter ending March 31, 2000. Razmilovic, Jaeggi and Burke signed both registration statements.

151.     Symbol's next Form S-8, filed in November 2001, incorporated by reference the 2000 Form 10-K and the Forms 10-Q for the quarters ended March 31, June 30, and September 30, 2001. Razmilovic and Jaeggi signed this registration statement.

152.     In June 2002, Symbol filed a Form S-8 that incorporated by reference the 2001 Form 10-K and March 31, 2002 Form 10-Q. Jaeggi signed this registration statement.

153.     The periodic reports incorporated in the registration statements described above were materially false and misleading as a result of the defendants' fraudulent practices. As a result, Razmilovic, Jaeggi and Burke knew that the registration statements they signed were also materially false and misleading.

## THE DEFENDANTS' GAINS FROM THE FRAUD

154.     All the defendants profited from their fraud. Symbol profited from its inflated stock price when it acquired Telxon in a stock swap merger. Telxon's shareholders received

one-half share of Symbol stock for each share of Telxon stock, or a total of approximately 8.8 million shares of Symbol stock. As a result of the undisclosed accounting fraud, these Symbol shares were substantially overvalued. Symbol benefited from the overvaluation by issuing fewer shares than it would have otherwise had to use to acquire Telxon, and thereby underpaying Telxon shareholders for their stock.

155.    The individual defendants' substantial gains from the fraud totaled millions of dollars and included, among other things, the following:

(a)    Razmilovic received performance bonuses and other incentive compensation, severance payments and the proceeds of multiple transactions in Symbol securities. To lock in profits on his Symbol stock, Razmilovic entered into so-called European "zero cost collar" transactions with a brokerage firm, an option strategy designed to protect against a decline in the stock price. Razmilovic "collared" thousands of Symbol shares that he owned by selling a call option and buying a put option, thereby establishing a minimum and maximum price range for the stock. Razmilovic received substantial sums in proceeds from multiple collar transactions he arranged while engaged in the fraud. In each case, Razmilovic falsely certified to the brokerage firm that he did not possess material non-public information about Symbol. Upon his departure from the company, he also sold thousands of shares of Symbol stock that he acquired by exercising stock options priced below the inflated market price.

(b)    Jaeggi received performance bonuses and other incentive compensation and the proceeds of multiple transactions in Symbol securities. While engaged in the fraud, Jaeggi collared" thousands of shares of Symbol stock and falsely certified to the brokerage firm with whom he executed the collars that he did not have material non-public information about Symbol. Jaeggi received substantial sums in proceeds from these collar transactions.

(c)      Goldner exercised tens of thousands of stock options using his improper "look back" practice, and thereby avoided substantial exercise costs.

(d)      Burke received performance bonuses and other incentive compensation, severance payments and the proceeds of multiple transactions in Symbol securities. Burke "collared" thousands of shares of Symbol stock while engaged in the fraud and falsely certified to the brokerage firm with whom he executed the collars that he did not have material non-public information about Symbol. Burke received substantial sums in proceeds from these collar transactions. He also sold thousands of shares of Symbol stock that he acquired by exercising stock options priced below the inflated market price.

(e)      DeGennaro received performance bonuses and other incentive compensation.

(f)      Borghese received performance bonuses, other incentive compensation and severance payments. Borghese also sold thousands of shares of Symbol stock that he acquired by exercising stock options priced below the inflated market price.

(g)      DeSantis received performance bonuses and other special compensation.

(h)      Heuschneider received performance bonuses and the proceeds of transactions in Symbol securities.

(i)      Mortenson received performance bonuses and other incentive compensation, and the proceeds of transactions in Symbol securities.

(j)      Dean received performance bonuses and other special compensation.

(k)      Donlon received performance bonuses and other incentive compensation, and stock sale proceeds.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5

(All Defendants)

156.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 155.

157.    Symbol, Razmilovic, Jaeggi, Goldner, Burke, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

158.    As part and in furtherance of the violative conduct, Symbol, Razmilovic, Jaeggi, Burke, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon, directly or indirectly, singly or in concert, knowingly or recklessly, engaged in a fraudulent scheme to inflate Symbol's reported financial results through patently improper "topside" adjustments, a multitude of revenue recognition schemes, the fabrication and manipulation of non-recurring charges and "cookie jar" reserves to manage earnings, suppression of inventory levels and other fraudulent practices.

