**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**- against-**

**SYMBOL TECHNOLOGIES, INC., et al.,**

**Defendants.**

-------------------------------------------------------------------- x

**Civ. No. 04-2276 (SJF)(WDW)**

**Oral Argument Requested**

# DEFENDANT TOMO RAZMILOVIC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO FED.R.CIV.P. 52(c).

Defendant Tomo Razmilovic respectfully submits this memorandum of law in support of his motion for judgment on partial findings pursuant to Fed.R.Civ.P. 52(c).[1] Proposed findings of fact and conclusions of law have been filed contemporaneously with Mr. Razmilovic's motion and memorandum, as required by Rules 52(a) and (c). The Court should grant judgment for Mr. Razmilovic on the Commission's disgorgement claims because the Commission failed to prove any causal connection between its proposed disgorgement amount and the alleged fraud in this case before resting on March 15, 2010. In addition, because the Commission sought penalties based on the disgorgement amount, the Court should enter judgment for no more than the amount of penalty provided by statute, as discussed below.

---

[1] In ruling on a motion for a judgment on partial findings under Federal Rule of Civil Procedure 52(c), a court must determine whether "a preponderance of the evidence goes against the plaintiff's claim." *Wechsler v. Hunt Health Systems, Ltd.*, 330 F.Supp.2d 383, 433 (S.D.N.Y. 2004) (citations omitted). The court does not indulge any inferences in favor of the non-moving party or consider the evidence in the light most favorable to the non-moving party. *Id.* Rather, "the court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." *Id.* (citation omitted); *see also* 9C Wright & Miller, *Federal Practice & Procedure: Civil 3d* § 2573.1 at 259-63 (noting that court's authority includes making credibility determinations).

## I. THE LAW CLEARLY REQUIRES THE COMMISSION TO PROVE CAUSATION

On March 15, 2010, near the outset of the trial in this case on the Commission's remedies claims against Mr. Razmilovic, this Court stated that the Commission's "burden is to prove causation . . ." *See* Tr. Trans. 31:10-31:11. The Court correctly stated the well-established rule. *See, e.g., SEC v. Patel*, 61 F.2d 137, 140 (2d Cir. 1995) (undertaking a careful analysis of the causal connection between the amount to be disgorged and defendant's wrongdoing before determining that the trial court had made an appropriate finding as to the causal connection); *see also SEC v. Fischbach,* 133 F.3d 170, 175 (2d Cir. 1997) (only those profits fraudulently obtained can be disgorged).

When the Commission fails to demonstrate a causal connection between an amount received by a defendant and the alleged fraud, courts have routinely held that the amount is *not* subject to disgorgement. *See, e.g., SEC v. Resnick,* 604 F.Supp.2d 773, 783 (D. Md. 2009) (disgorgement of salary denied because Commission had not proved that receipt of salary was causally linked to the securities violations); *SEC v. Jones*, 476 F. Supp. 2d 374, 386 (S.D.N.Y. 2007) (denying disgorgement where the Commission's evidence failed to demonstrate that the disgorgement sought was causally connected to the wrongdoing); *SEC v. Church Extension of the Church of God, Inc.,* 429 F.Supp.2d 1045, 1050 (S.D. Ind. 2005) (court ordered disgorgement of only half defendants' salary for the year in which the fraud occurred, as defendants had provided real services and valuable services to the company for many years); *SEC v. M&A West, Inc.,* No. C-01-3376, 2005 WL 2988963, at *2 (N.D. Cal. Oct. 31, 2005) (court refused to order disgorgement of salary earned by defendant from a transaction for which he was not found liable for securities law violations); *SEC v. Black,* No. 04 C 7377, 2009 WL 1181480, at *3-4 (N.D. Ill. Apr. 30, 2009) (court permitted disgorgement only of that