159.    As part and in furtherance of the violative conduct, Goldner, directly or indirectly, singly or in concert, knowingly or recklessly, engaged in a fraudulent scheme to manipulate

64

stock option exercise dates to enable certain senior executives, including himself, to profit unfairly at the company's expense by artificially reducing the cost of the option exercises to the executives. In connection with this scheme, Goldner prepared, signed and filed documents with the Commission that he knew, or was reckless in not knowing, were materially false and misleading.

160.    As part and in furtherance of the violative conduct, Symbol issued press releases and filed with the Commission the periodic reports and proxy statements described in paragraphs 126 and 143 above. Due to the fraudulent practices in which the defendants engaged, these documents contained financial statements that materially overstated Symbol's revenue and net income for the subject reporting periods and other material misstatements concerning Symbol's financial performance and its stock option plans. As a result, the press releases, periodic reports and proxy statements described in paragraphs 126 and 143 above were materially false and misleading.

161.    The defendants knew or were reckless in not knowing that because of their fraudulent conduct and the fraudulent conduct of others, the press releases, periodic reports and/or proxy statements described above in paragraphs 126 and 143 were materially false and misleading.

162.    By reason of the foregoing, Symbol, Razmilovic, Jaeggi, Goldner, Burke, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

163.    By reason of the foregoing, Razmilovic, Jaeggi, Burke, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon, singly or in concert, directly or

indirectly, also aided and abetted Symbol's violations, and unless enjoined will again aid and

abet violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17

C.F.R. § 240.10b-5].

<u>**SECOND CLAIM FOR RELIEF**</u>

**Violations of Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act and Rule 10b-5**

(Symbol, Razmilovic, Jaeggi, Goldner and Burke)

164.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 163.

165.     Symbol, Razmilovic, Jaeggi, Goldner and Burke directly or indirectly, singly or in

concert, by use of the means or instruments of transportation or communication in, or the means

or instrumentalities of, interstate commerce, or by the use of the mails, or of the facilities of a

national securities exchange, in the offer or sale and in connection with the purchase or sale of

securities, knowingly or recklessly, have:  (a) employed devices, schemes and artifices to

defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of

material fact, or omitted to state material facts necessary in order to make statements made, in

light of the circumstances under which they were made, not misleading; and/or (c) engaged in

acts, transactions, practices and courses of business which operated or would have operated as a

fraud or deceit upon purchasers of securities and upon other persons.

166.     As part and in furtherance of the violative conduct, Symbol filed with the

Commission the periodic reports described in paragraph 143 above.  Due to the fraudulent

practices in which the defendants engaged, these documents contained financial statements that

materially overstated Symbol's revenue and net income for the subject reporting periods and

other material misstatements concerning Symbol's financial performance. As a result, the periodic reports described in paragraph 143 above were materially false and misleading.

167.   As described above in paragraphs 147-153, one or more of these materially false and misleading periodic reports were incorporated by reference in registration statements, including amendments thereto, that were signed by Razmilovic, Jaeggi and Burke and filed by Symbol with the Commission. As a result, these registration statements were also materially false and misleading.

168.   As described above in paragraph 127, Goldner participated in preparing, and issued legal opinions with respect to, registration statements filed by Symbol in which the Plan was included as an exhibit. Due to Goldner's undisclosed manipulation of stock option exercise dates, the Plan was materially false and misleading. As a result, these registration statements were also materially false and misleading.

169.   Symbol, Razmilovic, Jaeggi, Burke and Goldner knew, or were reckless in not knowing, that the respective registration statements described above were materially false and misleading.

170.   By reason of the foregoing, Symbol, Razmilovic, Jaeggi, Goldner and Burke, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

### Violations of Section 13(a) of the
### Exchange Act and Rules 12b-20, 13a-1 and 13a-13

(All Defendants)

171.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 170.