compensation associated with defendant's improper disclosures and noted that it would be appropriate to offset the disgorgement of amounts attributable to the "real and valuable services" he provided to the company); *SEC v. Todd*, No. 03-2230, 2007 WL 1574756, at *18 (S.D. Cal. May 30, 2007) (denying disgorgement where the Commission failed to establish that the defendant profited from his violations, because the defendant did not cash in stock options or exploit the alleged scheme, and because the Commission failed to make a distinction between ill-gotten gains and rightly-earned compensation and severance); *SEC v. Savino*, No. 01-2438, 2006 WL 375074, at *17 (S.D.N.Y. Feb. 16, 2006) (denying disgorgement to the extent the defendant received no commissions for improper transactions because his guaranteed salary was greater than the sum of the commissions).

In a letter filed with the Court on March 8, 2010 [Dkt. No. 186], and in its pre-hearing brief filed the same day [Dkt No. 187], the Commission asserted that "once the Commission has made a reasonable demonstration of the disgorgement amount, the burden shifts to the wrongdoer to demonstrate that the amount requested is not a reasonable approximation of the unlawfully obtained profits." *See* Commission Pre-Hearing Brief [Dkt. No. 187] at 7. This formulation badly misstates the Commission's burden of proof in this proceeding; indeed, it is almost incomprehensible because it nowhere explains what the "disgorgement amount" the Commission is required to demonstrate really means. This evasiveness on the Commission's part is not accidental — both in its papers, and in the case-in-chief it put on during the trial, the Commission has refused to acknowledge that it must show a causal connection between the Defendant's "gains" and the alleged fraud.

The Commission has argued that five cases stand for the proposition that its initial burden may be met without reference to causality. *See* Commission Pre-Hearing Brief [Dkt. No. 187] at

7; *see also* Commission March 8 Letter [Dkt. No. 186] at 2. The Commission is flatly wrong. Four of the five cases merely cite to *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1230-32 (D.C. Cir. 1989), for the proposition that the burden shifts to the defendant after the Commission has made the requisite showing. *See SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996); *SEC v. Anticevic*, No. 05 CV 6991, 2009 WL 420508 at *5 (S.D. N.Y. Nov. 30, 2009); *SEC v. Grossman*, No. 87-1031, 1997 U.S. Dist. LEXIS 6225, at *25 (S.D.N.Y. May 6, 1997); *SEC v. Great Lakes Equities Co.*, 775 F.Supp. 211, 214 (E.D. Mich. 1991). And as the *First City Financial* court itself makes clear, however, the requisite showing, *i.e.*, the Commission's initial burden, is discharged by establishing that the amount sought to be disgorged is "causally connected to the violation." 890 F.2d at 1231.[2]

Indeed, the Commission's own cases establish that it must set forth evidence to demonstrate a reasonable approximation of profits causally connected to the alleged wrongdoing. *See, e.g., Anticevic,* No. 05 CV 6991, 2009 WL 420508 at *5 (SEC submitted "detailed affidavits" showing that the amount sought to be disgorged were ill-gotten gains); *Grossman*, No. 87-1031, 1997 U.S. Dist. LEXIS 6225, at *25 (affirming the district court's conclusion that a causal connection existed between the defendants' manipulation of stock prices and their profits from trading in those stocks, since "the purpose and effect of the scheme was to manipulate and stabilize the prices" of a set of stocks in order to profit from trades in these stocks).

[2] In the remaining case cited by the Commission, *SEC v. Benson*, 657 F.Supp. 1122 (S.D.N.Y. 1987), the defendant misappropriated corporate funds by requiring kickbacks from outside sales representatives, requiring employees to submit false expense reports and pay the proceeds to the defendant, diverting refunds on unused airline tickets to his designee, and paying fictitious commissions to a sales representative, who then paid the proceeds to the defendant. *Id.* at 1125. Therefore, after the Commission proved that the defendant committed these violations, it was a reasonable conclusion that the entirety of the misappropriated funds were causally connected to the misappropriation. *Id.* The funds were, after all, *misappropriated*. Thus, the burden shifted to the defendant to prove that some portion of the money that he essentially stole was not causally connected to his theft. This case simply does not stand for what the Commission argues that it does.