172.    Symbol failed to file with the Commission, in accordance with the rules and regulations prescribed by the Commission, such annual and quarterly reports as the Commission has prescribed and Symbol failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they are made, not misleading, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13]. As alleged above, Symbol's annual and quarterly reports described above in paragraph 143 were materially false and misleading because, among other things, they included financial statements that materially overstated Symbol's revenue and net income and other material misstatements concerning Symbol's financial performance.

173.    Razmilovic, Jaeggi, Goldner, Burke, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon, knowingly or recklessly, directly or indirectly, singly or in concert, engaged in fraudulent practices resulting in:  (a) material overstatements of Symbol's revenue and net income on its books and records and in financial statements included in the periodic reports identified above; and/or (b) other material misstatements in those periodic reports.

174.    At all times relevant hereto, Razmilovic, Jaeggi, Goldner and Burke were controlling persons of Symbol for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

175.    By reason of the foregoing:

(a)     Symbol, directly, or indirectly, singly or in concert, has violated, and unless enjoined will again violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13  [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13];

(b)     Razmilovic, Jaeggi, Goldner and Burke are each liable as controlling persons pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Symbol's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13]; and unless they are enjoined, Razmilovic, Jaeggi, Goldner and Burke will again engage, as controlling persons, in conduct that would render them liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13]; and

(c)     DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon aided and abetted Symbol's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13]; and unless they are enjoined, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon will again aid and abet violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13].

**FOURTH CLAIM FOR RELIEF**

**Violations of Section 13(b)(2) of the Exchange Act**

(All Defendants)

176.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 175.

177.    Symbol failed to:

a.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets; and

b.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

     i.    transactions were executed in accordance with management's general or specific authorization;

     ii.    transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

     iii.    access to assets was permitted only in accordance with management's general or specific authorization; and

     iv.    the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences,

in violation of Section 13(b)(2) of the Exchange Act [15 U.S.C § 78m(b)(2)]. As alleged above, Symbol made fraudulent topside adjustments and other improper accounting entries on its books and records, and Symbol's internal accounting controls were insufficient to reasonably assure that its annual and quarterly financial statements were prepared in conformity with GAAP.

178. Razmilovic, Jaeggi, Goldner, Burke, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon, knowingly or recklessly, directly or indirectly, singly or in concert, engaged in fraudulent practices resulting in material misstatements of Symbol's revenue, net income and/or other items on its books and records and in financial statements included in the periodic reports identified above in paragraph 143.

179. At all times relevant hereto, Razmilovic, Jaeggi, Goldner and Burke were controlling persons of Symbol for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

180. By reason of the foregoing:

(a) Symbol, directly, or indirectly, singly or in concert, has violated, and unless enjoined will again violate, Section 13(b)(2) of the Exchange Act [15 U.S.C § 78m(b)(2)];

(b) Razmilovic, Jaeggi, Goldner and Burke are each liable as controlling persons pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Symbol's violations of Section 13(b)(2) of the Exchange Act [15 U.S.C § 78m(b)(2)]; and unless they are enjoined, Razmilovic, Jaeggi, Goldner and Burke will again engage, as controlling persons, in conduct that would render them liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for violations of Section 13(b)(2) of the Exchange Act [15 U.S.C § 78m(b)(2)]; and

(c) DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon aided and abetted Symbol's violations of Section 13(b)(2) of the Exchange Act [15 U.S.C §

78m(b)(2)]; and unless they are enjoined, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon will again aid and abet violations of Section 13(b)(2) of the Exchange Act [15 U.S.C § 78m(b)(2)].

### FIFTH CLAIM FOR RELIEF

**Violations of Section 13(b)(5) of
the Exchange Act and Rule 13b2-1**

(All Defendants Other Than Symbol)

181.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 180.

182.    Razmilovic, Jaeggi, Goldner, Burke, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon engaged in fraudulent practices in the course of which they knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified, directly or indirectly, or caused to be falsified books, records and accounts of Symbol that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].  As alleged above, these defendants made, directed or otherwise caused fraudulent adjustments or other improper entries to Symbol's books and records, or they supervised or otherwise participated in the process by which such adjustments or entries were made.