## II. THE COMMISSION INTRODUCED NO EVIDENCE OF CAUSATION

In this case, the Commission made a tactical decision to rely on its patently incorrect legal theory and present as its proposed disgorgement amount, through document custodians and authentication witnesses, what it claims were Mr. Razmilovic's ***total*** compensation and profits from stock sales,[3] without even attempting to show how any of these items were causally connected to the alleged fraud. The Commission made its approach clear in its pre-hearing brief – that it would seek to have the Court simply impose its computation of compensation and stock sale profits[4] and then deal with which portions, if any, were causally connected to the alleged fraud through the defense case and a rebuttal case. *See* Commission Pre-Hearing Brief [Dkt. No. 187] at 6-10. The Commission proceeded to present its case at trial using this theory, despite having been advised repeatedly as to its burden of proof, both by the defense, s*ee* Defense March 5 Letter [Dkt. No. 182]; Defense March 10 Letter [Dkt. No. 197], and by the Court. *See* Tr. Trans. 31:10-31:11. Having deliberately made this choice, and having rested its case-in-chief without putting on any evidence of causation, the Commission's disgorgement claims should be dismissed, and the Commission should not be permitted to try and prove causation through the defense case or a rebuttal case.

Simply put, the Commission rested without meeting its burden of proof. In these circumstances, a Rule 52(c) judgment in Mr. Razmilovic's favor is clearly appropriate.

---

3 *See* Commission Pre-Hearing Brief [Dkt. No. 187] at 5-6 (seeking "[t]he amount of Razmilovic's total compensation earned during the relevant time period").

4 The Commission's computation is deeply flawed because, among other things, of the way it attempts to count paper profits never actually obtained by Mr. Razmilovic and double counts the sale of the same shares twice.

## III. BECAUSE THE COMMISSION FAILED TO DEMONSTRATE CAUSATION, THE CLAIM FOR DISGORGEMENT MUST BE DISMISSED AS TO EACH CATEGORY OF DISGORGEMENT CLAIMED

The sections below discuss the lack of causation evidence for each item of disgorgement claimed by the Commission:

### A. Salary

The Commission presented evidence through document custodian and authentication witnesses that Mr. Razmilovic received a salary. *See* Tr. Trans. 20:22-23: 12; 51:24-66:11; Plaintiff's Ex. 11 ("Pl. Ex."). The Commission presented no evidence, however, that his salary was tied to Symbol's financial performance. The Commission's principal witness, Suzanne Johnson, admitted that she had no knowledge of any connection between the salary amounts and the alleged fraud:

> Q: Now, when you went over the various items of pay, including salary and some bonuses and some stock exercises and so forth; is it correct that you were just testifying as to the numbers that appear on the page in terms of what Mr. Razmilovic received. Correct?
>
> A: Yes.
>
> Q: And do you have any knowledge as to whether those items were paid because Mr. Razmilovic was involved in some kind of fraud, or not?
>
> A: No.

*Id.* at 114: 23-115:7.

Courts routinely reject attempts by the Commission to include salary as disgorgement when there is such a lack of causal connection, and this is what is what this Court should do here as well. *See, e.g., Resnick,* 604 F. Supp. 2d at 783; *Church Extension of the Church of God, Inc.,* 429 F.Supp.2d at 1050; *M&A West, Inc.,* No. C-01-3376, 2005 WL 2988963, at *2.