183.    By reason of the foregoing, Razmilovic, Jaeggi, Goldner, Burke, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon have violated, and unless enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## SIXTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13b2-2

(Razmilovic, Jaeggi, Burke and DeGennaro)

184.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 183.

185.    Razmilovic, Jaeggi, Burke and DeGennaro, directly or indirectly, made or caused to be made materially false or misleading statements, or omitted to state or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant, in connection with:  (i) audits and examinations of the financial statements of Symbol; and (ii) the preparation and filing by Symbol of reports required to be filed with the Commission.

186.    While acting as officers of Symbol, Razmilovic, Jaeggi, Burke and DeGennaro made, and caused others to make, materially false and misleading statements to accountants in connection with audits of Symbol's annual financial statements and quarterly reviews of Symbol's interim financial statements during the relevant period.  Among other things, Razmilovic, Jaeggi and Burke signed materially false and misleading representation letters that management provided to Symbol's accountants with respect to those engagements.  Among other things, DeGennaro made materially false oral statements, and directed others to provide materially false documents, to Symbol's accountants in connection with such engagements.

187.    By reason of the foregoing, Razmilovic, Jaeggi, Burke and DeGennaro have violated, and unless enjoined will again violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## SEVENTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13a-14

(Jaeggi)

188.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 187.

189.    As Symbol's chief financial officer, Jaeggi signed a certification pursuant to Rule 13a-14 that was included in Symbol's interim report on Form 10-Q for the quarter ended September 30, 2002. In that certification, Jaeggi falsely stated, among other things, that:  (a) the report did not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statement not misleading; (b) the financial statements and other financial information included in the report fairly present in all material respects the financial condition, results of operations and cash flows of Symbol as of and for the period presented in the report; and (c) he had disclosed to Symbol's auditors and Symbol's audit committee all significant deficiencies and material weaknesses in the design or operation of Symbol's internal controls and any fraud, whether or not material, that involved management or other employees who had a significant role in Symbol's internal controls.

190.    As alleged above, the financial results included in that quarterly report have since been restated, and the report contained other material misrepresentations as a result of fraudulent practices in which Jaeggi participated and significant internal control deficiencies for which he was responsible.  Jaeggi failed to disclose his knowledge of Symbol's fraudulent accounting practices or its significant internal control deficiencies to Symbol's audit committee or its auditors.

191.    By reason of the foregoing, Jaeggi violated, and unless enjoined, will again violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## EIGHTH CLAIM FOR RELIEF

### Violations of Section 16(a)
### of the Exchange Act and Rule 16a-3

(Goldner)

192.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 191.

193.    As an officer of Symbol, Goldner was required to disclose changes in his beneficial ownership of Symbol securities by filing with the Commission a statement of such changes on Form 4 in accordance with Section 16(a) of the Exchange Act [15 U.S.C. §78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3]. As alleged above, Goldner filed, and caused other officers of Symbol to file, Forms 4 that misstated the transaction dates for stock option exercises conducted pursuant to the "look back" practice that he devised and directed.

194.    By reason of the foregoing, Goldner violated, and unless enjoined, will again violate, Section 16(a) of the Exchange Act [15 U.S.C. §78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3].

## NINTH CLAIM FOR RELIEF

### Violations of Section 14(a) of the
### Exchange Act and Rules 14a-3 and 14a-9

(Symbol and Goldner)

195.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 194.

196.    Symbol directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange or otherwise, solicited or permitted the use of its name to solicit proxies, consents or authorizations in respect of non-exempt securities registered pursuant to section 12 of the Exchange Act [15 U.S.C. § 78l]:

(A)    while failing to furnish each person solicited, concurrently or previously, with a written  proxy statement containing the information specified in Schedule 14A [17 C.F.R. § 14a-101] or with a written proxy statement included in a registration statement filed under the Securities Act on Form S-4 [17 C.F.R. § 239.25] and containing the information specified in such Form; and

(B)    by means of a proxy statement, form of proxy statement, form of proxy, notice of meeting and other communications that contained statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, or which omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct statements in earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which was false or misleading;

in violation of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

197.    As alleged above, Symbol filed proxy statements in connection with the Telxon merger and executive stock option plans that contained material misstatements, and omitted to

disclose material facts, concerning Symbol's financial performance and the terms of the Plan and other stock option plans.