**B. Severance Payments**

The Commission presented evidence that Mr. Razmilovic received a severance payment of $5 million upon his resignation in 2002, and is apparently claiming that this amount should be included as disgorgement. *See* Tr. Trans. 64:17-65:6; Pl. Ex. 9. However, just as in the case of Mr. Razmilovic's salary, the Commission presented no evidence that this severance payment was causally connected to the alleged fraud, and for this reason the Commission failed to meet its burden of proof with respect to this item. Moreover, the Commission's own exhibits conclusively and affirmatively establish that the $5 million severance payment was not tied to the financial performance of Symbol or otherwise causally related to the alleged fraud. The Commission introduced into evidence, as Plaintiff's Exhibit 5, Mr. Razmilovic's employment agreement with Symbol dated July 1, 2000. Paragraphs 12(c) and 12(d) of that employment agreement provided that in the event of the termination of Mr. Razmilovic's employment for certain reasons -- but, crucially, not for the reason of voluntary resignation pursuant to paragraph 12(a)(iii) of the employment agreement -- Mr. Razmilovic would be entitled to a severance payment based in part on the bonus received in the previous year and the target bonus for the current year. *See* Pl. Ex. 5 [Employment Agreement paragraphs 12(a)(iii), 12(c), and 12(d)]. In the event of voluntary termination pursuant to paragraph 12(a)(iii), the employment agreement did not provide for any severance payment. Paragraph 1 of the Separation, Release and Non-Disclosure Agreement effective February 14, 2002 (the "Severance Agreement"), introduced into evidence by the Commission as Plaintiff's Exhibit 7, expressly provided that Mr. Razmilovic's termination of employment was by voluntary resignation pursuant to paragraph 12(a)(iii) of the July 1, 2000 employment agreement. Pl. Ex. 7 at ¶ 1. Accordingly, Mr. Razmilovic was not

entitled to a severance payment based on financial performance, including based on any bonus, upon his termination from Symbol.

The Severance Agreement effective February 14, 2002 did provide for two severance payments in paragraphs 2(A) and 2(B). *See* Pl. Ex. 7 at ¶¶ 2(A) and 2(B). The second of these -- the payment provided for in paragraph 2(B) to be paid on or about May 7, 2003 -- was a $2 million payment representing an amount equal to salary and target bonus, but that severance payment of $2 million was never paid and the Commission offered no evidence that it was ever paid. *See* Pl. Ex. 9 (listing no payment of $2 million on or about May 7, 2003). The first of the severance payments provided for in the Severance Agreement, specified in paragraph 2(A) of that agreement, provided for a $5 million payment within 30 days of execution of the Severance Agreement. This is the payment listed in the Commissions' evidence. *See* Pl. Ex. 9 at 7. But paragraph 2(A) of the Severance Agreement specifying a $5 million severance payment (unlike paragraph 2(B) specifying the $2 million severance payment that was never paid) does not link the $5 million severance payment in any way to any financial performance of Symbol, to any bonus or target bonus, or to anything else that could demonstrate a causal relationship between the payment and the alleged fraud.[5] Accordingly, not only did the Commission fail to show any causal connection between the $5 million severance payment and the alleged fraud, but also the Commission's own exhibits demonstrate conclusively that this payment was not causally connected to the alleged fraud.

**C. Bonus**

The Commission presented evidence that Mr. Razmilovic received a bonus for work done in 1999 and 2000. Mr. Razmilovic's employment agreement provided for a bonus based on

[5] Of course, evening putting this aside, and as described in Section III(C), no evidence was admitted at trial showing that any bonus payments were causally connected to the alleged fraud.

financial performance. However, the Commission was not able to introduce evidence of what particular level of financial performance triggered the bonus payments. In fact, the Court *excluded* the exhibits offered by the Commission that had some information to this effect (although Mr. Razmilovic does not agree that this would have been sufficient, as discussed below) on the ground that the Commission did not disclose those exhibits to Mr. Razmilovic in a timely fashion. *See* Tr. Trans. 25:4-33:8. Accordingly, there is no evidence in the record to support a theory that the bonus payments were causally connected to the alleged fraud.

In any event, however, even if the Commission's exhibits had been admitted into evidence, they would have showed only the level of financial performance, expressed in "earnings per share" (EPS) terms, required to trigger bonus payments to Mr. Razmilovic. Neither these exhibits nor any other evidence offered by the Commission demonstrated whether these EPS triggers would or would not have been met absent the alleged fraud. Thus, the Commission failed to prove that the 1999 and 2000 bonus payments were caused by the alleged fraud even if the exhibits excluded by the Court are considered (which of course they should not be).