198.    As alleged above, Goldner signed and otherwise participated in the preparation of the proxy statements identified above in paragraph 126.   While doing so, Goldner engaged in a scheme to manipulate stock option exercise dates in a manner that deviated from the stated terms of the Plan.  As a result of that scheme, the proxy statements identified above in paragraph 126 were materially false and misleading.

199.    At all times relevant hereto, Goldner was a controlling person of Symbol for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

200.    By reason of the foregoing, Symbol violated, and unless enjoined, will again violate, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

201.    By reason of the foregoing, Goldner is liable as a controlling person pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Symbol's violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9]; and unless he is enjoined, Goldner will again engage, as a controlling person, in conduct that would render him liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Symbol, its agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(a), 13(b)(2) and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2) and 78n(a), and Rules 10b-5, 12b-20, 13a-1, 13a-13, 14a-3 and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, 240.14a-3 and 240.14a-9].

### II.

A.    Permanently enjoining Razmilovic, Jaeggi and Burke, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2];

B.    Permanently enjoining Jaeggi, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Exchange Act Rule 13a-14 [17 C.F.R. §240.13a-14];

C.    Permanently enjoining Razmilovic, Jaeggi and Burke, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive

actual notice of the injunction by personal service or otherwise, and each of them, from

controlling, directly or indirectly, any person who violates Sections 13(a) and 13(b)(2) of the

Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-13

thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

## III.

A.    Permanently enjoining Goldner, his agents, servants, employees and attorneys and

all persons in active concert or participation with him who receive actual notice of the injunction

by personal service or otherwise, and each of them, from violating, directly or indirectly, Section

17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(5) and 16(a) of

the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5) and 78p(a)] and Rules 10b-5, 13b2-1 and 16a-

3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.16a-3].

B.    Permanently enjoining Goldner, his agents, servants, employees and attorneys and

all persons in active concert or participation with them who receive actual notice of the

injunction by personal service or otherwise, and each of them, from controlling, directly or

indirectly, any person who violates Sections 13(a), 13(b)(2) and 14(a) of the Exchange Act

[15 U.S.C. §§ 78m(a), 78m(b)(2) and 78n(a)] and Rules 12b-20, 13a-1, 13a-13, 14a-3 and 14a-9

thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.14a-3 and 240.14a-9].

## IV.

A.    Permanently enjoining DeGennaro, his agents, servants, employees and attorneys

and all persons in active concert or participation with them who receive actual notice of the

injunction by personal service or otherwise, and each of them, from violating, directly or

indirectly, Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and, 78m(b)(5)]

and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2].

B.      Permanently enjoining DeGennaro, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13].

## V.

A.      Permanently enjoining Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2-1].

B.      Permanently enjoining Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13].

## VI.

Ordering Symbol, Razmilovic, Jaeggi, Goldner, Burke, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon to disgorge the ill-gotten gains they received as a result of the violations alleged above, and ordering Razmilovic, Jaeggi, Goldner, Burke, DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon to pay prejudgment interest thereon.

## VII.

A.     Ordering Symbol, Razmilovic, Jaeggi, Goldner and Burke to pay civil money penalties pursuant to 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

B.     Ordering DeGennaro, Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VIII.

A.     Prohibiting Razmilovic, Jaeggi, Goldner and Burke, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

B.     Prohibiting DeGennaro and Borghese, pursuant to Section 21(d)(2) of the Exchange Act, from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## IX.

Granting such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
       June 3, 2004

                                    EDWIN H. NORDLINGER
                                    Acting Regional Director
                                    Northeast Regional Office

By:       *Edwin H. Nordlinger*
                  Edwin H. Nordlinger (EH-6258)

                  Attorney for Plaintiff
                  SECURITIES AND EXCHANGE COMMISSION
                  233 Broadway
                  New York, New York 10279
                  (646) 428-1630

Of Counsel:

    George N. Stepaniuk
    Burk Burnett
    Jimmy Fokas