**D. Stock Sales and "Collar" Transactions**

The Commission also failed to prove any reasonable approximation of disgorgement causally connected to the alleged fraud with respect to the stock option exercises and collar transactions. The Commission's case on this subject suffered from three independent flaws: First, the Commission's theory improperly looked to paper rather than actual profits on stock option exercises. Second, the Commission sought to have the Court count the same shares as sold on two different occasions, which is obviously impossible and constitutes improper double counting, which by definition cannot be a reasonable approximation of anything. And the

Commission never showed how the profits or proceeds that Mr. Razmilovic actually obtained for the shares at issue were affected or caused by the alleged fraud — a failure fatal to its case.

The Commission's evidence showed that on four occasions Mr. Razmilovic exercised stock options that had been granted to him by Symbol prior to 1998. Pl.'s Ex. 15 [ST 239038]; Ex. 16 [ST 239052]; Ex. 17 [pg. 7 of document]; Ex. 18 [ST 101203]; Tr. Trans. 134:8-134:15. For each of these option exercise transactions, Mr. Razmilovic engaged in what is known as an "exercise and hold" transaction. *See* Tr. Trans. 136:11-138:12. That is, instead of immediately selling the shares he received by virtue of exercising the stock options, he held them for sale at a later time. For example, in the case of the May 1, 2000 stock option exercise, Mr. Razmilovic exercised his right (stock options granted in 1995 and 1996) to purchase 213,833 shares of Symbol stock at a price of $6.89 (this amount is known as a "strike price" or "exercise price.") At the time of this exercise (May 1, 2000), Symbol's stock closed on the New York Stock Exchange at $57.56 per share. The SEC simply takes the difference between the strike price of $6.89 and the May 1, 2000 market price of $57.56 and calls this "profit." *See* Pl. Ex. 16 [ST 239052] (As noted above, the SEC also failed to prove how much of this market price, if any, was inflated as a result of the alleged fraud, and instead pretended that Symbol had no value even though nothing of the sort was ever alleged in the Complaint).

Mr. Razmilovic did not profit on the day of exercise, any more than an investor who purchases stock "profits" by the fact that the stock he just purchased has risen in value on the stock exchange. The investor's paper net worth might be higher as a result of a rise in the stock price, but it cannot be said that the investor reaped "profits" until he or she sells the stock. The test of "profit" has to be measured at the time that the stock is sold, not by paper profit at the time of exercise of an option. Courts routinely look at actual profit, not paper profit, in calculating

disgorgement from stock sales and trading. *See, e.g.*, *SEC v. Patel*, 61 F.3d 137, 139-40 (2d Cir. 1995); *SEC v. Sekhri*, No. 98 Civ 2320, 2002 WL 31100823, at *17 (S.D.N.Y. July 22, 2002); *SEC v. China Energy Savings Technology, Inc.*, 2008 WL 6572372, at *12 (E.D.N.Y. Mar. 28, 2008); *SEC v. Downe*, 969 F. Supp. 149, 157 (S.D.N.Y. 1997); *SEC v. Aragon Capital Management, LLC,* No. 07 Civ. 919, 2009 WL 4277244, at *12 (S.D.N.Y. Nov. 24, 2009).

The Commission then compounded this error by double counting as profit the sale of the same shares through collar transactions. As noted above, Mr. Razmilovic exercised options and held the resulting shares rather than sell them at the time of exercise. For three of the four transactions presented by the Commission — the 1999, 2000, and 2001 option exercise transactions — the shares Mr. Razmilovic received by exercising his stock options were tendered to Bank of America to hold as part of "European collar agreements" that he entered into with the bank. *See* Pl. Ex. 22, 28, 32. These agreements expressly precluded Mr. Razmilovic from selling the shares. *See Id.*, Ex. 22 and 32. The collar agreements simply set a maximum and a minimum price — a floor and a ceiling — at which Mr. Razmilovic would sell the shares on a day certain in the future.. *Id.* Using the May 1, 2000 transaction as an example, Mr. Razmilovic received 100,000 net shares by exercising stock options, and gave those shares to Bank of America to hold until expiration of the collar agreement on August 1, 2002. *See* Pl. Exs. 16, 22. When that day came, the NYSE market price of Symbol stock was $8.97. *See id.*, Ex. 25. The collars acted like a form of insurance policy, such that Mr. Razmilovic received the minimum price he had agreed to with Bank of America ($15.51) rather than the market price ($8.97) on the August 1, 2002 expiration date. *See id.; see also* Pl. Exs. 23 and 24 [adjusting for 3 to 2 splits in Symbol stock].

Thus, although the collars sound complicated at first blush, the reality is quite simple: Mr. Razmilovic exercised stock options and received shares. He did not sell those shares but instead gave them to Bank of America until by operation of the collar agreements those same shares were sold for the minimum price set forth in the collar agreements. The SEC ignores this reality and counts as "profit" the paper share value at the time of the exercise and hold transactions, and then counts as additional "profit" the sale of the same exact shares through the mechanism of the collar transactions. This is true for the 1999, 2000, and 2001 option exercise and collar transactions. None of the Commission's "paper profit" and double counting of collar "profit" can be counted as disgorgement.[6]

Even putting aside these conceptual errors with its case, however, the Commission's case on stock options suffered from an independent, and independently fatal, flaw: it did not even attempt to establish what portion of the profit Mr. Razmilovic received from the sale of his stock options shares was causally connected to the alleged fraud. First of all, the Commission put on no case with regard to whether the stock price of Symbol was inflated as a result of any alleged fraud at the time Mr. Razmilovic exercised stock options. Thus, even the Commission's "paper profits" theory fails for lack of causal connection evidence, because the Commission made no showing that Mr. Razmilovic's paper profit at the time of exercise was more than it otherwise would have been because of the alleged fraud. Of course, paper profit is not a proper measure of "ill-gotten gains" for disgorgement purposes because that would read the word "gotten" out of the term. As discussed above, what actually occurred here for the 1999, 2000, and 2001 transactions is that Mr. Razmilovic sold the shares through the mechanism of the Bank of

[6] The February 1, 2002 stock option exercise transactions is different in that Mr. Razmilovic sold the shares in the open market rather than place the shares into collar transactions. The Commission's case still failed to prove causation with respect to these sales because it failed to prove or even put on any evidence that the price Mr. Razmilovic received for the shares in the open market was higher than it should have been because of the

America collar transactions at the minimum price Mr. Razmilovic and Bank of America negotiated. *See* Pl. Ex. 22, 28, 32. In order to prove a causal connection between any profits from these actual sales and the alleged fraud, the Commission would have to show that the minimum price in the collar agreements (known as the "put strike price") was somehow higher than it should have been as a result of the alleged fraud.

Not only did the Commission fail to put on any evidence of such a causal connection, but also when the Commission's counsel asked the Bank of America witness how the put strike price was established, the witness responded that it was a matter of private negotiation and set just to make sure the premiums on the minimum and maximum prices in the collar cancelled each other out. *See* Tr. Trans. 173:9-173:20 ("[T]he strike would be established, so that the premium on the one would offset the premium on the other. So that the purchaser or the investor who bought the put option would owe the dealer . . . exactly the amount that the dealer owes for the option the dealer bought."). The witness did not testify that the collar strike prices (the floor and ceiling prices in the collar agreements) were tied to the stock market price for Symbol stock, and the Commission did not even attempt to show in any event that the stock market price was inflated as a result of the alleged fraud. Thus, the Commission presented no evidence of whether the minimum collar price at which the shares from the 1999, 2000, and 2001 option exercises were actually sold were higher than they should have been as a result of the alleged fraud or were otherwise impacted by the alleged fraud. Without such a showing, the Commission failed in its burden to show a causal connection between the stock sale receipts and the alleged fraud.

**E. Other Compensation**

The Commission elicited the testimony of Suzanne Johnson in an attempt to show that Mr. Razmilovic received a payout of approximately $1.9 million in April 2002 as part of his

---

alleged fraud.

severance package. *See* Tr. Trans. 64:24-65:6. The same witness, however, later stated that she did not know the origin of the $1.9 million and could not state that it was part of the severance package. *See* Tr. Trans. 119:21-121:16. There is no other evidence establishing the source of this payment. It cannot, therefore, be said to be "causally connected" to the alleged fraud, as there is no evidence whatsoever of what the payment was for. Absent such a showing, the $1.9 million of unknown provenance cannot be ordered as disgorgement.

## IV. THE ALLEGED FRAUD WAS NOT "PERVASIVE"

As a fallback position, the Commission has also asserted that it should prevail on its theory that disgorgement should include every penny that Mr. Razmilovic received during the time period of the alleged fraud, without regard to whether any particular amount was received as a result of the alleged fraud, because the alleged fraud was "pervasive." To make this case, however, the Commission would have to prove that Mr. Razmilovic rendered ***no*** legitimate services in return for his salary and bonuses, and that the Symbol Technologies stock he received as additional compensation had no value ***whatsoever***. The Commission has never asserted, nor could it assert, either proposition.[7] Regardless of how "pervasive" the Commission chooses to characterize the fraud alleged in the Complaint to have been, no disgorgement would be owed by Mr. Razmilovic unless the company's allegedly misstated financial statements, rather than Mr. Razmilovic's service as the CEO of the company, are what caused him to receive amounts that he would not otherwise have received. For example, it could conceivably be the case that the stock price of Symbol was trading at a higher level than it otherwise would have been absent the alleged fraud, and that some portion of Mr. Razmilovic's stock sales or bonuses resulted from an

[7] Any assertion that Symbol had no value would be baseless. For example, not long after the alleged fraud, the company sold for $3.9 billion. *See* September 19, 2006 Form 8-K filed by Motorola Inc. [announcing acquisition of Symbol, Inc. for $15 a share, or $3.9 billion]. The Court may take judicial notice of this Form 8-K, pursuant to the parties' stipulation, *see* Tr. Trans. 214:14-215:3, and *Kramer v. Time Warner Inc.*, 937 F. 2d 767, 773-74 (2d Circuit 1991).

inflated stock price, yet the Commission never even made an effort in its case to make such a showing.[8]

Even a cursory review of the cases cited by the Commission demonstrates the inapplicability of its "pervasiveness" argument. In each of these cases, all of the profits sought to be disgorged were directly traceable to the defendant's misconduct, and in most of them, the entity or undertaking at issue was simply a sham vehicle organized to perpetrate a fraud. *See SEC v. Hasho,* 784 F.Supp. 1059 (S.D. N.Y. 1992) (defendants were participants in a boiler room operation; every action and every sale of securities was permeated with fraud and so court ordered total disgorgement of commissions); *Commodity Futures Trading Commission v. Emerald Worldwide Holdings, Inc.,* No. 03-8339, 2007 U.S. Dist. LEXIS 67947, at *11, *13 (C.D. Cal. May 17, 2007) (describing the defendants' operation as "a sham designed to obtain money from unsuspecting victims" and ordering total disgorgement); *SEC v. Interlink Data Network of Los Angeles, Inc.,* No. 93-3073, 1993 U.S. Dist. LEXIS 20163, at *3-*26, *54 (C.D. Cal. Nov. 15, 1993) (awarding total disgorgement where defendants' unregistered "boiler room" operation existed only to sell wholly fraudulent securities based on gross misrepresentations, and to operate a Ponzi scheme, entirely for the personal benefit of the principals, who used the operation to finance their lavish lifestyles); *Commodity Futures Trading Comm. v. British American Commodity Options Corp.,* 788 F.2d 92, 94 (2d Cir. 1986) (order of total disgorgement affirmed where the court was unable to find "any activity that was lawful"); *SEC v. Inorganic Recycling Corp.,* No. 99 Civ. 10159, 2002 U.S. Dist. LEXIS 15817, at *3, *7-8 (S.D. N.Y. Aug. 23, 2002) (describing the false securities offering, from which the unrebutted evidence clearly

---

[8] The Commission, a national agency, has itself agreed that disgorgement should be demonstrated by expert testimony in the form of "event studies" to distinguish ill-gotten gains from innocent fluctuations in the market. *See SEC v. Yuen*, No. 06-55857, 272 Fed.Appx. 615, 618 (9th Cir. Apr. 1, 2008). The Ninth Circuit affirmed the disgorgement figure, noting that "both parties and two experts agreed that the method used by the SEC's expert . . .

established that the defendants diverted funds to personal use, as a "scam"); *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1230-32 (D.C. Cir. 1989) (citing *British American Commodity Options Corp.*, 788 F.2d 92, but making no finding on pervasiveness, and finding instead that the defendant simply failed to rebut the Commission's showing of a reasonable approximation of profits causally connected to the insider trading because the defendant's arguments were "impossibly speculative").

## V. AT MOST, ONLY A LIMITED PENALTY MAY BE IMPOSED

The Commission's penalties claim seeks a penalty equal to the disgorgement amount it is able to prove. *See* Commission Pre-Hearing Brief [Dkt. No. 187] at 11. Because it has not met its burden of establishing its right to any disgorgement, the Commission cannot obtain such a penalty.[9]

---

is the generally accepted method of calculating disgorgement." *Id.*

[9] The only other basis for a penalty put forward by the Commission (in its pre-hearing brief) is the $120,000 per violation penalty for third tier violations as provided in 15 U.S.C. § 77t(d), 15 U.S.C. § 78u(d), and 17 C.F.R. §§ 201.1001-201.1002. If a third tier penalty even applies based on the default judgment imposed over Mr. Razmilovic's objection, the maximum that the Commission could obtain would be $120,000 for each of the claims for relief alleged against Mr. Razmilovic in the Complaint, for a total of $720,000. *SEC v. Henke*, 275 F.Supp.2d 1075, 1083-84 (N.D. Cal. 2003); *see also* Complaint, Claims 1-6. However, because the Commission never established in this proceeding any harm to investors, only a second tier penalty can be applied under the statute, 15 U.S.C. § 77t(d)(2)(B), such that the maximum penalty that could be imposed by the Court would be $360,000.

## VI. CONCLUSION

The Commission failed to meet its burden — indeed, it never seriously attempted — to prove a causal connection between any of the amounts received by Mr. Razmilovic and the alleged fraud. Courts routinely deny disgorgement in these circumstances, and this case should be no different. Accordingly, Mr. Razmilovic requests that this Court enter judgment for Mr. Razmilovic pursuant to Fed. R. Civ. P. 52(c), denying the Commission's request for disgorgement and denying its request for any penalty based on a putative amount of disgorgement.

Dated: March 31, 2010

Respectfully submitted,

DLA PIPER LLP (US)

By s/Jeffrey B. Coopersmith

David Nachman
1251 Avenue of the Americas
New York, NY 10020-1104
david.nachman@dlapiper.com
(212) 335-4500

Jeffrey B. Coopersmith
Admitted *Pro Hac Vice*
701 Fifth Avenue, Suite 7000
Seattle, WA 98104-7044
jeff.coopersmith@dlapiper.com
(206) 839-4847

Noah Katsell
Admitted *Pro Hac Vice*
401 B Street, Suite 1700
San Diego, CA 92101-4297
noah.katsell@dlapiper.com
(619) 699-2700