UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————X

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

TOMO RAZMILOVIC, BRIAN BURKE, FRANK
BORGHESE, JAMES DEAN, ROBERT
DONLON and GREGORY MORTENSON,

Defendants.

———————————————————————X

**MEMORANDUM OF DECISION**

**CV-04-2276 (SJF)(WDW)**

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y

★   SEP 3 ᵛ 2011   ★

LONG ISLAND OFFICE

FEUERSTEIN, J.

I.    Procedural History

On June 3, 2004, the Securities and Exchange Commission ("SEC") commenced this

action against defendant Tomo Razmilovic ("Razmilovic"), and others[1], alleging claims, *inter alia*,

for violations of Section 17(a) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. §

77q(a); Sections 10(b), 13(a), 13(b)(2) and 13(b)(5) of the Securities Exchange Act of 1934 ("the

Exchange Act"), 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2) and 78m(b)(5), and Rules 10b-5, 12b-20,

---

[1] The complaint named the following defendants: Symbol Technologies, Inc.
("Symbol"), Kenneth Jaeggi ("Jaeggi"), Leonard Goldner ("Goldner"), Brian Burke ("Burke"),
Michael DeGennaro ("DeGennaro"), Frank Borghese ("Borghese"), Christopher DeSantis
("DeSantis"), James Heuschneider ("Heuschneider"), James Dean ("Dean"), Robert Donlon
("Donlon") and Gregory Mortenson ("Mortenson"). Partial final consent judgments were entered
as against the following defendants: (1) Dean on June 15, 2004, (Doc. No. 4); (2) Burke on
February 28, 2005, (Doc. No. 35); (3) Donlon on January 22, 2008, (Doc. No. 73); and (4)
Mortenson on February 7, 2008, (Doc. No. 76).  Final consent judgments were entered as against
the following defendants: (1) Symbol on June 15, 2004, (Doc. No. 5), as amended on January 23,
2007; (2) Goldner on February 13, 2006, (Doc. No. 41); (3) Heuschneider, Jaeggi and DeSantis
on November 2, 2009, (Doc. Nos. 126, 127 and 128, respectively); and (4) Borghese on February
22, 2010, (Doc. No. 169).

13a-1, 13a-13, 13b2-1 and 13b2-2 thereunder, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, 240.13b2-1 and 240.13b2-2. The SEC seeks, *inter alia*: (1) to permanently enjoin Razmilovic from future violations of the securities laws, from controlling any person who violates the securities laws and from acting as an officer or director of a public company; (2) disgorgement of all profits realized by Razmilovic as a result of his violations of the securities laws, including prejudgment interest thereon; and (3) civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d). (Compl., ¶ 14, pp. 78-82).

On July 21, 2009, the SEC served Razmilovic's counsel with a notice to take Razmilovic's deposition at the SEC's offices in New York on Monday, September 28, 2009. (See Motion to Compel, Doc. No. 100, Ex. B). Razmilovic's counsel informed the SEC that Razmilovic refused to appear for a deposition in the United States[2] and alternatively proposed conducting an in-person deposition of Razmilovic in Sweden or a deposition via videoconference. (Id., Ex. F). By order dated October 9, 2009, I, *inter alia*, granted the SEC's subsequent motion to compel the deposition of Razmilovic in person on or before October 22, 2009, as provided in the SEC's notice of deposition; denied Razmilovic's motion to conduct his deposition via videoconference; and advised that Razmilovic's failure to appear in person for the deposition as noticed could result in sanctions being imposed against him and/or his attorneys pursuant to Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure, including the entry of a default judgment against him. (Doc. No. 109). Razmilovic failed to appear for the deposition as directed by the October 9, 2009 order.

On December 21, 2009, the SEC moved, pursuant to Rule 37 of the Federal Rules of Civil

---

[2] Razmilovic currently resides in Sweden, where he fled following his indictment on criminal charges relating to the pervasive fraud scheme at Symbol.

Procedure, for a default judgment against Razmilovic based upon his failure to comply with this Court's October 9, 2009 order. (Doc. No. 137). On December 22, 2009, I granted the SEC's motion for a default judgment against Razmilovic pursuant to Rule 37 of the Federal Rules of Civil Procedure based upon his failure to comply with this Court's October 9, 2009 order. By order dated February 25, 2010, I denied Razmilovic's motion for reconsideration of the December 22, 2009 order.

On March 15, 2010, a bench trial commenced to determine the appropriate remedies for Razmilovic's violations of the securities laws established by the entry of a default judgment against him. The SEC rested its case-in-chief on that date. The following day, the trial was continued to May 10, 2010[3]. On March 17, 2010, at my request, counsel for Razmilovic filed a joint proposed scheduling order which directed, *inter alia*: (1) the SEC to (a) notify Razmilovic's counsel by March 19, 2010 if it intended to call an expert witness, (b) provide Razmilovic's counsel with the name and curriculum vitae of any such expert witness immediately upon the selection of that expert and (c) serve upon Razmilovic's counsel an expert witness report on or before April 9, 2010; (2) Razmilovic to serve on the SEC's counsel any revised or updated expert report by his previously-identified expert witness on or before April 9, 2010; and (3) both parties to submit to the Court no later than April 30, 2010 a revised joint pretrial order, reflecting any additional exhibits and/or witnesses either party proposed to offer or call during the continued trial. That proposed order was approved and signed by me on March 18, 2010 and entered as an order of the Court on March 19, 2010.

On April 5, 2010, Razmilovic filed a motion for judgment on partial findings pursuant to

---

[3] I subsequently granted Razmilovic's request to adjourn the trial date and adjourned the trial date until June 21, 2010.

3

Rule 52(c) of the Federal Rules of Civil Procedure. On April 12, 2010, I granted, over Razmilovic's objection, the SEC's motion to reopen its case-in-chief to call Edward S. O'Neal[4] as an expert witness and to admit into evidence O'Neal's report and two (2) additional exhibits.

By order entered June 15, 2010, I, *inter alia*, denied Razmilovic's motion for judgment on partial findings. During the proceedings on June 21, 2010, I, *inter alia*, denied the parties' respective motions to exclude the testimony of each other's expert witness at trial and, over the SEC's objection, granted Razmilovic's request to determine the remaining issues upon submission of experts' reports, deposition transcripts and post-hearing briefs. Accordingly, the trial was adjourned *sine die* and a briefing schedule was set. The following constitutes my findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

II.     Findings of Fact

      A.     Employment Agreements

1.     Razmilovic was the president and chief operating officer of Symbol from 1995 through June 2000. (Complaint [Compl.], ¶ 18; Trial Exhibits [TE.], 4 (Employment Agreement between Symbol and Razmilovic dated October 16, 1995 ["1995 Employment Agreement"])).

2.     In consideration of the services rendered by Razmilovic under the 1995 Employment Agreement, Symbol agreed, *inter alia*, to compensate him with a base salary and an annual bonus to be determined pursuant to Symbol's Executive Bonus Plan. (TE 4, ¶¶ 4(a) and (b)).

---

[4] I had previously granted the SEC leave to call O'Neal as a rebuttal witness, if necessary.

3.      As set forth in its 2000, 2001 and 2002 Proxy Statements, Symbol's "executive

compensation program" ("ECP"):

> "Relate[s] compensation to performance.  Overall compensation paid to senior
> executives should be tied to how well [Symbol] performs financially. * * *
>
> It is [Symbol's] policy to pay its senior executives at levels that reflect [Symbol's]
> financial performance relative to comparable organizations. * * * The three
> elements of [Symbol's] [ECP] are: Base salary[,] Executive Bonus Plan[,] [and]
> Stock option awards. * * *
>
> * * * Adjustments in base salary are generally not based upon the financial
> performance of [Symbol]. * * *
>
> [Symbol] promotes a pay-for-performance philosophy.  A significant element of
> annual compensation is linked to the financial performance of [Symbol]. * * * The
> purpose of the [Executive Bonus Plan] is to tie the level of annual executive
> incentive compensation to the financial performance of [Symbol]. * * *
>
> Under the Executive Bonus Plan, each year [Symbol] establish[es] corporate
> financial performance objectives * * *, based on earnings per share. [Symbol]
> ha[s] identified three levels of performance: threshold performance, at which the
> minimum award (one-half a participant's target bonus) will be earned and below
> which no award will be earned[;] target performance, at which the target award
> will be earned; and maximum performance, at which the maximum award (twice a
> participant's target bonus) will be earned and above which no additional award
> will be earned. * * *"
>
> * * * Stock options provide employees with the opportunity to become
> shareholders of [Symbol], and to participate in the creation of shareholder value as
> reflected in growth in the price of [Symbol's] common stock.
>
> Option exercise prices are equal to 100% of the fair market value of [Symbol's]
> common stock on the date of option grant.  This ensures that participants will
> derive benefit only as shareholders realize corresponding gains. * * *
>
> * * * We believe that granting stock options reinforces [Symbol's] objective of
> insuring a strong link between employee rewards and shareholder interests. * * *
>
> * * * We firmly believe that the long term interests of [Symbol's] shareholders are
> best served when management maintains a significant, equity-based interest in
> [Symbol].  We consider both vested, unexercised options and shares owned as
> meaningful expressions of such interest.  We developed a [stock ownership and

option retention] program with target levels of equity interest for each executive officer.  Under the program, * * *, if an executive has not attained the minimum requirements described [therein], his ability to exercise options or sell shares is limited. * * *

The program limits the exercise of vested options * * * unless the executive meets and will continue to meet the equity interest requirement * * *.  The equity interest requirement provides that the combined value of [Symbol's] common stock and vested options held by the executive, each valued at the then market price of [Symbol's] common stock, must be equal to or greater than a designated multiple of the executive's annual base salary plus target bonus.

If the equity interest requirement is satisfied, the program allows for the exercise of vested options within strict limits. * * *."

(TE 11 (Symbol's Proxy Statement dated March 15, 2000 ["2000 Proxy Statement"]), at

10-13; TE 12 (Symbol's Proxy Statement dated April 2, 2001 ["2001 Proxy Statement"]),

at 10-13; TE 13 (Symbol's Proxy Statement dated March 12, 2002 ["2002 Proxy

Statement"]), at 7-10; see also TE 45, at 82; TE 46).

4.      Pursuant to the minutes of meetings of the Compensation/Stock Option Committee of

Symbol's Board of Directors ("Symbol's Compensation Committee") held on December

14, 1998, December 13, 1999 and December 11, 2000, the Committee adopted

performance criteria for its Executive Bonus Plan for the years 1999, 2000 and 2001,

respectively, pursuant to which, *inter alia*, Razmilovic's bonus "would be based entirely

on corporate financial performance * * *." (TE 38[5], 40 and 43; see also TE 11, at 12; TE

─────────────────────

[5] Razmilovic contends that I should not consider this exhibit because I sustained his objection to its admission at trial based upon the SEC's failure to include it in the parties' first joint pre-trial order.  However, as the transcript of the trial proceedings makes clear, the SEC argued, *inter alia*, that there was no prejudice to Razmilovic by the admission of that exhibit because Martin, his own expert, had responded to the information contained therein in concluding that the performance bonuses Razmilovic had received in 1999 and 2000 had been contingent on Symbol meeting performance objectives. (Declaration of Jeffrey B. Coopersmith, Esq. in Support of Defendant Tomo Razmilovic's Post-Trial Brief [Coopersmith Decl.], Ex. 6, at

12, at 12).

5.      Pursuant to the minutes of a meeting of Symbol's Compensation Committee held on

February 26, 2001, "biennial performance [stock] options" awarded to Symbol's

executive officers were:

> "split between 'performance' grants which [would] vest on July 1, 2006, subject to
> earlier vesting and 'normal' grants which [would] vest according to [Symbol's]
> normal Executive option vesting schedule. * * * [T]he performance portion of
> each award would initially vest on January 1, 2006, subject to accelerated vesting
> if certain levels of earnings growth were attained in 2001 and 2002. * * * The EPS
> [earnings per shares] calculation in 2001 and 2002 would use the same criteria as
> used * * * in calculating EPS for purposes of [Symbol's] Executive Bonus Plan."

(TE 19, at 1-2).

6.      In 1999, Razmilovic was paid a base salary in the amount of six hundred thirty-five

thousand seven hundred forty-nine dollars ($635,749.00) and a bonus in the amount of

seven hundred forty-two thousand dollars ($742,000.00).  (TE 11, at 14; TE 12, at 14; TE

13, at 12; TE 20; TE 37[6]).

7.      The "performance" stock options awarded in 1999 met the criteria for accelerated vesting.

---

32).  In response, counsel for Razmilovic argued that he may or may not present Martin's report
upon his defense depending upon whether it was necessary in order to respond to the SEC's case-
in-chief.  (Id. at 33).  Accordingly, I sustained Razmilovic's objection to the admission of Exhibit
38 into evidence, but indicated that the SEC could "bring it in on [its] rebuttal case."  (Id. at 33-
34).  Thereafter, upon the request of Razmilovic's counsel, I agreed to proceed on written
submissions and documentary evidence, rather than proceed with the trial, and Razmilovic
proffered Martin's expert report in his submissions.  Since Razmilovic, in fact, submitted
Martin's expert report, consideration of Exhibit 38 is not precluded by my evidentiary ruling at
trial.  In any event, any error in the admission of this exhibit would be harmless in light of the
other evidence bearing on this issue.

    [6] The 2000 data in this exhibit includes the seven hundred forty-two thousand dollar
($742,000.00) bonus paid to Razmilovic in February 2000 "relat[ing] to [Symbol's] performance
in 1999."  (TE 37).

(TE 19, at 4).

8.    On February 15, 2000, Symbol reported its results for the fourth quarter and full year ended December 31, 1999 indicating: (1) (a) a more than sixteen percent (16.2%) increase in revenue, (b) a more than thirty-four percent (34.7%) increase in operating earnings, (c) a more than thirty-five percent (35.3%) increase in net earnings and (d) a more than thirty-four percent (34.6%) increase in diluted earnings per share, for the 1999 fourth quarter; and (2) (a) a sixteen and one-half percent (16.5%) increase in revenue, (b) an almost twenty-five percent (24.9%) increase in operating earnings, (c) a more than twenty-five percent (25.2%) increase in net earnings and (d) a more than twenty-four percent (24.2%) increase in diluted earnings per share, for the 1999 full year.  (TE 42).

9.    In February 2000, "in connection with [him] being promoted to Chief Executive Officer," Razmilovic was awarded stock options to purchase three hundred seventy-five thousand (375,000) shares of Symbol's common stock at an exercise price of fifty-three dollars and seventy-five cents ($53.75).  (TE 12, at 12).

10.    One hundred fifty thousand (150,000) of those options were to vest on February 14, 2002, one hundred twelve thousand five hundred (112,500) of those options were to vest on February 14, 2003 and one hundred twelve thousand five hundred (112,500) of those options were to vest on February 14, 2004.  (Id.)

11.    In July 2000, "in connection with [him] entering into a new five-year employment agreement with [Symbol]," Razmilovic was awarded additional stock options to purchase two hundred fifty thousand (250,000) shares of Symbol's common stock at an exercise price of thirty-nine dollars and eighty seven and a half cents ($39.875) per share.  (Id.)

12.   Razmilovic's right to purchase twenty-five thousand (25,000) shares under those options vested on July 31, 2001; his right to purchase an additional thirty-seven thousand five hundred (37,500) shares vested six (6) months thereafter, i.e., on January 31, 2002; and the remaining options were to vest on each of the next five (5) consecutive six (6) month anniversary dates, beginning on July 31, 2002.  (Id.)

13.   From July 2000 until February 2002, Razmilovic was the president and chief executive officer ("CEO") of Symbol.  (Compl., ¶ 18; TE 5 (Employment Agreement between Symbol and Razmilovic dated July 1, 2000 ["2000 Employment Agreement"]).

14.   In consideration of the services rendered by Razmilovic under the 2000 Employment Agreement, Symbol agreed, *inter alia*, to compensate him: (a) with a base salary starting at the rate of one million dollars ($1,000,000.00) per annum for the period ending June 30, 2002, and increasing every two (2) years thereafter to a mutually agreeable amount; and (b) with an annual bonus to be determined pursuant to Symbol's Executive Bonus Plan, in a targeted amount of one hundred percent (100%) of his base salary actually earned.  (TE 5, ¶¶ 4(a) and (b); see TE 12, at 10-12, 15).

15.   On November 30, 2000, a wholly-owned subsidiary of Symbol was merged with Telxon Corporation ("the Telxon acquisition") in a stock-for-stock merger.  (TE 45, at 10, 46).

16.   "The [Telxon] acquisition was accounted for as a purchase and the excess of the purchase price over the fair value of the assets acquired and liabilities assumed was recorded as goodwill."  (TE 45, at 46).

17.   In its restatement, Symbol subsequently "adjusted goodwill for revisions to the fair values of the assets and liabilities acquired."  (Id.)

9

18.   In 2000, Razmilovic was paid a base salary in the amount of eight hundred thirty-two
      thousand seven hundred seventy dollars ($832,770.00), a bonus in the amount of nine
      hundred forty-nine thousand four hundred dollars ($949,400.00), and a special bonus in
      the amount of two hundred sixty thousand dollars ($260,000.00), related to Symbol's
      acquisition of Telxon Corporation.  (TE 10; TE 12, at 12, 14; TE 13, at 12; TE 45
      (Symbol's Annual Report on Form 10-K/A for the year ended December 31, 2002 ["2002
      Annual Report"]), at 78; TE 19, at 3-4; TE 20; TE 37).

19.   Symbol's 2001 Proxy Statement provides, in relevant part, that "special bonuses were
      paid to certain participants in the Executive Bonus Plan in recognition of the additional
      duties and responsibilities relating to the acquisition of Telxon Corporation."  (TE 12, at
      10-12, 15).

20.   On February 27, 2001, Symbol reported its results for the fourth quarter and full year
      ended December 31, 2000, indicating: (1) a more than thirty-two percent (32.7%) increase
      in revenue for the fourth quarter of 2000; (2) a more than twenty-seven percent (27.3%)
      increase in revenue for the full year; but (3) a net loss in income and diluted earnings per
      share for both the fourth quarter and full year ended December 31, 2000.  (TE 44).

21.   In May 2001, Symbol initiated an internal review of certain financial matters in response
      to an inquiry from the SEC.  (TE 45, at 2, 16, 42, 71).

22.   In 2001, Razmilovic received a base salary of one million two dollars ($1,000,002.00)
      and no performance bonus.  (TE 13, at 9, 12; TE 45, at 78; TE 37[7]).

_____

      [7] The 2001 data in this exhibit includes the two hundred sixty thousand dollar
($260,000.00) Telxon bonus and the nine hundred forty-nine thousand four hundred dollar
($949,400.00) "performance bonus paid in March 2001, which relates to [Symbol's] 2000

23.     Symbol's 2002 Proxy Statement indicates, in relevant part, that in February 2001 "in connection with a periodic performance review," Razmilovic was granted stock options to purchase three hundred seventy-five thousand (375,000) shares of Symbol's common stock at an exercise price of twenty-seven dollars and ninety-seven cents ($27.97).

24.     Twelve thousand seven hundred fifty (12,750) of those options vested on January 1, 2002 and the remaining options would have vested on or after July 1, 2002 but were canceled in February 2002 "in connection with arrangements entered into between Symbol and Mr. Razmilovic." (TE 13, at 9-10).

25.     On February 14, 2002, Razmilovic "resigned" as president and CEO of Symbol, but entered into two (2) new agreements with Symbol that superceded and replaced the 2000 Employment Agreement.  (TE 6 (Employment Agreement between Symbol and Razmilovic dated February 14, 2002 ["2002 Employment Agreement"], ¶¶ 3, 4(a), 14; TE 7 (Separation, Release and Non-Disclosure Agreement ["Separation Agreement"], ¶¶ 1, 2(B)); see TE 13, at 13).

26.     Pursuant to those two (2) agreements, Razmilovic was to remain a full-time employee of Symbol until May 6, 2002 and thereafter he would be a part-time employee of Symbol in a "consultative capacity" for a five (5)-year term.  (TE 6, ¶¶ 3, 4(a), 14; TE 7, ¶¶ 1, 2(B); see also TE 45, at 82).

27.     In consideration of the services rendered by Razmilovic under the 2002 Employment Agreement, Symbol agreed, *inter alia*, to compensate him: (a) with a salary at the rate of thirty-eight thousand four hundred sixty-one dollars and fifty-three cents ($38,461.53) per

---

performance."  (TE 37).

bi-weekly pay period (one million dollars ($1,000,000.00) on an annualized basis) through and including May 6, 2002; and (b) with a salary at the rate of two hundred thousand dollars ($200,000.00) per annum for the period from May 7, 2002 through May 6, 2007, (TE 6, ¶ 5(a); see TE 13, at 13).

28.     The Severance Agreement provides, in relevant part: "In consideration for executing this Agreement and in full and complete satisfaction of [Symbol's] contractual obligation to Razmilovic under the [2000] Employment Agreement, Symbol will provide Razmilovic the following: (A) * * * Razmilovic will receive a lump sum payment of $5 million dollars.  Razmilovic relinquishes his right to all outstanding stock options whether vested or unvested as of [February 14, 2002], with the exception of 236,250 shares granted to Razmilovic on October 19, 1998, under [Symbol's] 1997 Stock Option Plan. * * *"

29.     In accordance with that provision of the Separation Agreement, Razmilovic relinquished one million eight hundred eighteen thousand seven hundred fifty (1,818,750) stock options.  (Brody Decl., Ex. 1; TE 7, ¶ 2(A); see TE 13, at 13).

30.     Symbol's 2002 Proxy Statement indicates that those stock options had been granted to Razmilovic in February 2001 "in connection with a periodic performance review," but had been canceled in February 2002 "in connection with arrangements entered into between Symbol and Mr. Razmilovic."  (TE 13, at 9-10).

31.     In 2002, Razmilovic received a base salary of four hundred seventy-six thousand nine hundred thirty-two dollars ($476,932.00), the five million dollar ($5,000,000.00) severance payment and no performance bonus.  (TE 45, at 78; TE 37).

32.     The 1995, 2000 and 2002 Employment Agreements: (1) required Razmilovic, *inter alia*,

to "use his best efforts to promote [Symbol's] * * * best interests * * *," (TE 4 and 5, ¶¶

3(a); TE 6, ¶ 4(a)), and (2) could be terminated, *inter alia*, (a) voluntarily by Razmilovic,

(TE 4 and 5, ¶¶ 12(a)(iii); TE 6, ¶ 13(a)(iii), or (b) for "cause" upon written notice to

Razmilovic of election of Symbol's Board of Directors to terminate his employment.  (TE

4 and 5, ¶¶ 12(a)(iv); TE 6, ¶ 13(a)(iv)).

33.   "Cause" is defined in the 1995, 2000 and 2002 Employment Agreements as "a

determination made in good faith by vote of a majority of the members of the Board of

Directors of [Symbol] * * * that one of the following conditions exists or one of the

following events has occurred: * * * (ii) * * * willful misconduct or gross negligence on

[Razmilovic's] part in connection with the performance of [his] duties."  (TE 4 and 5, ¶¶

12(b)(1)(ii); TE 6, ¶ 13(b)(iii)).

34.   The 1995 and 2000 Employment Agreements further provide that Razmilovic would be

entitled to a severance payment "[i]n the event of the termination of [his] employment * *

* for any reason * * * *other than due to* * * * (ii) his voluntary termination of his

employment with [Symbol] pursuant to subsection 12(a)(iii); or (iii) his termination for

cause as provided in subsection 12(a)(iv) * * *."  (TE 4 and 5, ¶¶ 12(c)) (emphasis

added).

35.   The 2000 Employment Agreement also provided for an additional severance payment

"[i]n the event of the termination of [Razmilovic's] employment prior to July 1, 2003 for

any reason *other than due to* * * * (ii) his voluntary termination of his employment with

[Symbol] pursuant to subsection 12(a)(iii); or (iii) his termination for cause as provided in

subsection 12(a)(iv) * * *."  (TE 5, ¶ 12(d)) (emphasis added).

13

36.     The Separation Agreement indicates, *inter alia*, that Razmilovic resigned his position
        with Symbol as president and CEO pursuant to paragraph 12(a)(iii) of the 2000
        Employment Agreement.  (TE 7, ¶ 1).


        B.      Symbol's Restatement

37.     Although Symbol's internal investigation was "hindered by certain of [its] former
        employees," (TE, at 16, 42, 43), it eventually "identified accounting errors and
        irregularities relating to [its] previously issued financial statements," requiring it to restate
        its "selected financial data for 1998, 1999, 2000 and 2001, financial statements for the
        years ended December 31, 2000 and 2001, and unaudited selected quarterly information
        for each of the four quarters of 2001 and first three quarters of 2002."  (TE 45, at 1).

38.     On February 25, 2004, Symbol filed an amendment to its Form 10-K (Annual Report
        pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934) for the fiscal year
        ended December 31, 2002 ("the Restatement"), that had originally been filed on
        December 30, 2003[8] ("the original 10-K"), "to reflect the restatement of [its] 2002 and
        2001 financial statements * * *."  (TE 45).

39.     Pursuant to the Restatement, Symbol "reversed cumulative net revenue of $234,220,000
        and cumulative net earnings of $325,536,000 that had previously been recognized through
        the period ended September 30, 2002."  (TE 45, at 3).

---

[8]  The filing of Symbol's original 10-K had itself been delayed "as a result of Symbol's internal investigations and the resulting restatement of [its] selected financial data for 1998, 1999, 2000 and 2001, financial statements for the years ended December 31, 2000 and 2001, and unaudited selected quarterly information for each of the four quarters of 2001 and the first three quarters of 2002."  (TE 45, at 1).

14

40.    As of September 30, 2002, [Symbol's] restated Stockholders' Equity was $946,261,000 as compared with $1,171,393,000 as originally reflected in [Symbol's] Form 10-Q for the quarter then ended." (TE 45, at 3; see also TE 45, at 43).

41.    As noted in Symbol's Restatement:

> "The adjustments necessary to restate [Symbol's] financial statements in accordance with accounting principles generally accepted in the United States of America ('U.S. GAAP') relate to widespread errors and irregularities primarily involving the timing and amount of product and service revenues recognized and the timing and amounts recognized with respect to certain reserves, restructurings, certain option programs and several categories of cost of revenue and operating expenses. [Symbol] reversed cumulative net revenue of $234,220,000 and cumulative net earnings of $325,536,000 that had previously been recognized through the period ended September 30, 2002. As of September 30, 2002, [Symbol's] restated Stockholders' Equity was $946,261,000 as compared with $1,171,393,000 as originally reflected in [Symbol's] Form 10-Q for the quarter then ended."

(TE 45, at 2-3; see also TE 45, at 18, 28, 42, 43, 71).

42.    Symbol's Restatement further indicates that:

> "In particular, the [internal] investigation found that revenue was accelerated from the appropriate quarters to earlier quarters through a variety of improper means and, on a more limited basis, revenue was improperly created and inflated on a net basis. Additionally, there were errors and irregularities associated with the establishment and utilization of certain reserves and restructurings, including certain end-of-quarter adjustments that were apparently made in order to achieve previously forecasted financial results. There were also errors and/or irregularities associated with the administration of certain options programs, as well as several categories of cost of revenue and operating expenses, including efforts to artificially reduce reported inventory."

(TE 45, at 42-43).

43.    Examples of the fraud included in Symbol's Restatement are: (1) the improper recognition of revenue from non-binding sales agreements, (TE 45, at 44); (2) the improper amount and timing of (a) the restructuring, impairment and merger integration charges associated

with the Telxon acquisition recorded in December 2000 and (b) the restructuring charge associated with the reorganization of Symbol's manufacturing facility recorded in September 2001, as well as the subsequent utilization of the established reserves relating to both transactions, (TE 45, at 44-45); (3) the improper nature, timing and amount of inventory charges recorded in June 2001, (TE 45, at 45); (4) the incorrect capitalization of certain computer hardware development costs, (id.); (5) the misapplication of accounting principles relating to computer software design and development costs, (id.); (6) the incorrect amortization of certain patent-related costs beyond the life of the related patent, (id.); (7) the inability to associate various legal costs incurred with a specific patent, (id.); (8) improper adjustments to goodwill relating to the Telxon acquisition and the incorrect recording of adjustments properly made in accounts other than goodwill, (TE 45, at 46); (9) the erroneous establishment or release of reserves relating to accruals for costs incurred that had not been paid and prepayments for goods or services to be received that had been paid in advance, (id.); (10) the improper classification of certain categories of expenses in the statements of operations, (id.); (11) irregularities and improper administration of option exercises relating to Symbol's stock option plans, (TE 45, at 47); (12) the improper acceleration of cash receipts into earlier accounting periods and incorrect reclassifications to certain balance sheet accounts, such as accounts receivable and other assets, (TE 45, at 48); (13) the carrying of marketable securities, property, plant, equipment and other long-lived assets at amounts exceeding their net realizable values, (id); and (14) the improper timing of an "other-than-temporary impairment" in Symbol's investment in the common stock for Cisco Systems, Inc. in the second quarter of 2002,

16

when it should have been recognized in September 2001, (id.).

C.    Fraud Scheme

44.    Razmilovic and his co-defendants, "engaged in a fraudulent scheme to inflate revenue,

earnings and other measures of financial performance in order to create the false

appearance that Symbol had met or exceeded its financial projections," (Compl., ¶ 34),

resulting in "material misstatements of revenue, earnings and other financial information

reported by Symbol for annual and quarterly reporting periods from at least 1998 through

the fourth quarter of 2002." (Id.)

45.    The fraudulent accounting practices include: "patently improper topside adjustments, a

multitude of revenue recognition schemes, the manipulation of non-recurring charges and

'cookie jar' reserves to manage earnings * * *." (Id.; see also ¶ 158).

46.    Due to the fraudulent practices of Razmilovic and his co-defendants, documents filed by

Symbol with the SEC "contained financial statements that materially overstated Symbol's

revenue and net income for the subject reporting periods and other material misstatements

concerning Symbol's financial performance." (Compl., ¶ 166).

47.    Razmilovic and four (4) of his co-defendants directed the fraud, which was implemented

by the other five (5) co-defendants. (Compl., ¶ 34).

48.    Specifically, *inter alia*: (1) Razmilovic authorized adjustments made, and directed

additional adjustments to be made, on Symbol's "Tango" sheets in order to understate

Symbol's expenses and overstate its revenue and earnings, (Compl., ¶¶ 35-41); (2)

Razmilovic, and others, "negotiated large quarter-end transactions designed to pump

17

additional revenue into [Symbol's] financial statements" and otherwise "engaged in multiple fraudulent schemes to inflate Symbol's reported sales revenue and income * * *," (Compl., ¶¶ 42-43); (3) "[a]t the end of the second quarter of 2001, Razmilovic negotiated an artificial 'swap' transaction with a software company on which Symbol improperly recognized $4.25 million in revenue that quarter," (Compl., ¶ 44); and (4) Razmilovic signed (a) Form 10-K and/or Form 10-Q reports filed with the SEC which contained materially false and misleading information inflating Symbol's financial results, (Compl., ¶¶ 142-146), and (b) registration statements filed with the SEC which incorporated one or more of those false and misleading reports, (Compl., ¶¶ 147-148).

49.    Razmilovic benefitted from his fraud by receiving "performance bonuses and other incentive compensation, severance payments and the proceeds of multiple transactions in Symbol securities," including "European 'zero cost collar' transactions with a brokerage firm" and the exercise of stock options priced below the inflated market price.  (Compl., ¶ 155(a)).

50.    On May 28, 2004, Razmilovic was indicted in the United States District Court for the Eastern District of New York for his participation in the fraudulent scheme and accounting practices at Symbol.

51.    At the time of his indictment, Razmilovic was living in the United Kingdom, but he subsequently moved to Croatia, then Sweden, where he currently resides.

III.    Expert Reports

 A. SEC's Expert

 The SEC retained Edward S. O'Neal, Ph.D. ("O'Neal") to evaluate the inflation in the

common stock price of Symbol due to the financial misrepresentations that occurred between 1998

and 2002.  (Expert Report of Edward S. O'Neal, Ph.D. dated April 9, 2010 [O'Neal Rpt.], Brody

Decl., Ex. 4).  O'Neal assessed the impact of the financial misrepresentations on Symbol common

stock prices utilizing an "event study methodology," which looks at the expected return on the

security; the unexpected return on the security due to the event, i.e., the difference between the

observed return or actual stock price and the expected return; and the statistical likelihood of an

unexpected return as large as the one observed, i.e., how closely a stock tends to adhere to its

average relationship with the market.  (O'Neal Rpt., at 6-8).

 O'Neal identified three (3) statistically significant announcements:

> (1) Symbol's announcement following the close of trading on July 16, 2001 ("the
> July 16, 2001 announcement") that its 2001 second quarter revenue and earnings
> were expected to be "significantly below analyst estimates," (Brody Decl., Ex. 6),
> which O'Neal attributed, in part, "to some reversal of Symbol's prior accounting
> fraud concerning fraudulent sales into the distribution channel," (O'Neal Rpt., at
> 11), and which resulted in a thirty percent (30%) decline in Symbol's stock price
> the next trading day, i.e., on July 17, 2001, Symbol's stock price declined to five
> dollars and seventy-eight cents ($5.78), (id.);

> (2) an article in Newsday on February 13, 2002 ("the February 13, 2002 article")
> (a) revealing the SEC's inquiry into Symbol and the commission of an independent
> review by Symbol of its sales practices, and (b) questioning Symbol's accounting
> and sales practices and whether the retirement of its CEO, Razmilovic, was
> imminent, (Brody Decl., Ex. 10), which resulted in a seventeen percent (17%)
> decline in Symbol's stock price, i.e., to two dollars and sixty-six cents ($2.66),
> (O'Neal Rpt., at 11); and

> (3) Symbol's announcements after the close of trading on February 14, 2002 ("the
> February 14, 2002 announcements") (a) of its 2001 fourth quarter and full-year

19

results and its expected 2002 first quarter revenue earnings, (b) that it lowered earnings guidance for subsequent quarters and (c) that its CEO, Razmilovic, had abruptly retired, (Brody Decl., Ex. 11), which resulted in an almost twenty-nine percent (29%) decline in Symbol's stock price, i.e., to three dollars and ten cents ($3.10). (O'Neal Rpt., at 11-12).

According to O'Neal, those three (3) announcements "caused a total abnormal return to Symbol stock of -$11.54." (O'Neal Rpt., at 12). Thus, O'Neal applied that amount, adjusted accordingly to account for the three-to-two (3-2) stock splits of Symbol stock on two (2) separate occasions and/or for the correction of some financial results following the July 16, 2001 announcement, as the inflation present in Symbol's stock price during the fraud period. (Id. at 12-13).

B.    Razmilovic's Expert

Razmilovic retained Denise Neumann Martin, Ph.D. ("Martin") to calculate his disgorgement liability. (Expert Report of Denise Neumann Martin, Ph.D. [Martin Rpt.] dated April 9, 2010, Brody Decl., Ex. 5). Martin also utilized an "event study" methodology and identified eleven (11) statistically significant annoucements: the February 13, 2002 article and ten (10) dates subsequent to Razmilovic's resignation and stock transactions. (Id. at 7 and Ex. 6A). According to Martin, "much of the movement in Symbol's stock price was attributable to industry trends, and should not be included in any measure of disgorgement." (Id. at 5). Martin estimated the inflation price of Symbol stock as three dollars and forty-two cents ($3.42) and eventually concluded that Razmilovic is only liable to disgorge the amount of four million eight hundred seventy thousand dollars ($4,870,000.00). (Martin Rpt., at 3, 11).

20

IV.     Conclusions of Law

A.      Disgorgement

The SEC contends that it is not required to prove the disgorgeable amount with certainty. Rather, according to the SEC, the amount of disgorgement need only be a reasonable approximation of profits connected to the violation, with any risk of uncertainty falling upon Razmilovic, the wrongdoer.  The SEC contends that since its calculation of the disgorgement amount is reasonable, the burden shifted to Razmilovic to show that its calculation is not a reasonable approximation and to rebut the presumption that all profits earned during the fraud period are disgorgeable.

Razmilovic contends that the SEC has the burden of proving a causal connection between his compensation and the alleged fraud.


1.      Standard

Disgorgement is a form of equitable relief, see SEC v. Wang, 944 F.2d 80, 85 (2d Cir. 1991); see also SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1474 (2d Cir. 1996), and is "a method of forcing a defendant to give up the amount by which he was unjustly enriched." Federal Trade Commission v. Bronson Partners, LLC, ___ F.3d ___, 2011 WL 3629718, at * 9 (2d Cir. Aug. 19, 2011) (quoting SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 102 (2d Cir. 1978)).  "[T]he primary purpose of disgorgement orders is to deter violations of the [] laws by depriving violators of their ill-gotten gains." Id., at * 10 (quoting SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997)); see also SEC v. DiBella, 587 F.3d 553, 572 (2d Cir. 2009); First Jersey Securities, 101 F.3d at 1474, 1475; Wang, 944 F.2d at 85, 88.  The relevant inquiry is, thus, whether the defendant was unjustly enriched by his illegal conduct. See DiBella, 587 F.3d at 572.

21

The remedy of disgorgement "consists of factfinding by a district court to determine the amount of money acquired through wrongdoing * * * and an order compelling the wrongdoer to pay that amount plus interest to the court." SEC v. Cavanagh, 445 F.3d 105, 116 (2d Cir. 2006). Since the purpose of disgorgement is remedial, not punitive, disgorgement may not be awarded above that amount. Id. at 116, n. 25.  "A district court order of disgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court * * *." Id. at 117. The SEC must first demonstrate that its calculation of disgorgement reasonably approximates the amount of the defendant's unjust enrichment, after which the burden shifts to the defendant to show that the SEC's calculation was unreasonable, i.e., that he received less than the full amount sought to be disgorged. See SEC v. Colonial Investment Management LLC, 659 F.Supp.2d 467, 501 (S.D.N.Y. 2009), aff'd, 381 Fed. Appx. 27 (2d Cir. June 17, 2010); U.S. SEC v. Universal Exp., Inc., 646 F.Supp.2d 552, 563 (S.D.N.Y. 2009); SEC v. Aimsi Technologies, Inc., 650 F.Supp.2d 296, 304 (S.D.N.Y. 2009); SEC v. Opulentica, LLC, 479 F.Supp.2d 319, 330 (S.D.N.Y. 2007).

"Disgorgement need only be a reasonable approximation of profits causally connected to the violation." SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995) (quotations, alterations and citations omitted); see also U.S. SEC v. Universal Exp., Inc., Nos. 10-0788-cv(L), 10-3647-cv(Con), 2011 WL 4337125, at * 1 (2d Cir. Sept. 16, 2011) (summary order); SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998). "Any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created the uncertainty." Patel, 61 F.3d at 140 (quotation, alterations and citation omitted); see also Warde, 151 F.3d at 50. Where, as here, a fraud is pervasive, it is appropriate to order the defendant to disgorge all ill-gotten gains realized during the course of the fraud scheme. See, e.g. Commodity Futures Trading Commission v. British American Commodity

22

Options Corp., 788 F.2d 92, 93-94 (2d Cir. 1986) (holding that although generally, the party

seeking disgorgement must distinguish between legally and illegally derived profits where benefits

result from both lawful and unlawful conduct, cases involving systematic and pervasive fraud, as

opposed to isolated instances of fraud, are different); SEC v. Hasho, 784 F.Supp. 1059, 1111-12

(S.D.N.Y. 1992) ("When a defendant engages in a pervasive pattern of fraudulent conduct as

opposed to isolated instances, it is unnecessary to prove a direct nexus between each instance of

unlawful conduct and the disgorgement amount due."); see also SEC v. Huff, 758 F.Supp.2d 1288,

1359-60 (S.D. Fla. 2010).  "The district court has broad discretion not only in determining whether

or not to order disgorgement but also in calculating the amount to be disgorged." First Jersey

Securities, 101 F.3d at 1474-75; see also SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996)("The

decision to order disgorgement of ill-gotten gains, and the calculation of those gains, lie within the

discretion of the trial court, which must be given wide latitude in these matters." (Internal

quotations and citation omitted)).

Notwithstanding language in certain cases suggesting otherwise, the Second Circuit has

recently stated that the appropriate measure of disgorgement is not necessarily the calculation of

the defendant's net profits from his illegal acts, since the defendant is "not entitled to deduct costs

associated with committing [his] illegal acts." See Bronson Partners, ___ F.3d ___, 2011 WL

3629718, at * 11 (quoting SEC v. Cavanagh, No. 98-Civ-1818-DLC, 2004 WL 1594818, at * 30

(S.D.N.Y. July 16, 2004), aff'd, 445 F.3d 105 (2d Cir. 2006)).  As the Second Circuit held, "where

the profits from fraud and the defendant's ill-gotten gains diverge, the district court may award the

larger sum." Id.

23

2.      Compensation

The SEC seeks disgorgement of the entire amount of compensation Razmilovic received

during the fraud period, i.e., from 1998 through 2002, including his base salary, bonus and lump

sum severance payment, on the basis: (1) that Razmilovic's employment at Symbol should have

(and would have) been terminated based upon his participation in the fraud scheme and, therefore,

he should not have received any compensation during the period that he participated in the fraud

scheme prior to its discovery; (2) that Razmilovic's base salary and bonus were contractually

premised upon either Razmilovic's promise to act in Symbol's best interests or upon Symbol's

financial performance, but neither requirement was met; (3) that Razmilovic's severance payment

was a performance bonus, but his "performance" was fraudulent; and (4) that Razmilovic should

not be entitled to retain the special bonus related to the Telxon acquisition because that transaction

was improperly used by him and his co-defendants to "prop up" Symbol's financial performance.

The SEC seeks disgorgement liability from compensation, including prejudgment interest from

April 5, 2002, the date on which Razmilovic received the severance payment, to September 10,

2010, in the total amount of fifteen million eight hundred twenty-two thousand six hundred three

dollars and eighteen cents ($15,822,603.18).

According to Razmilovic, the SEC has failed to satisfy its burden of establishing a causal

connection between the base salary, bonus payments and severance payment he received during the

fraud period.[9]  In her report, Martin, Razmilovic's expert, concluded that neither Razmilovic's base

salary nor his severance payment should be included in the disgorgement amount because neither

---

[9] To the extent the SEC seeks disgorgement of an additional one million nine hundred
thousand dollars ($1,900,000.00) paid to Razmilovic in April 2002, (see Razmilovic Mem., at 8),
the record is bereft of any evidence with respect to such payment.  Accordingly, Razmilovic is
not liable to disgorge the amount of that payment.

component of compensation was contingent upon Symbol's financial performance and it was her understanding that Razmilovic should only be required to disgorge the portion of his compensation and profits that were causally connected to Symbol's restated earnings.[10]   (Martin Rpt., at 1-2). According to Martin, she only considered "what compensation or profits would [Razmilovic] not have earned in the absence of fraud," and concluded that "absent the fraud, [Razmilovic] would have continued getting his salary" under the Employment Agreements.   (Brody Decl., Ex. 2, at 117-118).

Several courts have found that "[d]isgorgement of salaries and other forms of compensation may be an appropriate remedy" in SEC enforcement cases.   SEC v. Black, No. 04 C 7377, 2009 WL 1181480, at * 2 (N.D. Ill. Apr. 30, 2009) (citing cases).

a.      Base Salary

Razmilovic contends that the SEC has not established that his base salary was tied to Symbol's financial performance.   Razmilovic does not, however, dispute that all of his Employment Agreements with Symbol required him, *inter alia*, to "use his best efforts to promote [Symbol's] * * * best interests * * *."   (TE 4 and 5, ¶¶ 3(a); TE 6, ¶ 4(a)).   By participating in the pervasive fraud scheme alleged in the complaint, Razmilovic clearly did not act to promote Symbol's best interests during the fraud period, i.e., during the years 1999 through 2002.

Nonetheless, the SEC has not established that the entire base salary Razmilovic received

---

[10]   However, Martin testified during her deposition that the basis for that understanding was from Razmilovic's counsel, (Brody Decl., Ex. 2, at 78-79), and she had no opinion about whether a CEO that commits fraud should be allowed to remain employed at, and receive compensation from, a company, (id., at 116-117).   She further testified that Razmilovic "certainly * * * wouldn't have" received a salary from Symbol from 1999 through 2002 if responsible persons at the company had become aware of the fraud he had committed.   (Id., at 118).

during the fraud period was causally linked to his unlawful conduct. <u>See, e.g.</u> <u>SEC v. Kelly</u>, 765

F.Supp.2d 301, 325-26 (S.D.N.Y. 2011) (declining to order disgorgement of the defendants' entire

yearly compensation and bonuses absent any evidence that they were linked to the company's

financial performance or were otherwise causally connected to the alleged wrongdoing); <u>SEC v.</u>

<u>Resnick</u>, 604 F.Supp.2d 773, 783 (D. Md. 2009) (declining to order disgorgement of the

defendant's salary where there was no evidence that the defendant's salary was causally linked to

his unlawful conduct).  Indeed, although the Employment Agreements tied the overall

compensation of its senior executives, including base salary, bonuses and stock options, to

Symbol's financial performance, they expressly indicate that adjustments in base salary were not

based upon Symbol's financial performance and it is reasonable to infer since, *inter alia*, Symbol

remained a viable company notwithstanding the pervasive fraud scheme, that Razmilovic

performed some functions and services of value to Symbol during the fraud period other than those

activities which inflated its earnings.  <u>See</u> <u>Resnick</u>, 604 F.Supp.2d at 783.

All but two (2) of the cases requiring a defendant to disgorge his or her salary, and upon

which the SEC relies, are distinguishable because the fraud committed by those defendants

extended the life of the employer-company and, therefore, the defendants would not have received

any compensation from a company that would not have existed but for their fraud.  <u>See, e.g.</u> <u>SEC</u>

<u>v. First Pac. Bancorp.</u>, 142 F.3d 1186, 1192 (9th Cir. 1998) (the defendant's fraud extended the

bank's life, thereby allowing him to continue drawing, *inter alia*, a salary);  <u>SEC v. Conaway</u>, No.

2:05-CV-40263, 2009 WL 902063, at * 20 (E.D. Mich. Mar. 31, 2009) (finding a question of fact

regarding whether the defendant should be required to disgorge his salary since the company might

have been forced into bankruptcy earlier absent the defendant's illegal conduct, thereby shortening

his tenure there); <u>U.S. SEC v. Church Extension of the Church of God, Inc.</u>, 429 F.Supp.2d 1045,

26

1050 (S.D. Ind. 2005) (the defendants' fraud delayed the collapse of the church, thereby enabling

them to continue their employment and receive compensation therefor).  Thus, the salaries of the

defendants in those cases were clearly connected to the defendants' wrongdoing and, therefore,

constituted ill-gotten gains.  To the contrary, Symbol remained a viable company notwithstanding

Razmilovic's fraud.

The Posner case is also distinguishable because the district court expressly found that any

contention that the defendants' services "were of real value to the company [was] belied by the

results reported in [the company's] public filings."  SEC v. Drexel Burnham Lambert, Inc., 837 F.

Supp. 587, 612 (S.D.N.Y. 1993), aff'd sub nom, SEC v. Posner, 16 F.3d 520 (2d Cir. 1994).  In

this case, such evidence is lacking.  Indeed, it is reasonable to infer that since Symbol remained a

viable company notwithstanding the pervasive fraud scheme, some of the services performed by

Razmilovic for Symbol were of real value to the company.

In addition, the Black case is distinguishable because the district court in that case found

that it was reasonable to infer from the company's termination of its relationship with the

defendant only two (2) months after learning of his illegal conduct that it would have promptly

terminated its relationship with the defendant earlier had it known of the defendant's unlawful

conduct earlier.  Black, 2009 WL 1181480, at * 10-11.  Since Razmilovic resigned from his

position as CEO, any causal connection between his fraud and his continued employment at

Symbol is not patently evident.

Nevertheless, it is reasonable to infer a causal connection between Razmilovic's fraud and

his promotion to CEO of Symbol, effective July 2000[11], insofar as he was promoted shortly after

---

[11]  The 2000 Proxy Statement dated May 21, 2000 evidences that Symbol contemplated
promoting Razmilovic to CEO no later than May 2000.  (TE 12).

Symbol's February 2000 announcement of increased revenue and diluted earnings per share for the year ended December 31, 1999, which indisputably resulted from the fraud.  Accordingly, Razmilovic is liable to disgorge the difference between his salary as COO of Symbol and his salary as CEO of Symbol, i.e., he is not liable to disgorge any amount of the base salary he received as COO of Symbol in 1999, but he is liable to disgorge the amount of one hundred ninety-seven thousand twenty-one dollars ($197,021.00) from the 2000 base salary he received[12]; the amount of three hundred sixty-four thousand two hundred fifty-three dollars ($364,253.00) from the 2001 base salary he received[13]; and the amount of three hundred seventy thousand nine hundred seventy-three dollars and eighty-four cents ($370,973.84) from the 2002 base salary he received[14].

---

[12] In determining the portion of Razmilovic's 2000 salary attributable to his promotion to CEO, and, thus, his ill-gotten gains, I took Razmilovic's annual base salary from 1999, i.e., six hundred thirty-five thousand seven hundred forty-nine dollars ($635,749.00); divided it by twelve (12) to ascertain his monthly salary as COO ("the COO monthly salary"), i.e., approximately fifty-two thousand nine hundred seventy-nine dollars and eight cents ($52,979.08); multiplied that monthly salary by six (6), for the months beginning January 2000, through and including, June 2000, prior to Razmilovic's promotion to CEO ("the six month COO salary"), i.e., three hundred seventeen thousand eight hundred seventy-four dollars and fifty cents ($317,874.50); deducted that amount from the amount of base salary Razmilovic received for the entire 2000 year, i.e., eight hundred thirty-two thousand seven hundred seventy dollars ($832,770.00) minus three hundred seventeen thousand eight hundred seventy-four dollars and fifty cents ($317,874.50) equals five hundred fourteen thousand eight hundred ninety-five dollars and fifty cents ($514,895.50); then deducted from that amount the six month COO salary to ascertain the amount of compensation attributable to Razmilovic's promotion to CEO effective July 1, 2000, i.e., one hundred ninety-seven thousand twenty-one dollars ($197,021.00).  Although Razmilovic's base salary as COO may have been increased in the years after 1999, there is no evidence from which that may be ascertained and, as previously indicated, the amount of disgorgement need only be a reasonable approximation of the gains causally connected to the fraud.

[13] The difference between the annual base salary he received as CEO for the year 2001, i.e., one million two dollars ($1,000,002.00), and the annual base salary he received as COO for the year 1999, i.e., six hundred thirty-five thousand seven hundred forty-nine dollars ($635,749.00).

[14] In determining the portion of Razmilovic's 2002 salary base attributable to his ill-gotten gains, I deducted two (2) months of his COO monthly salary, i.e., one hundred five

In sum, Razmilovic must disgorge the total amount of **nine hundred thirty-two thousand two hundred forty-seven dollars and eighty-four cents ($932,247.84)** from the base salary he received from Symbol during the fraud period.

    b.  Bonuses

      i.  Performance Bonuses

Since Razmilovic's bonuses under the Executive Bonus Plan were directly tied to the financial performance of Symbol, and the bonuses he received in 1999 and 2000 were based upon fraudulently reported financial numbers, Razmilovic is liable to disgorge the entire amount of those bonuses, i.e., **one million six hundred ninety-one thousand four hundred dollars ($1,691,400.00).**[15]

Razmilovic's contention that he should not be required to disgorge his performance bonuses because certain trial exhibits should be excluded from evidence, (Razmilovic Mem., at 6), is unpersuasive since, *inter alia*, his own expert admitted in her report that Symbol's restated

---

thousand nine hundred fifty-eight dollars and sixteen cents ($105,958.16), from the four hundred seventy-six thousand nine hundred thirty-two dollars ($476,932.00) base salary he received in 2002, notwithstanding that Razmilovic resigned effective February 14, 2002 and, thus, did not actually work an entire two (2) months. To the extent Razmilovic may have performed consulting services after the date of his resignation, I find that any amount received by Razmilovic in connection with such services constitutes ill-gotten gains since, *inter alia*, Razmilovic was clearly not acting in the best interests of Symbol at that time, i.e., he engaged in insider trading and failed to cooperate, if not actively inhibited, the investigation of the fraud at Symbol during that time. Therefore, it is reasonable to infer that after the date of his resignation, any services rendered by Razmilovic were not of value to Symbol.

[15] Razmilovic received a performance bonus in the amount of seven hundred forty-two thousand dollars ($742,000.00) in 1999 and a performance bonus in the amount of nine hundred forty-nine thousand four hundred dollars ($949,400.00) in 2000.

29

earnings would not have met the target earnings amounts for performance-related bonuses in either year that he received those bonuses and, therefore, that Razmilovic is liable to disgorge the amount of those performance bonuses. (Martin Rpt., at 11; Brody Decl., Ex. 2, at 119-122). I reject Razmilovic's contention that that portion of Martin's expert report should be ignored because the report had been submitted after he had moved for partial judgment pursuant to Rule 52(c) of the Federal Rules of Civil Procedure at the close of the SEC's case.[16] See, e.g. Gaffney v. Riverboat Services of Indiana, Inc., 451 F.3d 424, 451 n. 29 (7th Cir. 2006) (rejecting the defendant's contention that the record should be evaluated when the Rule 52(c) was made at the close of the plaintiff's case, rather than as a whole, as unsupported by case law and Rule 52(c)). The court's task on a Rule 52(c) motion is "to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies. . . . Rule 52(c) implies the same inquiry the Court makes to resolve all of the legal and factual matters under Rule 52(a)." Wechsler v. Hunt Health Systems, Ltd., 330 F.Supp.2d 383, 433 (S.D.N.Y. 2004); see also EBC, Inc. v. Clark Building Systems, Inc., 618 F.3d 253, 272-73 (3d Cir. 2010) ("In considering whether to grant judgment under Rule 52(c), the district court applies the same standard of proof and weighs the evidence as it would at the conclusion of the trial. * * * The district court should also make determinations of witness credibility where appropriate."); Ackerman v. Pilipiak, — B.R. —, 2011 WL 3841535, at * 5 (E.D.N.Y. Aug. 25, 2011) (holding that in nonjury trials, "the court acts as both judge and jury,

_____

[16] Rule 52(c) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence." In accordance with that provision, I previously denied Razmilovic's motion pursuant to Rule 52(c) with leave to renew upon the close of the evidence.

weighing the evidence, resolving any conflicts, and deciding where the preponderance lies.")
Unlike cases where the non-moving party submits no evidence in support of its claim and instead
relies solely on the moving party's failure to present any evidence in dispute thereof, see, e.g.
Wechsler, 330 F.Supp.2d at 433, there is evidence in the record as whole, including Martin's
expert report, supporting the SEC's claim that Razmilovic's performance bonuses were causally
connected to his fraud. Moreover, where a party introduces evidence on his own behalf after he
has moved for relief under Rule 52(c), he waives his right to relief under Rule 52(c). See Federal
Ins. Co. v. HPSC, Inc., 480 F.3d 26, 32 (1st Cir. 2007) (holding that the plaintiff waived its right to
appeal the denial of its Rule 52(c) motion by presenting evidence after the close of the defendant's
case on its counterclaim); Gaffney, 451 F.3d at 451 n. 29; TransCanada Pipelines Ltd. v. USGen
New England, Inc., — B.R. —, 2011 WL 3880402, at * 12 (D. Md. Aug. 30, 2011) (holding that
the appellant's decision to present evidence of its own after the bankruptcy court had denied its
motion for judgment on partial findings pursuant to Rule 52(c) barred it from limiting the focus of
the appeal solely to the evidence presented in the appellee's case-in-chief).[17] Since Razmilovic
presented his own evidence, including Martin's expert report, I am not limited to considering only
the evidence put forth by the SEC on its case-in-chief and may properly consider all of the
evidence presented in this case.

---

[17] The cases cited by Razmilovic, Sanders v. Gen. Servs. Admin., 707 F.2d 969, 972-73 (7th Cir. 1983), and White v. Rimrock Tidelands, Inc., 414 F.2d 1336, 1340 (5th Cir. 1969), are distinguishable insofar as, *inter alia*, they challenged the district courts' grant, as opposed to denial, of the respective defendants' motions for involuntary dismissal pursuant to former Rule 41(b) of the Federal Rules of Civil Procedure (replaced by Rule 52(c)).

ii.     Telxon Bonus

Razmilovic contends that the SEC has failed to establish that the special bonus he received in connection with the Telxon acquisition ("the Telxon bonus") was paid to him "for any reason related to [Symbol's] financial performance or any alleged fraud." (Razmilovic Mem., at 6). Razmilovic's expert also opines that the Telxon bonus is not disgorgeable because, unlike the performance bonuses, it was not contingent on Symbol's earnings. (Martin Rpt., at 11).

Razmilovic ignores the allegations in the complaint, deemed true by this Court's December 22, 2009 order granting the SEC a default judgment against Razmilovic pursuant to Rule 37 of the Federal Rules of Civil Procedure, and evidence, (see TE 45, at 44-45, 46), that the entire Telxon restructuring charge had been improperly recorded and fraudulently used to "prop up" Symbol's earnings and that Razmilovic, at the very least, signed Symbol's financial reports and registration statements based upon those improper charges during the fraud period. Since the accounting of the Telxon acquisition was entirely fraudulent, it is reasonable to infer that Razmilovic would not have received the Telxon bonus if the true value of that acquisition had been known. Therefore, the entire amount of the Telxon bonus constitutes ill-gotten gains. Accordingly, Razmilovic is liable to disgorge the entire amount of the Telxon bonus, i.e., **two hundred sixty thousand dollars ($260,000.00).**

c.     Severance Payment

Razmilovic contends that the SEC has not demonstrated that the five million dollar ($5,000,000.00) severance payment he received upon his resignation, and after Symbol had already

32

learned of the SEC's investigation of it[18], "was caused by any fraud," (Defendant Tomo Razmilovic's Post-Trial Brief [Razmilovic Mem.], at 5), or was based upon Symbol's financial performance.

In the same provision of the Separation Agreement, Symbol agreed to pay the lump sum severance payment to Razmilovic and Razmilovic agreed to "relinquish[] his right to all outstanding stock options * * *." (TE 7, ¶ 2(A)).[19] Those outstanding stock options had been granted to Razmilovic in February 2001 "in connection with a periodic performance review." (TE 13, at 9-10). Since Razmilovic had participated in the pervasive fraud scheme at Symbol during the review period, the stock options he received in connection with his performance during that period constitute ill-gotten gains. Moreover, since it may reasonably be inferred from the Separation Agreement that the severance payment was made in consideration for Razmilovic's relinquishment of his right to all outstanding stock options, yet those stock options constitute ill-gotten gains to which Razmilovic had no right, Razmilovic was not entitled to the severance payment. Accordingly, Razmilovic is liable to disgorge to entire amount of the lump sum severance payment he received from Symbol, i.e., five million dollars ($5,000,000.00).[20]

---

[18] Notably, there is no indication that responsible individuals at Symbol knew at that time that Razmilovic was implicated in the SEC's investigation.

[19] Moreover, in the Form 4 Statement of Changes in Beneficial Ownership filed by Razmilovic with the SEC in 2002, Razmilovic indicated that he agreed to forfeit certain stock options "[i]n connection with his severance arrangements * * *." (Declaration of Todd D. Brody in Support of its [sic] Post-Hearing Memorandum [Brody Decl.], Ex. 1).

[20] In sum, the total amount of the ill-gotten gains Razmilovic received as compensation, exclusive of stock transactions, equals the sum of **seven million eight hundred eighty-three thousand six hundred forty-seven dollars and eighty-four cents ($7,883,647.84)**.

33

3.     Stock Transactions

The SEC also seeks disgorgement of all profits Razmilovic earned from Symbol stock transactions during the fraud period, including his sales of Symbol stock on the open market, his transfers of Symbol stock directly to Symbol at market value to pay options exercise prices and withholding taxes on his stock options exercises and European "zero-cost" collar transactions.

Since one of the effects, if not the very purpose, of the pervasive fraud scheme at Symbol was to manipulate Symbol's earnings and, thereby, inflate the value of its stock, it is reasonable to infer that Razmilovic profited from the scheme in all of his transactions involving Symbol securities during the fraud period.  See, e.g. Lorin, 76 F.3d at 462 (holding that it was "well within the discretion of the district court * * * to reason that because the purpose and effect of the scheme was to manipulate and stabilize the prices of the [company's] stocks, [the defendants] likely profited from the scheme in all of their trades in those securities.")  Indeed, Razmilovic's expert concedes that the profits Razmilovic earned on the shares of Symbol stock that he "swapped" during his exercise of stock options to pay the options price and withholding taxes should be included in any disgorgement calculation "since they would not have been earned absent the alleged earnings misstatement and associated stock price inflation." (Martin Rpt., at 8; see Martin Decl., at 8 ("Once the correct inflation is calculated, * * * it has to be applied to Mr. Razmilovic's four exercises of employee stock options * * *.")  However, both parties have submitted expert reports utilizing similar "event study" methodologies, but containing divergent conclusions with respect to the effect the fraud scheme had on the price of Symbol stock during the fraud period.

a.     Calculation of Profits

The SEC seeks a disgorgement award from Razmilovic's stock transactions, including

34

prejudgement interest thereon from February 1, 2002, the date of Razmilovic's last options exercise, in the total amount of seventy million two hundred sixty-five thousand three hundred twenty-six dollars and eighty cents ($70,265,326.80). The SEC calculates the amount of Razmilovic's profits from his exercise of stock options by using the number he and Symbol reported to the IRS on his W-2s.[21]

Razmilovic contends that he is liable only for the inflation in Symbol's stock price caused by the fraud. Martin, Razmilovic's expert, calculates the amount of inflation to be three dollars and forty-two cents ($3.42), whereas O'Neal, the SEC's expert, calculates the amount of inflation to be eleven dollars and fifty-four cents ($11.54). According to Martin, Razmilovic is only liable to disgorge a total amount of approximately two million six hundred eighty-one thousand seven hundred thirty-nine dollars ($2,681,739.00) as his profits from all four (4) options exercise transactions. (Martin Rpt., at 8 and Ex. 7; Martin Decl., at 17).

With respect to insider trading, the Second Circuit has held that "where stock is purchased [or sold] on the basis of inside information, the proper measure of damages is the difference between the price paid for shares at the time of purchase [or the price at which the shares were sold] and the price of the shares shortly after the disclosure of the inside information." Patel, 61 F.3d at 139-140; see also Warde, 151 F.3d at 50 (finding that the district court reasonably fixed disgorgement as the difference between the price of the defendant's warrants when purchased on

---

[21] The SEC calculates the amount of Razmilovic's profits from his stock options exercises to total twenty-five million one hundred one thousand ninety-three dollars and sixty-eight cents ($25,101,093.68); the amount of his profits from his collar transactions to total eight million one hundred forty thousand four hundred twenty-eight dollars and thirty-eight cents ($8,140,428.38); and the amount of his profits from his stock sales on the open market to total seven million five hundred seventy-eight thousand one hundred sixty-four dollars and nineteen cents ($7,578,164.19).

inside information and their price after the disclosure of the inside information); SEC v. Drucker,
528 F.Supp.2d 450, 451-52 (S.D.N.Y. 2007), aff'd, 346 Fed. Appx. 663, 666 (2d Cir. Sept. 21,
2009) (calculating the amount to be disgorged as the difference between the amount realized by
each defendant via his insider sales and the amount he would have realized if he had sold after the
disclosure of the inside information concerning the company's earnings).  Although this is not an
insider trading case, it is reasonable to similarly calculate the amount of Razmilovic's ill-gotten
gains from his exercise of stock options during the fraud period as the difference between the
inflated value of the proceeds realized by him on the date of the relevant stock option exercise and
the value of the proceeds he would have otherwise realized absent the fraud.  See, e.g. United
States v. Hatfield, — F.Supp.2d —, 2011 WL 2446430, at * 5 (E.D.N.Y. June 14, 2011) (holding
that only the difference between the stock's inflated value and what it would have sold for absent
the fraud was subject to criminal forfeiture).[22]

---

[22] By submitting evidence of the amount of profits from the stock options exercises
reported by Razmilovic to the IRS on his W-2s, the SEC satisfied its initial burden of showing
the actual profits realized by Razmilovic from those tainted stock transactions.  However,
Razmilovic rebutted that showing by submitting evidence, including the opinion of his expert
witness, demonstrating that the entirety of his reported profits were not causally related to the
fraud scheme and that the inflation in Symbol's stock price is a more accurate measure of his
illegally obtained profits.  In response, the SEC submitted its own evidence establishing the
inflated price of Symbol's stock resulting from the fraud.  Accordingly, under the circumstances
of this case, the inflated price of Symbol stock resulting from the fraud is a more accurate
approximation of Razmilovic's ill-gotten gains than is his reported profits from the stock options
exercises.

Contrary to the SEC's contention, Razmilovic's reliance on private securities fraud cases
addressing the issue of inflation, but in the context of loss causation, is not misplaced.  Although
the SEC is not required to prove the element of loss causation in order to establish liability, see,
e.g. SEC v. Kelly, 765 F.Supp.2d 301, 318 (S.D.N.Y. 2011); SEC v. Lee, 720 F.Supp.2d 305,
325 (S.D.N.Y. 2010); SEC v. Simpson Capital Management, Inc., 586 F.Supp.2d 196, 201; SEC
v. Credit Bancorp., Ltd., 195 F.Supp.2d 475, 490-91 (S.D.N.Y. 2002), it is required to prove a
causal connection between the fraud and Razmilovic's ill-gotten gains for the purposes of

b.      Weight Afforded Expert Reports

Although I accept Razmilovic's contention that the proper measure of disgorgement in this case is the amount by which the value of Symbol's stock was inflated as a result of the fraud, I nonetheless reject his expert's calculation of the value of that inflation.

Upon presentation of expert opinion, the court must make a "preliminary assessment of whether the reasoning or methodology underlying the [opinion] is . . . valid and of whether the reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Both parties' experts utilized an "event study" methodology, which, inter alia, examines the effect of an event on a corporation's stock price by looking for "abnormal returns during those event periods, usually days, when a stock moves differently than predicted based upon market and industry factors" and determines whether those abnormal returns are related to the alleged fraud. In re Xerox Corp. Securities Litigation, 746 F.Supp.2d 402, 408 (D. Conn. 2010). It is undisputed that such methodology is a generally accepted method of calculating the inflation in a stock's price in cases involving securities fraud. See, e.g. SEC v. Yuen, 272 Fed. Appx. 615, 618 (9th Cir. Apr. 1, 2008); In re Imperial Credit Industries, Inc. Sec. Litig., 252 F.Supp.2d 1005, 1015-16 (C.D. Cal. 2003), aff'd sub nom Mortensen v. Snavely, 145 Fed. Appx. 218 (9th Cir. Aug. 17, 2005) (holding that an event study is necessary to distinguish between fraud-related and non-fraud related influences on

disgorgement. See Patel, 61 F.3d at 139 (holding that for the purposes of disgorgement, the calculation of profits need only be "a reasonable approximation of profits causally connected to the [securities law] violation." (emphasis added)); see also SEC v. Haligiannis, 470 F.Supp.2d 373, 384 (S.D.N.Y. 2007); Hasho, 784 F.Supp. at 1111. The determination of the extent to which the value of a security was inflated due to fraud is the same regardless of whether the plaintiff must demonstrate loss causation, i.e., that its loss was causally connected to the fraud, or, in essence, gain causation, i.e., that the defendant's ill-gotten gain is causally connected to the fraud.

stock price); <u>Xerox Corp.</u>, 746 F.Supp.2d at 411 (finding that an event study is an accepted

methodology); <u>U.S. v. Grabske</u>, 260 F.Supp.2d 866, 867-68 (N.D. Cal. 2002) ("Economists often

determine the amount of stock price inflation due to fraud through an 'event study[,]' * * * [which]

looks to how the price of the stock changed after the fraud was disclosed as evidence of the amount

by which it was inflated prior to disclosure."). Where the experts' opinions diverge, however, is in

their selection of the variables to use in their analysis and the weight to be accorded to such

variables.  For the reasons set forth below, I find O'Neal's opinion to be entitled to greater weight

than Martin's.

      In calculating the applicable inflation amount, Martin, Razmilovic's expert, *inter alia*,

excludes two (2) of the three (3) events upon which O'Neal relied as statistically relevant: (1) the

July 16, 2001 announcement and (2) the February 14, 2002 announcements.  (<u>See</u> O'Neal Rpt., at

17).[23]  <u>See</u>, <u>e.g.</u> <u>In re Xcelera.com Sec. Litig.</u>, Civil Action No. 00-11649-RWZ, 2008 WL

7084626 (D. Mass. Apr. 25, 2008) (rejecting an expert's event studies because, *inter alia*, the

expert failed to use relevant dates).  Martin omitted those announcements from her event study

because she had concluded that they were not connected to the alleged fraud, (Brody Decl., Ex. 2,

at 89-93; Martin Decl., at 4-7; Supplemental Declaration of Denise Neumann Martin, Ph.D.

[Martin Supp. Decl.], at 3, 5-6, 8-9), and she only included "earnings announcement[s] without

earnings guidance" in her analysis, (Brody Decl., Ex. 2, at 195-200).  During her deposition Martin

---

[23] Indeed, in her declaration dated September 20, 2010, submitted as a supplement to her report, Martin notes that the "major difference" between her calculation of the disgorgement amount and O'Neal's calculation is O'Neal's inclusion of the July 16, 2001 and February 14, 2002 announcements in his event study.  (Declaration of Denise Neumann Martin, Ph.D. [Martin Decl.], at 3).  Both experts included the February 13, 2002 announcement in their event studies. Accordingly, the determinative issue is whether Martin erred in excluding those announcements from her event study or, conversely, whether O'Neal erred in including those announcements in his event study.

testified that the word "fraud" need not appear in a disclosure in order for it to be considered corrective, (id., at 90); that following the July 16, 2001 announcement, Symbol's stock price fell significantly, (id., at 88-89, 197); that the price fall was a reaction to information both that Symbol had failed to meet analysts' expectations for the second quarter of 2001 and that earnings were "being guided down going forward," (id., at 96), with the latter information being what O'Neal found to be revelatory of the fraud; and that the release of lower than expected earnings can serve as a corrective disclosure, (id., at 93-94, 104).[24]

Martin's opinions, and particularly her calculations of the amount by which the value of Symbol shares were inflated during the fraud period and the amount Razmilovic is liable to disgorge, are entitled to little or no weight because, *inter alia*, in addition to her omission of two (2) statistically relevant dates,: (a) she is not qualified to testify as to the amount Razmilovic is liable to disgorge from his stock transactions insofar as she testified during her deposition that she has no prior experience with disgorgement cases involving the exercise of stock options and that she did not "literally know how the [stock exercise] transaction occur[red]" in this case, (Brody Decl., Ex. 2, at 108, 109), see, e.g. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119

---

[24] I note the hypocrisy of Martin criticizing O'Neal for including the purportedly "confounded" July 16, 2001 disclosure in his event study, allegedly in contravention of the methodology he employed, while at the same time asserting that although she included "confounded" disclosures in her own event study, she did not include either the July 16, 2001 or February 14, 2002 disclosures. (See Martin Decl., at 3, 6-8; Martin Supp. Decl., at 4). O'Neal denies that the July 16, 2001 announcement is "confounded" as he understands that term to mean. (Martin Decl., Ex. C, at 96).

Moreover, unlike O'Neal, who proffered alternative calculations of the inflation amount in the event I rejected his methodology in favor of Martin's, Martin does not proffer any alternative calculation "even assuming some portion of the July 16, 2001 and February 14, 2002 disclosures were revelatory of fraud." (Martin Supp. Decl., at 8, 12). Rather, she avers only that the disclosures should then have been rejected by O'Neal under his stated methodology. (Martin Supp. Decl., at 8, 12).

S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that Rule 702 of the Federal Rules of Evidence

requires "a reliable basis in the knowledge and experience of the relevant discipline."); Xerox

Corp., 746 F.Supp.2d at 416 (rejecting the defendants' expert's opinion on the effect of the fraud

on the company's stock price because, *inter alia*, he did not have the requisite experience in the

field); (b) she did not base her opinion upon economic literature, (Brody Decl., Ex. 2, at 108), and

used an earnings response model unsupported by accepted econometric principles; and (c) she did

not follow her own procedures in this case, e.g., she compared the performance of Symbol stock

against only one (1) index, as opposed to two (2) or more. See, e.g. Amorgianos v. National R.R.

Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002) (holding that in evaluating the reliability of an

expert's opinion, the court must undertake "a rigorous examination of the facts on which the expert

relies, the method by which the expert draws an opinion from those facts, and how the expert

applies the facts and methods to the case at hand."); see also Xerox Corp., 746 F.Supp.2d at 417

(rejecting the defendants' expert's opinion because his "methods depart[ed] from the level of

intellectual rigor that characterizes the practice of the expert in the relevant field.")  In sum,

although Martin properly utilized an event study methodology, she did not apply that methodology

reliably to the facts of this case.

To the contrary, O'Neal's opinions are based upon a reliable foundation.  In his report,

O'Neal, *inter alia*, adequately explains how he identified the statistically relevant dates he utilized

in his event study and how he utilized those events to determine the effect that the pervasive fraud

scheme had on the value of Symbol's stock during the fraud period.

The case In re IPO Sec. Litig., 399 F.Supp.2d 261, 265 (S.D.N.Y. 2005), aff'd sub nom

Tenney v. Credit Suisse First Boston Corp., Inc., 2006 WL 1423785 (2d Cir. May 19, 2006), upon

which Razmilovic primarily relies to justify Martin's failure to consider the July 16, 2001

announcement, is distinguishable.[25] In IPO, the district court noted that it was "vital to understand the [fraud] scheme that plaintiffs allege[d] was concealed from the market." 399 F.Supp.2d at 266. Pursuant to that fraud scheme, the defendants intentionally discounted earnings estimates and issued cautionary statements to "excite" the market and inflate prices when those estimates were beaten, as a result of which the plaintiffs purchased securities of the issuing companies at artificially inflated prices. Id. The plaintiffs alleged that "when each Issuer [of the securities] failed to continue the trend which had been established since the IPO of consecutively and sequentially posting actual revenue results that had exceeded those which had been forecasted, the fraud effectively ended and purchasers of the inflated stocks were damaged." Id. However, the district court noted that the alleged corrective disclosures, i.e., the announcements that the issuing companies would not meet forecasts, the quarterly reports of revenues failing to exceed forecasts and the downward revisions of analysts' estimates, "[did] not imply that [the] defendants concealed a scheme to depress earnings estimates and drive up prices." Id. Thus, the district court found that the only means by which the plaintiffs could establish loss causation in that case was by showing that at some point, the fraud was disclosed to the market and that such disclosure affected the issuing companies' stock price. Id. Since the plaintiffs in that case never alleged that the defendants' scheme was ever disclosed, they could not maintain a private securities fraud claim.

The other cases upon which Razmilovic relies are also distinguishable from this case. In Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005), the plaintiffs claimed that the

---

[25] The procedural posture of this case is different. IPO addressed the pleading requirement for the element of loss causation, an element not required here, in light of the Supreme Court's decision in Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (holding that an allegation that a misrepresentation caused an inflated purchase price alone is insufficient to plead loss causation).

41

defendants issued false and misleading reports recommending that investors purchase shares of companies, but there was no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of the defendants' recommendations; that the defendants misstated or omitted risks that led to the plaintiffs' loss; that the subject of the defendants' false recommendations, i.e., to buy or accumulate stock, or any corrective disclosure regarding the falsity of those recommendations, was the cause of the decline in the companies' stock value; or that the defendants misstated or concealed any risks associated with the investments. Id. at 164, 175. The Second Circuit expressly distinguished that case from cases, such as this one, in which some or all of the risk that materialized was clearly concealed by a defendant's misstatement or omission. Id.

In Leykin v. AT&T Corp., 423 F.Supp.2d 229 (S.D.N.Y. 2006), aff'd, 216 Fed. Appx. 14 (2d Cir. 2007), the scheme alleged by the plaintiffs involved corporate abuse, misconduct and diversion of assets, but no transactions in the relevant securities, i.e., it was not alleged that the defendant made any materially false or misleading statements upon which investors relied in purchasing or selling securities, nor that he actually traded in the securities as part of the fraud; and there was no showing that a concealed risk materialized during the relevant period. 423 F.Supp.2d at 241-42. In any event, the district court recognized that "[a] concealed risk can lead to a decline in stock price *either* because a corrective disclosure reveals the falsity of the misrepresentations or omissions, *or* because the risk which was concealed materializes and causes the price decline." 423 F.Supp.2d at 240 (emphasis added).

The case In re Oracle Corp. Sec. Litig., 627 F.3d 376 (9th Cir. 2010), which Razmilovic cites as supplemental authority for his position by letter dated November 18, 2010, is

distinguishable, *inter alia*, because, unlike the Second Circuit, the Ninth Circuit has not endorsed a "materialization of the risk" theory. See, e.g. In re Nuveen Funds/City of Alameda Sec. Litig., Nos C 08-4575 SI, C 09-1437 SI, 2011 WL 1842819, *10 (N.D. Cal. May 16, 2011).[26]

Unlike the above-cited cases, Razmilovic's misrepresentations and omissions concealed Symbol's true financial performance during the fraud period and it was foreseeable that had Symbol's true financial performance been known, the value of its stock would have been less. Once the subject of Razmilovic's fraud, i.e., Symbol's true financial performance, began to materialize, the value of Symbol stock started to decline. The Second Circuit has held that an allegation that the defendant's fraudulent misrepresentations concealed the subject that caused the foreseeable loss is sufficient to establish a causal connection between the fraud and the effect on the stock's value, Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 98 (2d Cir. 2001), and other district courts in this Circuit have held that a corrective disclosure is not necessary to establish causation where it is alleged that the subject of the misrepresentations and omissions, i.e., a risk allegedly concealed by the defendants which subsequently materialized, caused the value of the securities to decline. See, e.g. In re Lehman Brothers Securities and ERISA Litig., — F.Supp.2d —, 2011 WL 3211364, at * 30 (S.D.N.Y. July 27, 2011) (holding that in this Circuit, loss causation, i.e., a causal connection between the fraud and the effect on the value of the securities, may be established either by a corrective disclosure or a materialization of a concealed risk); Freudenberg v. E*Trade Financial Corp., 712 F.Supp.2d 171, 202 (S.D.N.Y. 2010) (holding that corrective disclosure is not required); In re Parmalat Sec. Litig., 375 F.Supp.2d 278, 305-06

---

[26] The only other reported case cited by Razmilovic, Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co., 597 F.3d 330 (5th Cir. 2010), has since been vacated by the United States Supreme Court and remanded to the United States Court of Appeal for the Fifth Circuit. Erica P. John Fund, Inc. v. Halliburton Co., 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011).

43

(S.D.N.Y. 2005) (finding allegations that the defendants misrepresented the accuracy and completeness of the company's financial statements, which actually understated the company's debt and overstated its revenue and net assets, to be sufficient); see also Lentell, 396 F.3d 161 (finding that the plaintiffs had failed to plead loss causation, i.e., a causal connection between the fraud and the effect on the value of the securities, because they did not allege that the subject of the defendants' fraud, i.e., their false recommendations that investors should buy or accumulate the companies' stock, *or* any corrective disclosure regarding the falsity of those recommendations, was the cause of the decline in the stock value which the plaintiffs claimed as their loss).

The concealed risk of the pervasive fraudulent scheme here, including, *inter alia*, an SEC investigation, a financial restatement and a decline in stock value, began to materialize when the July 16, 2001 announcement partially revealed the true financial performance of Symbol.  The relevant "truth" revealed by that announcement was not that a fraud was committed per se; but rather was the "truth" about Symbol's financial condition, which, upon revelation, caused a sudden decline in Symbol's stock value.  See, e.g. Freudenberg, 712 F.Supp.2d at 202.

Morever, the truth of the subject of the fraud scheme in which Razmilovic participated, i.e., Symbol's true financial performance, was revealed to the market not as a single event, but through a series of disclosing events.  Accordingly, the July 16, 2001 announcement, which disclosed the beginning of the materialization of the risk of Symbol's previously-concealed true financial performance, i.e., a failure to meet earnings estimates and lowered earnings guidance, was properly considered by O'Neal in his event study and, conversely, was improperly omitted by Martin in her event study.  See, e.g. Freudenberg, 712 F.Supp.2d at 202 (holding that the materialization of concealed risks and information regarding the quality of the company's investments sufficed to plead a causal connection between the fraud and the effect on the company's securities, and that a

44

corrective disclosure need not take the form of a single announcement, but can occur through a series of disclosing events); In re Bradley Pharmaceuticals, Inc. Sec. Litig., 421 F.Supp.2d 822, 828-29 (D. N.J. 2006) (holding that the plaintiffs adequately pled loss causation, i.e., a causal connection between the fraud and the effect on the company's securities, where the revelation of the "truth" did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events beginning almost two (2) months earlier); Parmalat, 375 F.Supp.2d at 307 (holding that the fact that the true extent of the fraud was not revealed to the public until two (2) months after the price of the company's shares had declined was immaterial where the risk allegedly concealed by the defendants materialized during the time that the shares began to decline and arguably caused the decline in value).

Razmilovic's reliance on In re Flag Telecom Holdings, LTD. Sec. Litig, 574 F.3d 29 (2d Cir. 2009), is misplaced because, *inter alia*, the "industry events" upon which the plaintiffs relied in that case involved the defendants' misrepresentations themselves regarding the company's condition and prospects and there was no evidence that any of those alleged industry events revealed the truth about the company's condition and prospects, i.e., the subject of the defendants' alleged misstatements.[27] Id. To the contrary, the SEC alleges that the corrective event at issue, i.e., the materialization of Symbol's true financial performance, only began when the July 16, 2001 press release partially revealed that the true financial performance of Symbol might not be as previously stated. There is evidence in the record, including opinions by expert witnesses, that the

---

[27] Moreover, the precedential value of Flag Telecom, which involved an appeal from an order certifying a class pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, is questionable in light of the Supreme Court's recent decision in Erica P. John Fund, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011), holding that it is unnecessary to establish loss causation in order to obtain class certification.

value of Symbol stock remained inflated after the July 16, 2001 announcement and that subsequent events continuing to reveal the actual "truth" of Symbol's financial performance further impacted the value of Symbol stock.  Unlike the Flag Telecom case, the SEC is not relying upon the fraudulent misrepresentations and omissions by Razmilovic to establish that the value of Symbol stock was inflated during the entire fraud period, i.e., through February 14, 2002, while incongruously claiming that the July 16, 2001announcement constituted a total, as opposed to only partial, disclosure of the truth of Symbol's financial performance.  In fact, O'Neal adjusted his inflation amount to account for some correction in the value of the stock price following the July 16, 2001 announcement.  (See O'Neal Rpt., at 11).

The case, In re Omicron Group, Inc. Sec. Litig., 597 F.3d 501 (2d Cir. 2010), to which Razmilovic cites in further support of his contention that the February 14, 2002 disclosure should not have been included in any event study, is inapposite because, inter alia: the disclosure at issue in that case reported, inter alia, that an outside director and chair of the audit committee of the company, not its CEO, had resigned; it was never alleged that the director who had resigned had participated in any way in the fraudulent accounting scheme alleged; and none of the matters reported in the disclosure at issue had "even purported to reveal some then-undisclosed fact with respect to the specific misrepresentations alleged in the complaint * * *." Id. at 505, 511-12.  The Second Circuit held that since the facts underlying the alleged fraud and the director's resignation had been known to the market for a year prior to the resignation, the resignation did not add to the public's knowledge any new material facts. Id. at 512.  To the contrary, the February 14, 2002 announcement disclosed more than just Razmilovic's abrupt resignation as CEO of Symbol; it also disclosed previously undisclosed information regarding, inter alia, Symbol's financial performance during the fourth quarter and full year ended December 31, 2001, which necessarily could not have

46

been included in the July 16, 2001 announcement.[28]

        c.      1999 Stock Transactions

        i.      1999 Stock Options Exercise

On July 27, 1999, Razmilovic exercised options to purchase two hundred forty-three thousand four hundred twenty-five (243,425) at an average option price per share of approximately nine dollars and eighty-seven cents ($9.8680).[29] (TE 15 and 21; see TE 8 and 9). Rather than pay the option price and withholding tax in cash, Razmilovic sold one hundred forty-four thousand one hundred sixteen (144,116) shares of Symbol stock to Symbol at the market

---

[28] I also reject Razmilovic's attempt to discredit O'Neal by claiming, in essence, that he merely restated the SEC's conclusions. O'Neal testified that although he considered the data and documents provided to him by the SEC, he augmented that information and ensured that it was correct, and performed his own literature search from which he identified an additional document important for his analysis. (Martin Decl., Ex. C, at 39-43, 53-54, 59-60). It was not unreasonable for O'Neal to confine his analysis to the period set forth by the SEC, (id., at 43); to fail to render any legal conclusion regarding the appropriate method of determining disgorgement, (id., at 49-52); or to fail to consider what particular fraud was revealed by a specific disclosure.

[29] Razmilovic exercised forty-one thousand four hundred and four (41,404) options that had been granted to him on February 6, 1995 at an option price per share of approximately seven dollars and seventy-eight cents ($7.7779) and two hundred two thousand twenty-one (202,021) options that had been granted to him on October 16, 1995 at an option price per share of approximately ten dollars and thirty cents ($10.2964), for a total options exercise price of approximately two million eighty thousand eighty-nine dollars ($2,080,089.00). (TE 15 and 21). Razmilovic reported a taxable gain from this transaction of seven million six hundred thirty-nine thousand one hundred sixty-six dollars ($7,639,166.00).

price of forty-one dollars and twenty-five cents ($41.25).[30]  (TE 15 and 21).[31]

According to O'Neal, in the absence of any fraud, the price of Symbol stock on the date of

the 1999 options exercise would have been fifteen dollars and twenty-nine cents ($15.29).[32]

(O'Neal Rpt., Ex. 2).  Therefore, absent the fraud, the Symbol stock transferred by Razmilovic to

Symbol as payment for the options price and withholding tax only had a value of two million two

hundred three thousand five hundred thirty-three dollars and sixty-four cents ($2,203,533.64) and

Razmilovic would have had to pay the remainder of the options price and withholding tax by some

other means, i.e., in cash, by the transfer of additional shares of stock to Symbol[33], etc.  (Id.)  Thus,

Razmilovic profited from his fraud, and is liable to disgorge, the amount of three million seven

hundred forty-one thousand two hundred fifty-one dollars and thirty-six cents ($3,741,251.36), i.e.,

the difference between the value of the actual proceeds realized by him from the transfer of shares

---

[30] Accordingly, the value of the shares transferred by Razmilovic to Symbol to pay the options price and withholding tax was five million nine hundred forty-four thousand seven hundred eighty-five dollars ($5,944,785.00), i.e., 144,116 x $41.25.

[31] Although Martin, Razmilovic's expert, testified that Razmilovic did not profit from his transfer of shares of Symbol stock to Symbol as payment for the options exercises price and withholding taxes, (Brody Decl., Ex. 2, at 129-131), I find that opinion to be entitled to no weight since, *inter alia*, it is not included in her expert report and she further testified that it was not based upon a "formal calculation" and that she only "went partway to sort of convincing [herself] mathematically that it was true, * * *." (Id. at 130).

[32] The actual price of Symbol stock on the exercise date, i.e., forty-one dollars and twenty-five cents ($41.25), minus the inflation in stock price, as adjusted for the two (2) stock splits, i.e., twenty-five dollars and ninety-six cents ($25.96).

[33] Although Martin calculates the disgorgement amount based upon the additional shares Razmilovic would have had to transfer as payment for the options exercise price and withholding tax absent the fraud, there is no evidence, *inter alia*, that Razmilovic possessed the requisite number of mature shares to transfer, or was otherwise free to transfer that additional amount of stock to Symbol.  Accordingly, the cash value of the stock is a more reasonable approximation of the disgorgeable amount from the stock options exercises.

48

of Symbol stock to Symbol as payment for the options exercise price and withholding tax and the value of the proceeds he would have received in the absence of his fraud.

ii.     1999 Collar Transaction

Following the 1999 stock options exercise, Razmilovic was left with ninety-nine thousand three hundred nine (99,309) new shares of Symbol common stock.[34]  (TE 21 and 22).  The SEC seeks disgorgement of the amount of profits Razmilovic reported on his 1999 W-2 with respect to the value of those remaining shares, i.e., approximately three million one hundred sixteen thousand five hundred fifteen dollars and four cents ($3,116,515.04)[35].  However, on July 30, 1999, Razmilovic entered into a European "put spread collar" or "zero cost collar" with Bank of America, N.A. ("BofA") with respect to those shares[36], pursuant to which: (1) he sold call options to BofA, allowing BofA to purchase, and obligating him to sell, those shares on the expiration date, i.e., August 1, 2002, if the stock price at expiration was higher than the call strike price[37]; and (2) he purchased put options from BofA, obligating BofA to purchase those shares on the expiration

---

[34]  Two hundred forty-three thousand four hundred twenty-five (243,425) minus the one hundred forty-four thousand one hundred sixteen (144,116) shares transferred to Symbol as payment for the options exercise price and withholding tax.

[35]  The amount of remaining shares multiplied by the difference between the market price on the date of exercise and the average option price Razmilovic paid per share, i.e. approximately thirty-one dollars and thirty-eight cents ($31.382).

[36]  It is undisputed that Razmilovic placed all of the excess shares resulting from his stock options exercises into European option collars with BofA.  (See Martin Decl., at 10, 12).

[37]  The call strike price was approximately sixty-one dollars and fifty cents ($61.4956). (TE 21-23).

date, i.e., August 1, 2002, if the stock price at expiration was lower than the high put strike price[38].
(TE 21-23).  Since the SEC also seeks disgorgement of the amount of profits Razmilovic realized
on the expiration date of that collar, i.e., August 1, 2002, requiring him to disgorge both amounts
would constitute impermissible double counting.[39]  In other words, Razmilovic did not actually
realize a profit on the ninety-nine thousand three hundred nine (99,309) shares remaining from his
1999 stock options exercise until August 1, 2002, when his 1999 collar transaction expired.
Therefore, Razmilovic is not liable to disgorge any amount of the profits on those remaining shares
that he reported in 1999 because, as set forth below, he is liable to disgorge the entire amount of
the profits he eventually realized from those shares upon expiration of the 1999 collar transaction.[40]

     Pursuant to the Confirmation Agreement between Razmilovic and BofA dated July 30,
1999 and the Revised Confirmation Agreement between Razmilovic and BofA dated April 14,
2000, Razmilovic warranted to BofA that he was "not entering into [the zero cost collar] while in
possession of material, non-public information concerning the business, operations or prospects of
[Symbol].  'Material' information for these purposes is any information to which an investor would
reasonably attach importance in reaching a decision to buy, sell, or hold securities of [Symbol]."
(TE 22, at 6; TE 23, at 7 ).  Clearly, in light of the pervasive fraud scheme at Symbol in which

---

[38]   The high put strike price was approximately thirty-five dollars and fourteen cents
($35.1404).  (TE 21-23).

[39]   Similarly, Razmilovic is not liable to disgorge his reported profits on the remaining
shares following his 2000 and 2001 stock options exercises, since he had also "collared" those
shares with BofA and, as set forth below, is liable to disgorge the proceeds he received from
those collar transactions.

[40]   Razmilovic ignores the fact that he realized a profit at some point from the excess
shares he retained following his stock options exercises, either on the date of exercise or on the
expiration dates of the collar transactions.

Razmilovic participated, that representation was fraudulent, rendering the entire collar transaction fraudulent.

On the expiration date of the 1999 collar transaction, the market price for Symbol stock was approximately eight dollars and ninety-seven cents ($8.97), lower than the adjusted high put strike price.[41]  (TE 25).  As a result of the fraudulent 1999 collar transaction, BofA paid Razmilovic three million one hundred fifty-six thousand three hundred seventy-six dollars and thirty-nine cents ($3,156,376.39) for the shares.[42]  (TE 25 and 26).  Accordingly, Razmilovic is liable to disgorge the amount of two million one hundred seventy-six thousand three hundred ninety-five dollars and eighteen cents ($2,176,395.18),[43] i.e., the difference between the amount he received from BofA pursuant to the transaction and the amount he paid for those shares[44].

---

[41] Pursuant to BofA's Notice of Option Strike Adjustments dated September 18, 2001, as a result of, *inter alia*, stock splits, the number of shares involved in the zero cost collar was adjusted to two hundred twenty-three thousand four hundred forty-five (223,445); the call strike price was adjusted to approximately twenty seven dollars and twenty-nine cents ($27.2905); and the high put strike price was adjusted to approximately fifteen dollars and fifty-eight cents ($15.5771).  (TE 24).

[42] Razmilovic's contention that BofA retained the shares at the expiration of the collar and, thus, received the value of those shares is misplaced.  At issue for the purposes of disgorgement is the amount of ill-gotten gains Razmilovic realized from his fraud, not any damages incurred by others as a result of his fraud.

[43] This amount is actually less than what Razmilovic would have to disgorge if I based the disgorgement award upon the value of the excess shares of stock on the date of the stock exercise in 1999.

[44] There is no causation issue with respect to the collar transactions because the payments Razmilovic received from BofA are the result of entirely fraudulent collar transactions.  Accordingly, whether or not the value of the Symbol shares involved in the collar transactions was inflated as of the expiration dates of the collar transactions is irrelevant.

51

d.      The 2000 Stock Transactions

i.      The 2000 Stock Options Exercise

On May 1, 2000, Razmilovic exercised options to purchase two hundred thirteen thousand eight hundred thirty-three (213,833) shares of Symbol stock at an average option price per share of approximately six dollars and eighty-nine cents ($6.8913)[45].  (TE 16, 47 and 48; see TE 8 and 9).  Rather than paying the options exercise price and withholding tax in cash, Razmilovic transferred one hundred thirteen thousand eight hundred thirty-three (113,833) shares of Symbol stock to Symbol at the market price of approximately fifty-seven dollars and fifty-six cents ($57.5626).[46] (TE 16).

According to O'Neal, absent the fraud, the price of Symbol stock on the date of exercise would have been approximately forty dollars and twenty-five cents ($40.2526)[47] and the value thereof would have been four million five hundred eighty-two thousand seventy-four dollars and twenty-two cents ($4,582,074.22).  (O'Neal Rpt., Ex. 2).  Therefore, Razmilovic realized ill-gotten gains, and is liable to disgorge, the amount of one million nine hundred seventy thousand

---

[45]  Two hundred three thousand two hundred eighteen (203,218) shares were granted on October 16, 1995 at an option price per share of approximately six dollars and eighty six cents ($6.8643) and ten thousand six hundred fifteen (10,615) shares were granted on February 12, 1996 at an option price per share of approximately seven dollars and forty-one cents ($7.4075). (TE 16).  Razmilovic reported a taxable gain of ten million eight hundred thirty-five thousand one hundred sixty-two dollars and six cents ($10,835,162.06) from this transaction.

[46]  Accordingly, the shares transferred by Razmilovic to Symbol as payment for the options exercise price and withholding tax were valued at approximately six million five hundred fifty-two thousand five hundred twenty-three dollars and forty-five cents ($6,552,523.45).  (TE 16).

[47]  The actual price of Symbol stock on the date of exercise, i.e., fifty-seven dollars and fifty-six cents ($57.5626), minus the inflation in stock price caused by the fraud, as adjusted for one (1) stock split, i.e., seventeen dollars and thirty-one cents ($17.31).

four hundred forty-nine dollars and twenty-three cents ($1,970,449.23), i.e., the difference between the value of the proceeds Razmilovic actually realized from the transfer of Symbol stock to Symbol as payment for the options exercise price and withholding tax and the proceeds he would have realized absent the fraud.

### ii.    2000 Collar Transaction

Following the 2000 stock options exercise, Razmilovic was left with one hundred thousand (100,000) shares of Symbol common stock.  On November 3, 2000, Razmilovic entered into another "zero cost" collar transaction with BofA with respect to those one hundred thousand (100,000) shares, pursuant to which: (1) he sold call options to BofA allowing BofA to purchase, and obligating him to sell, the shares on the expiration date, i.e., January 5, 2004, if the stock price at expiration was higher than the call strike price[48]; and (2) he purchased put options from BofA, obligating BofA to purchase the shares on the expiration date, i.e., January 5, 2004, if the stock price at expiration was lower than the put strike price[49].  (TE 27).  For the reasons set forth above, Razmilovic is not liable to disgorge any amount from the profits reported by him in 2000 upon acquiring the one hundred thousand (100,000) shares from his 2000 stock options exercise, although he is liable to disgorge the entire amount of the profits he realized from the 2000 collar transaction.

On January 6, 2004, one day after the expiration date of the collar transaction, the market

---

[48]  The call strike price was approximately seventy-seven dollars and ninety-three cents ($77.9257).  (TE 27-28).

[49]  The put strike price was approximately thirty-nine dollars and ninety-six cents ($39.9619).  (TE 27-28).

price for Symbol stock was seventeen dollars and eighty-eight cents ($17.88), lower than the adjusted put strike price.[50] (TE 30). As a result, BofA paid Razmilovic three million nine hundred seventy-nine thousand eight hundred fifteen dollars and twelve cents ($3,979,815.12). (TE 30). Accordingly, Razmilovic is liable to disgorge the amount of three million two hundred ninety thousand six hundred eighty-five dollars and twelve cents ($3,290,685.12),[51] i.e., the difference between the amount he received from BofA pursuant to the transaction and the amount he paid for the shares[52].

###### d.      The 2001 Stock Transactions

###### i.      2001 Stock Options Exercise

On May 2, 2001, Razmilovic exercised options to purchase four hundred sixty-four thousand four hundred fifteen (464,415) shares of Symbol stock at an average option price per share of approximately five dollars and fifty-three cents ($5.5355).[53] (TE 17 and 31; see TE 8 and

---

[50] Pursuant to BofA's Notice of Strike Adjustments dated September 17, 2002, the number of shares involved in the collar was adjusted to one hundred fifty thousand (150,000); the call strike price was adjusted to approximately fifty-one dollars and ninety-one cents ($51.9114); and the put strike price was adjusted to approximately twenty-six dollars and sixty cents ($26.6022). (TE 28).

[51] This is less than the more than five million dollars ($5,000,000.00) Razmilovic would have to disgorge if I based the disgorgement amount upon the value of the excess shares on the date of the 2000 stock options exercise.

[52] One hundred thousand (100,000) shares at an average option price per share of approximately six dollars and eighty-nine cents ($6.8913) equals six hundred eighty-nine thousand one hundred thirty dollars ($689,130.00).

[53] One hundred seventy-three thousand nine hundred twenty (173,920) shares had been granted to Razmilovic on February 12, 1996 at an option price per share of approximately four dollars and ninety-four cents ($4.9383) and two hundred ninety thousand four hundred ninety-five (290,495) shares had been granted to Razmilovic on October 21, 1996 at an option price per

9).  Rather than paying the options exercise price and withholding tax in cash, Razmilovic

transferred two hundred sixty-four thousand four hundred fifteen (264,415) shares of Symbol

stock to Symbol at the market price of twenty-eight dollars and eleven cents ($28.11).[54]  (TE 17

and 31).

   According to O'Neal, absent the fraud, the price of Symbol stock on the date of exercise

would have been sixteen dollars and fifty-seven cents ($16.57)[55] and the value of the stock

transferred by Razmilovic to Symbol as payment for the options exercise price and withholding

tax would have been four million three hundred eight-one thousand three hundred fifty-six

dollars and fifty-five cents ($4,381,356.55).  (O'Neal Rpt., Ex. 2).  Therefore, Razmilovic

realized ill-gotten gains in, and is liable to disgorge, the amount of three million fifty-one

thousand three hundred forty-nine dollars and ten cents ($3,051,349.10), i.e., the difference

between the amount of proceeds actually realized by him from the transfer of Symbol stock as

payment for the 2001 options exercise price and withholding tax and the amount he would have

realized absent the fraud.

---

share of approximately five dollars and eighty-nine cents ($5.8931).  (TE 17 and 31).
Razmilovic reported a taxable gain of ten million four hundred eighty-three thousand nine hundred
five dollars and sixty cents ($10,483,905.60) from this transaction.

   [54]  Accordingly, the shares sold by Razmilovic to Symbol on the date of exercise were
valued at seven million four hundred thirty-two thousand seven hundred five dollars and sixty-
five cents ($7,432,705.65).

   [55]  The actual price of Symbol stock on the date of exercise, i.e., twenty-eight dollars and
eleven cents ($28.11), minus the inflation in stock price resulting from the fraud, i.e., eleven
dollars and fifty-four cents ($11.54).

ii.     2001 Collar Transaction

On May 14, 2001, Razmilovic entered into another "zero cost collar" transaction with BofA with respect to the two hundred thousand (200,000) shares he acquired in the 2001 stock options exercise, pursuant to which: (1) he sold call options to BofA allowing BofA to purchase, and obligating him to sell, the shares on the expiration date, i.e., May 14, 2003, if the stock price at expiration was higher than the call strike price[56]; and (2) he purchased put options from BofA, obligating BofA to purchase the shares on the expiration date, i.e., May 14, 2003, if the stock price at expiration was lower than the put strike price[57]. (TE 31 and 32). For the reasons set forth above, Razmilovic is not liable to disgorge any amount from the profits reported by him in 2001 upon acquiring the two hundred thousand (200,000) shares from his 2001 stock options exercise, although he is liable to disgorge the entire amount of the profits he realized from the 2001 zero-cost collar transaction.

Pursuant to the Confirmation Agreement between Razmilovic and BofA dated May 17, 2001, Razmilovic warranted to BofA that he was "not entering into [the zero cost collar] while in possession of material, non-public information concerning the business, operations or prospects of [Symbol]. 'Material' information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell, or hold securities of [Symbol]." (TE 32, at 6). Clearly, in light of the pervasive fraud scheme at Symbol in which Razmilovic participated, that representation was fraudulent, rendering the entire collar transaction fraudulent.

On May 14, 2003, the expiration date of the 2001 collar transaction, the market price for

---

[56] The call strike price was approximately thirty-six dollars and forty-eight cents ($36.4840). (TE 31-32).

[57] The put strike price was approximately nineteen dollars ($19.0021). (TE 31-32).

Symbol stock was twelve dollars and twelve cents ($12.12), lower than the adjusted put strike price.[58]  (TE 34).  As a result of this fraudulent collar transaction, BofA paid Razmilovic three million seven hundred eighty-two thousand two hundred forty dollars ($3,782,240.00)[59].  (TE 34 and 35).  Accordingly, Razmilovic is liable to disgorge the amount of two million six hundred seventy-five thousand one hundred forty dollars ($2,675,140.00), i.e., the difference between the amount he received from BofA pursuant to the 2001 collar transaction and the amount he paid for the collared shares. [60]

In sum, Razmilovic realized ill-gotten gains in, and is liable to disgorge, the total amount of eight million one hundred forty-two thousand two hundred twenty dollars and thirty cents ($8,142,220.30) from the fraudulent collar transactions.


f.      The 2002 Options Exercise

On February 1, 2002, Razmilovic exercised options to purchase one million seven hundred forty-four thousand six hundred thirty (1,744,630) shares of Symbol stock at an average option

---

[58] Pursuant to BofA's Notice of Strike Adjustments dated September 18, 2001, the call strike price was adjusted to approximately thirty-six dollars and forty-seven cents ($36.4734); and the put strike price was adjusted to approximately eighteen dollars and ninety-nine cents ($18.9915).  (TE 33).

[59] This is less than the more than four and a half million dollars ($4,500,000.00) Razmilovic would be liable to disgorge if I based the disgorgement amount on the value of the excess shares on the date of the stock options exercise, as opposed to the expiration date of the collar transaction.

[60] Two hundred thousand (200,000) shares at an average option price per share of approximately five dollars and fifty-three cents ($5.5355) equals one million one hundred seven thousand one hundred dollars ($1,107,100.00).

price per share of approximately six dollars and eighty-eight cents ($6.8833).[61]  (TE 18; see TE 8,

TE 9 and TE 45, at 87).  Rather than pay the entire options exercise price and withholding tax in

cash, Razmilovic transferred one million sixty-four thousand seven hundred ninety-eight

(1,064,798) shares of Symbol to Symbol at the market price of fifteen dollars and sixteen cents

($15.16).[62]  (TE 18).

### i.    "Collared" Shares

The SEC contends that the 2002 options exercise was entirely fraudulent because

approximately seventy-seven (77%) of the shares transferred by Razmilovic to Symbol to pay the

option price had previously been "collared" with BofA and, thus, Razmilovic was precluded from

further transferring those shares prior to the expiration dates of the collared shares.

As noted above, the ninety-nine thousand three hundred nine (99,309) shares of Symbol

stock that had been acquired by Razmilovic pursuant to his 1999 stock options exercise had

previously been "collared" with BofA on July 30, 1999, (TE 22-23); as a result of two (2) three-

---

[61]  One hundred sixty-five thousand one hundred thirty (165,130) had been granted to
Razmilovic on October 21, 1996 at an option price per share of approximately five dollars and
eighty-nine cents ($5.8931); three hundred sixty-four thousand five hundred (364,500) had been
granted to Razmilovic on February 10, 1997 at an option price per share of approximately six
dollars and ninety-one cents ($6.9136); four hundred fifty-five thousand six hundred twenty-five
(455,625) had been granted to Razmilovic on February 10, 1997 at an option price per share of
approximately six dollars and fifty-two cents ($6.5185); and six hundred fifty-four thousand one
hundred seventy (654,170) had been granted to Razmilovic on January 5, 1998 at an option price
per share of approximately seven dollars and thirty-seven cents ($7.3704).  (TE 18; see also
Brody Decl., Ex. 1).  Razmilovic reported a taxable gain of fourteen million three hundred eighty-
eight thousand five hundred sixty-nine dollars ($14,388,569.00) from this transaction.

[62]  Accordingly, the shares were valued at sixteen million one hundred forty-two thousand
three hundred thirty-seven dollars and sixty-eight cents ($16,142,337.68) on the exercise date.
(TE 18).

to-two (3-2) stock splits on April 6, 2000 and April 16, 2001, the number of shares "collared" by the 1999 transaction was adjusted to two hundred twenty-three thousand four hundred forty-five (223,445), (TE 24); the one hundred thousand (100,000) shares of Symbol stock that had been acquired by Razmilovic pursuant to his 2000 stock options exercise had previously been "collared" with BofA on November 3, 2000, (TE 27-28); as a result of the April 16, 2001 stock split, the number of shares "collared" by the 2000 transaction was adjusted to one hundred fifty thousand (150,000), (TE 28); and the two hundred thousand (200,000) shares that had been acquired by Razmilovic pursuant to his 2001 stock options exercise had been "collared" by him with BofA on May 14, 2001, (TE 17, 31 and 32).[63]  (See Brody Decl., Ex. 2, at 251-256).  Thus, five hundred seventy-three thousand four hundred forty-five (573,445) shares, or approximately fifty-four percent (54%), of the shares transferred by Razmilovic to Symbol as payment for the 2002 options exercise price and withholding tax had been "collared" with BofA.

Pursuant to the terms of the relevant Confirmation Agreements, Razmilovic agreed that "until the Expiration Date, other than in connection with the Assignment and Security [or Pledge] Agreement and the Transaction or with the prior consent of BofA, * * * no sale, pledge, option, hedge, or other arrangement to transfer or dispose of any interest *in any securities* [or in any Shares (or securities convertible into or exchangeable or exercisable for Shares)] of [Symbol] shall be made by or for the account of [Razmilovic] * * *."  (TE 22, 23 and 32, at 7) (emphasis added). Thus, Razmilovic's agreements with BofA restricted any transfer of at least the "collared" shares prior to the expiration dates of the respective collar transactions.  Therefore, Razmilovic's

---

[63] Martin, Razmilovic's expert, admits that Razmilovic placed zero-cost collar transactions on all of the shares he gained through the exercise of his stock options in 1999, 2000 and 2001. (Martin Rpt., at 8).

transfer of those "collared" shares to Symbol as partial payment for the 2002 options exercise price and withholding tax was clearly fraudulent. Moreover, Razmilovic obtained a double profit from those shares, i.e., the profits he received from the 2002 stock options exercise and the profits he received upon expiration of the three (3) collar transactions. Accordingly, Razmilovic realized ill-gotten gains in, and is liable to disgorge, the amount of eight million six hundred ninety-three thousand four hundred twenty-six dollars and twenty cents ($8,693,426.20), i.e., the five hundred seventy-three thousand four hundred forty-five (573,445) "collared" shares transferred by him to Symbol as payment for the 2002 options exercise price and withholding tax multiplied by the market price of those shares on the date of exercise.[64]

ii.    "Non-Collared" Shares

The remaining four hundred ninety-one thousand three hundred fifty-three (491,353) shares transferred by Razmilovic to Symbol as payment for the 2002 options price and withholding tax were not previously "collared" with BofA. Since Razmilovic is liable to disgorge the entire amount of proceeds he received from fraudulently transferring the "collared" shares to Symbol as payment for the 2002 options exercise, it would constitute "double" disgorgement to also hold him liable for the proceeds he received on the inflated price of those "collared" shares. Accordingly, Razmilovic is only liable to disgorge the amount of proceeds he received from transferring the remaining four hundred ninety-one thousand three hundred fifty-three (491,353)

---

[64] Since Razmilovic did not have any right to transfer those collared shares on the date of exercise, and the average option price per share that he paid for those shares is taken into account with respect to the disgorgeable amount from the collar transactions, the entire value of those collared shares on the date of exercise must be disgorged without regard to inflation and without a reduction for the amount he paid for those shares.

shares to Symbol at an inflated value as payment for the 2002 options price and withholding tax.

According to O'Neal, absent the fraud, the price of Symbol stock on the date of the 2002 options exercise would have been nine dollars and forty cents ($9.40).[65]  (O'Neal Rpt., Ex. 2). Thus, the value of the remaining shares transferred by Razmilovic to Symbol to pay the 2002 options exercise price and withholding tax would have been four million six hundred eighteen thousand seven hundred eighteen dollars and twenty cents ($4,618,718.20).  Thus, Razmilovic is liable to disgorge the amount of two million eight hundred thirty thousand one hundred ninety-three dollars and twenty-eight cents ($2,830,193.28), i.e., the difference between the amount of the proceeds he actually realized from the transfer of the "non-collared" shares to Symbol to pay the 2002 options exercise price and withholding tax and the amount he would have realized on those shares absent the fraud.

In sum, Razmilovic realized ill-gotten gains from his exercise of stock options during the fraud period in, and is liable to disgorge, the total amount of twenty million two hundred eighty-six thousand six hundred sixty-nine dollars and seventeen cents ($20,286,669.17).

f.      The 2002 Open Market Stock Sales

The SEC seeks disgorgement of the entire proceeds Razmilovic received from his sales of Symbol stock on the open market in February and March 2002.  However, for the reasons set forth above, Razmilovic is only liable to disgorge the difference between the amount of proceeds he actually received from the sales and the amount he would have received absent his fraud.

---

[65] The fifteen dollar and sixteen cents ($15.16) price of Symbol stock on the closing date minus the five dollar and seventy-six cents ($5.76) inflation in stock price, adjusted to account for some correction in Symbol's financial results following the first announcement of lower-than-expected earnings on July 16, 2001.  (See O'Neal Rpt., at 11).

61

Razmilovic's expert estimates an additional disgorgement amount of four hundred ninety-seven thousand seven hundred eleven dollars ($497,711.00) based upon the difference Razmilovic would have received on the sale of Symbol stock on the open market in 2002 and the price he would have received absent the inflation in Symbol's stock price. (Martin Rpt., at 8; Martin Decl., at 17).

On February 14, 2002, Razmilovic sold seventy-four thousand eight hundred fifty (74,850) shares of Symbol stock at an inflated price of eleven dollars and seventy-nine cents ($11.79), for a total amount of eight hundred eighty-two thousand four hundred eighty-one dollars and fifty cents ($882,481.50).[66] (Brody Decl., Ex. 1). At the time of the sale, prior to the February 14, 2002 announcements, the value of Symbol stock was still inflated by three dollars and twelve cents ($3.12). (See O'Neal Rpt., at 17). Thus, absent the fraud, the value of Symbol stock would have been eight dollars and sixty-seven cents ($8.67) and Razmilovic would have only realized proceeds in the amount of six hundred forty-eight thousand nine hundred forty-nine dollars and fifty cents ($648,949.50). Accordingly, Razmilovic realized ill-gotten gains in, and is liable to disgorge, the amount of two hundred thirty-three thousand five hundred thirty-two dollars ($233,532.00), i.e., the difference between the amount of proceeds Razmilovic actually received from the sale and the amount he would have received absent the fraud.[67]

---

[66] Symbol announced that Razmilovic was resigning, that it was not going to meet its earnings expectations for the fourth quarter of 2001 and that it would not meet earnings guidance for the full year ended December 31, 2002, only after the close of the market on February 14, 2002, i.e., after Razmilovic sold those shares. (See Brody Decl., Ex. 2, at 175-176).

[67] Razmilovic acquired those shares from the 2002 stock options exercise, for which he fraudulently paid the options exercise price, in part, from the transfer of "collared" shares to Symbol. Accordingly, Razmilovic did not actually pay the entire options price for those shares. Therefore, it is reasonable to infer that Razmilovic did not pay any amount for these shares.

On March 1, 2002, Razmilovic sold seven hundred thirty-one thousand five hundred forty-nine (731,549) shares of Symbol stock at a price of approximately eight dollars and eighty-five cents ($8.8468)[68], and twenty-five thousand (25,000) shares at a price of approximately eight dollars and ninety-five cents ($8.9526)[69], for a total amount of six million six hundred ninety-five thousand six hundred eighty-two dollars and sixty-nine cents ($6,695,682.69). (Brody Decl., Ex. 3). Since Razmilovic had acquired those shares as a result of the fraudulent 2002 stock options exercise, (Brody Decl., Ex. 2, at 257), for which, as set forth above, he did not pay the entire options exercise price, Razmilovic's ill-gotten gains from this sale are deemed to be the price he should have paid for those shares on the date of the 2002 stock options exercise, i.e., six dollars and eighty-eight cents ($6.8833). Accordingly, by failing to pay for the shares he sold on March 1, 2002, Razmilovic realized ill-gotten gains in, and is liable to disgorge, the amount of five million two hundred seven thousand five hundred fifty-three dollars and seventy-three cents ($5,207,553.73).

In sum, Razmilovic is liable to disgorge the total amount of thirty-three million eight hundred sixty-nine thousand nine hundred seventy-five dollars and twenty cents ($33,869,975.20) as the ill-gotten gains resulting from his stock transactions, for a total disgorgement amount, exclusive of prejudgment interest, of forty-one million seven hundred

---

[68] Razmilovic realized an actual profit on this transaction in the amount of approximately one million four hundred thirty-six thousand three hundred ninety-six dollars and forty-six cents ($1,436,396.46), i.e., the amount of the proceeds received by him minus the average option price paid by him for the shares totaling five million thirty-five thousand four hundred seventy-one dollars and twenty-three cents ($5,035,471.23).

[69] Razmilovic realized an actual profit on this transaction in the amount of fifty-one thousand seven hundred thirty-two dollars and fifty cents ($51,732.50), i.e., the difference between the amount of proceed received and the average options price paid by him for the shares.

fifty-three thousand six hundred twenty-three dollars and four cents ($41,753,623.04).

    4.    Offsets Sought by Razmilovic

    a.    Razmilovic's Settlement with Symbol

Razmilovic contends that any amount awarded to the SEC as disgorgement should be offset by the amount of two million two hundred fifty thousand dollars ($2,250,000.00), which is the amount he agreed to pay to settle Symbol's private claims against him commenced in the Court of Chancery of the State of Delaware in and for New Castle County, because "[t]he allegations in Symbol's case against [him] are analogous to the allegations of the SEC's Complaint in this case." (Razmilovic Mem., at 19; see Declaration of Jess Velona in Support of Plaintiff's Opposition Post-Hearing Memorandum in Further Support of its Claims against Defendant Tomo Razmilovic for Disgorgement, Pre-Judgment Interest, Penalties, Permanent Injunctive Relief, and a Permanent Officer and Director Bar [Velona Decl.], Ex. 2 (Settlement and Release Agreement between Symbol and Razmilovic dated July 20, 2009)).

Regardless of whether the claims asserted against Razmilovic by the SEC in this case are analogous to the claims asserted against him in a private securities fraud action commenced by Symbol, the relief sought is different. The damages sought by Symbol were compensatory in nature, whereas the disgorgement sought by the SEC is remedial in nature, i.e., designed to deter future violations of the securities laws by depriving Razmilovic of the rewards he obtained through his violation of the securities laws. The Second Circuit has held:

> "Since disgorgement is a method of forcing a defendant to give up the amount by which he was unjustly enriched, it is unlike an award of damages * * * and is neither foreclosed nor confined by an amount for which injured parties were willing to settle. A settlement payment may properly, however, be taken into

account by the court in calculating the amount to be disgorged * * *."

First Jersey Securities, 101 F.3d at 1475 (citation omitted); see also SEC v. Shah, 92 Civ. 1952, 1993 WL 288285, at * 5 (S.D.N.Y., July 28, 1993); SEC v. Penn Central Co., 425 F.Supp. 593, 599 (E.D. Pa. 1976) ("The fact that defendants have been sued in private litigation based on the same allegations as those made by the SEC does not make the relief sought any less remedial. * * * Disgorgement contemplates total recovery from the wrongdoer, not recovery that may be * * * subject to a compromise of actual damages. * * * To the extent that defendants have made restitution, the amounts paid would serve to offset part or all of a judgment for disgorgement.") It is within the district court's discretion to give a defendant credit for the money he paid to reimburse the victims of his fraud and to require him to disgorge the rest of his profits. First Jersey Securities, 101 F.3d at 1475.

In light of the vast amount of the disgorgement award, and in order to convey the fact that the award is not punitive, but only encompasses the ill-gotten gains Razmilovic realized from his fraud, I will exercise my discretion to offset the disgorgement award by any amount Razmilovic pays to Symbol to settle its claims against him.[70] However, Razmilovic has not paid any amount towards its settlement with Symbol to date. (See Razmilovic Mem., at 19-20). Accordingly, Razmilovic remains liable to disgorge the total amount of forty-one million seven hundred fifty-three thousand six hundred twenty-three dollars and four cents ($41,753,623.04), unless **within twenty (20) days from the date of this order,** Razmilovic files proof of payment of the full settlement amount to Symbol (now Motorola), at which time the disgorgement amount will be

---

[70] The same does not hold true for the civil penalties awarded against Razmilovic since they are, in fact, punitive in nature. See, e.g. In re Mutual Funds Inv. Litig., 681 F.Supp.2d 622, 626 (D. Md. 2010).

offset by the actual amount paid to Symbol, up to two million two hundred fifty thousand dollars ($2,250,000.00), exclusive of any interest paid thereon.

      b.  Taxes

    In a footnote in his brief in opposition to the SEC's post-trial memorandum, Razmilovic requests an offset of the disgorgement amount "[b]ecause the evidence shows that [he] paid taxes" on the profits he realized from the stock options exercises. (Defendant Tomo Razmilovic's Brief in Opposition to Plaintiff's Post-Hearing Memorandum [Razmilovic Opp.], at 18-19, n. 12).

    Contrary to Razmilovic's contention, there is no legal authority to support a deduction for taxes paid upon ill-gotten gains. See, e.g. SEC v. Dibella, 3:04CV1342, 2008 WL 6965807, at * 3 (D. Conn. Mar. 13, 2008), aff'd, 587 F.3d 553 (2d Cir. 2009) (income taxes are not deductible from disgorgement amount); U.S. SEC v. Zwick, 03 Civ. 2742, 2007 WL 831812, at * 24 (S.D.N.Y. Mar. 16, 2007), aff'd, 317 Fed. Appx. 34 (2d Cir. Aug. 27, 2008) (accord); U.S. SEC v. Svoboda, 409 F.Supp.2d 331, 345 (S.D.N.Y. 2006) (finding no legal authority to support deducting capital gains taxes from disgorgement amount). Razmilovic's attempt to distinguish those cases is unpersuasive, since, inter alia, the courts only held in the alternative that the defendants therein had not shown the amount of taxes paid. Accordingly, the disgorgement amount will not be offset by any amount paid by Razmilovic as taxes on his ill-gotten gains.

    B.  Prejudgement Interest

    Razmilovic contends that the SEC should not be awarded prejudgment on the disgorgement

66

amount because he has not had the "use" of his unlawful gains since 2004 since "far more than the amount of funds subject to disgorgement [which he contends is four million eight hundred seventy thousand eight hundred forty-nine dollars ($4,870,849.00)] are held in Swiss bank accounts that have been frozen," by the government.  (Razmilovic Mem., at 22-23).

"The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion, * * *." First Jersey Securities, 101 F.3d at 1476 (quoting Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1071-72 (2d Cir. 1995)); see also Aimsi Technologies, 650 F.Supp.2d at 304.

In SEC v. Zafar, No. 06-CV-1578, 2009 WL 129492, at * 7 (E.D.N.Y. Jan. 20, 2009), upon which Razmilovic relies, the Honorable John Gleeson, United States District Judge, denied the SEC's motion for summary judgment on the award of prejudgment interest on the basis that "it [was] not clear that prejudgment interest should be awarded for the period during which all of [the defendant's] assets were frozen" (emphasis added), since the freeze order "sufficed to deprive [the defendant] of th[e] potential benefit [of an interest-free loan in the amount of his ill-gotten gains]." Id. Judge Gleeson found that the SEC had failed to demonstrate that it was appropriate to award prejudgment interest for the entire period during which the defendant had use of unlawful profits "when the defendant [had] already [been] restrained from using those profits." Id.

In this case, however, there is no evidence, and indeed Razmilovic carefully avoids even alleging, that all of his assets have been frozen by the government since 2004.  Whereas in Zafar, the defendant had sought access to some of the frozen funds during the course of the litigation in order to pay living expenses, legal expenses and expert witness fees, 2009 WL 129492, at * 3-4, Razmilovic has never once sought to modify the freeze orders issued by the Swiss Department of Justice's Central Authority for United States Request, dated July 2, 2004 (temporary freeze order

67

for ninety [90] days) and October 1, 2004 (permanent freeze order), (see Declaration of Simon

Kunz in Support of Defendant Tomo Razmilovic's Post-Trial Brief, at ¶¶ 3-4), in order to access

the frozen funds to pay living expenses, etc. Thus, it is clear that not all of Razmilovic's assets

have been frozen since July 2004. Moreover, since I have found the amount of Razmilovic's ill-

gotten gains to be in excess of forty-one million dollars ($41,000,000.00), but only seventeen

million three hundred seventy-nine thousand seven hundred thirty-five dollars ($17,379,735.00)

have been frozen, (see Razmilovic Mem., at 23)[71], Razmilovic has, at the very least, had the use of

more than half of his ill-gotten gains. Accordingly, because he has "had the use of [the] unlawful

profits for the entire period," First Jersey Securities, 101 F.3d at 1477; see also Warde, 151 F.3d at

50, Razmilovic is liable to pay prejudgment interest on the entire amount of his ill-gotten gains for

the entire period from the time of his unlawful gains to the entry of judgment herein.[72]

---

[71] Although the government sought to freeze only the seventeen million three hundred
seventy-nine thousand seven hundred thirty-five dollars ($17,379,735.00) it had traced to the
Swiss bank accounts, it had actually valued Razmilovic's ill-gotten gains "conservatively" at
approximately fifty-three million dollars ($53,000,000.00). (Declaration of Jeffrey B.
Coopersmith, Esq. in Support of Defedant Tomo Razmilovic's Post-Trial Brief [Coopersmith
Decl.], Ex. 1).

[72] In accordance with the SEC's request, prejudgment interest on the amount of seven
million eight hundred eighty-three thousand six hundred forty-seven dollars and eighty-four cents
($7,883,647.84) awarded as disgorgement from the compensation Razmilovic received during
the fraud period will commence from April 5, 2002, the date he received the severance payment.
Prejudgement interest on the amount of twenty million two hundred eighty-six thousand six
hundred sixty-nine dollars and seventeen cents ($20,286,669.17) awarded as disgorgement from
the stock options exercise will commence from February 1, 2002, the date of Razmilovic's last
options exercise. Prejudgment interest on the amount of eight million one hundred forty-two
thousand two hundred twenty dollars and thirty cents ($8,142,220.30) awarded as disgorgement
from the stock collar transactions will commence from January 6, 2004, the last expiration date
of Razmilovic's collar transactions. Prejudgment interest on the remaining amount awarded as
disgorgement from Razmilovic's open market sales of Symbol stock will commence from March
1, 2002. In the event the disgorgement amount is offset by any settlement amount paid by
Razmilovic to Symbol, prejudgment interest on the amount of five million four hundred forty-

The Second Circuit has approved the use of the rate employed by the Internal Revenue Service ("IRS") for an underpayment of taxes, see 26 U.S.C. § 6621(a)(2), as opposed to the treasury-bill rate, in connection with disgorgement. First Jersey Securities, 101 F.3d at 1476; see also Aimsi Technologies, 650 F.Supp.2d at 304. Accordingly, **within thirty (30) days** after the date of this order, the SEC is directed to file a proposed judgment including the amount of prejudgment interest calculated in accordance with this order.[73]


B.    Civil Penalties

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d)(1), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(A), authorize a district court to impose civil monetary penalties upon any person found to have committed a violation of those securities laws, and provide for three (3) tiers of potential penalties to "be determined by the court in light of the facts and circumstances." The first tier is generally applicable, see SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005), and provides for a penalty to be imposed in an amount, as adjusted for inflation, see 17 C.F.R. §§ 201.1001-1002, not to exceed the greater of: (1)(a) five thousand five hundred dollars ($5,500.00) for each violation occurring prior to, and including, February 2, 2001, 17 C.F.R. Pt. 201, Subpt. E, Tbl. I, and (b) six thousand five hundred dollars ($6,500.00) for each violation

---

one thousand eighty-five dollars and seventy-three cents ($5,441,085.73) will be paid from March 1, 2002 until the date of payment of any amount to Symbol, that amount will then be reduced by the amount of the settlement payment to Symbol, and prejudgement interest on that reduced amount will accrue from the date of payment of the settlement amount to Symbol to the date of entry of judgment herein.

[73] Since I have afforded Razmilovic twenty (20) days within which to submit proof of payment of the settlement amount to Symbol, the SEC has ten (10) days thereafter within which to submit the proposed judgment in accordance with this order.

occurring after February 2, 2001 and prior to, and including, February 14, 2005, 17 C.F.R. Pt. 201, Subpt. E, Tbl. II; or (2) "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i). The second tier increases the penalty to be imposed where the violation(s) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" to an amount, as adjusted for inflation, see 17 C.F.R. §§ 201.1001-1002, not to exceed the greater of: (1)(a) fifty-five thousand dollars ($55,000.00) for each violation occurring prior to, and including, February 2, 2001, 17 C.F.R. Pt. 201, Subpt. E, Tbl. I, and (b) sixty thousand dollars ($60,000.00) for violations occurring after February 2, 2001 and prior to, and including, February 14, 2005, 17 C.F.R. Pt. 201, Subpt. E, Tbl. II; or (2) "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii) . The third tier further increases the penalty to be imposed where the violation(s) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and where "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," to an amount, as adjusted for inflation, see 17 C.F.R. §§ 201.1001-1002, not to exceed the greater of: (1) (a) one hundred ten thousand dollars ($110,000.00) for each violation occurring prior to, and including, February 2, 2001, 17 C.F.R. Pt. 201, Subpt. E, Tbl. I, and (b) one hundred twenty thousand dollars ($120,000.00) for each violation occurring after February 2, 2001 and prior to, and including, February 14, 2005, 17 C.F.R. Pt. 201, Subpt. E, Tbl. II; or (2) "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. §§ 77t(d)(2)(C), 78(d)(3)(B)(iii). Although the statutory tier determines the maximum penalty allowed per violation, the actual amount of the penalty imposed is discretionary with the district court. See Kern, 425 F.3d at 153; Universal Express, 646 F.Supp.2d at 567.

70

The civil penalties authorized by the securities laws serve a dual purpose, i.e., to both punish the individual violator for his past violations and deter future violations of the securities laws. See Colonial Investment, 659 F.Supp.2d at 503; Universal Exp., 646 F.Supp.2d at 567; Opulentica, 479 F.Supp.2d at 331. The following factors are relevant in determining whether civil penalties are appropriate and, if so, in what amount: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; (5) whether the defendant has admitted wrongdoing; and (6) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." Colonial Investment, 659 F.Supp.2d at 503; see also Universal Exp., 646 F.Supp.2d at 568; Opulentica, 479 F.Supp.2d at 331. However, each case must ultimately be decided upon its own particular facts and circumstances. Colonial Investment, 659 F.Supp.2d at 503; see also Opulentica, 479 F.Supp.2d at 331.

Razmilovic contends that even assuming the applicability of third-tier civil penalties, under the "principle of proportionality," (Razmilovic Mem., at 20), the maximum amount of any civil penalties imposed upon him should be seven hundred twenty thousand dollars ($720,000.00) because his co-defendants only paid between thirty-five thousand dollars ($35,000.00) to two hundred fifty thousand dollars ($250,000.00) pursuant to their settlements with the SEC.[74] According to Razmilovic, he should not be required to pay more than ninety-nine times (99x) the amount paid by the Chief Financial Officer of Symbol who was allegedly at the center of the fraud scheme.

---

[74] According to Razmilovic, one of his co-defendants did not pay any amount of a civil penalty based upon his financial condition. (Razmilovic Mem., p. 21).

Razmilovic was a direct participant in a pervasive fraud scheme, spanning over three (3) years and involving fraud, deceit, manipulation and deliberate, or at least, reckless disregard of regulatory requirements, which either resulted in substantial losses to Symbol investors or, at the very least, created a risk of substantial losses to Symbol investors.  Yet instead of responding to the charges against him, Razmilovic fled the country, continues to refuse to admit any wrongdoing, and has never expressed any remorse for his conduct.  See, e.g. Universal Exp., 646 F.Supp.2d at 568 (finding the imposition of third-tier penalties appropriate because the defendant's dissemination of materially false information created a significant risk of substantial loss to the investing public, and  his actual sale of the company's shares at artificially inflated prices actually caused those losses).  In light of, *inter alia*, the seriousness and pervasiveness of the fraud scheme, the significant role played by Razmilovic in the scheme, the extent of the benefits Razmilovic received from his violations of the securities laws and his lack of remorse, a third tier penalty is appropriate.  See, e.g. SEC v. Lines, No. 07 Civ. 11387, 2011 WL 3627695, at * 2 (S.D.N.Y. Aug. 16, 2011) (accepting recommendation to award third-tier civil penalties since, *inter alia*, the defendants had actively participated in an eight (8)-month fraud scheme to manipulate a publicly-traded stock that resulted in material losses suffered by innocent purchasers of the company's stock and one defendant had recklessly published misleading reports touting the value of the company's stock while concealing his own financial interests, which artificially inflated trading of the company's shares and created a risk of substantial losses to unwitting purchasers).

I reject Razmilovic's contention that any civil penalty imposed upon him should be proportionate to the civil penalties imposed upon his co-defendants on the basis, *inter alia*, that Razmilovic ignores the crucial fact that all of his co-defendants not only appeared and defended the claims against them in this case, but also ultimately settled the claims against them.  Conversely,

72

Razmilovic is a fugitive from the criminal charges against him, whose default during discovery in this case led to a default judgment against him, but who then insisted on proceeding to trial on the issue of damages.  Accordingly, the compromised amount of the civil penalties imposed upon Razmilovic's co-defendants in this case have no bearing upon the appropriate amount of any penalty imposed upon him.

Nonetheless, imposing civil penalties upon Razmilovic equal to the maximum statutory amount, i.e., the gross amount of his pecuniary gain from the securities law violations, would result in a penalty amount of more than forty-one million dollars ($41,000,000.00).  This Court was unable to find any case imposing third-tier civil penalties in such an amount.  At least one court in this Circuit has held that in determining the amount of a third-tier civil penalty to impose, it is appropriate to "also consider[] the extent to which other aspects of the relief and/or judgment * * * will have the desired punitive effect." Universal Exp., 646 F.Supp.2d at 568; see also SEC v. Conaway, 697 F.Supp.2d 733, 771-72 (E.D. Mich. 2010) (imposing third-tier penalties in an amount equal to one-half of the defendant's economic benefit considering the disgorgement amount and substantial prejudgement interest on that amount, and the fact that the alternative amount of seven hundred twenty thousand dollars ($720,000.00) was not a sufficient penalty given the facts of that case).  In Universal Exp., the defendant was required to pay thirteen million dollars ($13,000,000.00) in disgorgement and prejudgment interest, and injunctive relief was granted against him, which the district court found would all have "retributive effect." Id.  The district court held that the SEC's request for civil penalties in an amount equal to the defendant's gross pecuniary gain exceeded the additional punishment required under the circumstances of that case and, therefore, imposed a third-tier civil penalty in the amount of one million dollars ($1,000,000.00).

73

Since Razmilovic is liable for disgorgement in an amount over forty-one million dollars ($41,000,000.00), exclusive of prejudgement interest, and, for the reasons set forth below, is permanently enjoined from further violations of the securities laws and from acting as an officer or director of any public corporation, a civil penalty in an amount equal to his pecuniary gain from his securities law violations would be excessive. However, the alternative amount of seven hundred twenty thousand dollar ($720,000.00) suggested by Razmilovic is insufficient to serve the punitive and deterrent purposes of the civil penalty statutes. See, e.g. Conaway, 697 F.Supp.2d at 771-72. Rather, third-tier civil penalties are imposed against Razmilovic in an amount equal to one-half of his gross pecuniary gain from his securities law violations, i.e., one-half of the disgorgement amount, for a total amount of twenty million eight hundred seventy-six thousand eight hundred eleven dollars and fifty-two cents ($20,876,811.52).

C.      Injunctive Relief

1.      Permanent Injunction from Future Violations of Securities Law

Section 20 of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(1), also authorize a district court to grant a permanent injunction enjoining the defendant from engaging in any acts or practices in violation of the securities laws. 15 U.S.C. §§ 77t(b), 78u(d)(1). To obtain a permanent injunction from future violations of the securities law, the SEC must demonstrate: (1) that the defendant committed violations of the securities laws in the past; and (2) a substantial likelihood that the defendant will commit future violations of the securities law. See Cavanagh, 155 F.3d at 135; see also First Jersey Securities, 101 F.3d at 1477 (holding that an injunction prohibiting a party from violating statutory provisions is appropriate where there is a likelihood that the violations will continue absent an injunction); U.S. SEC v.

74

Suman, 684 F.Supp.2d 378, 391 (S.D.N.Y. 2010), aff'd, 421 Fed. Appx. 86 (2d Cir. May 5, 2011) (accord). The "court must look beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence, but fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations." Opulentica, 479 F.Supp.2d at 329 (quotations and citations omitted).

"In determining whether there is a realistic likelihood that a defendant will violate the securities laws in the future, courts look to a number of factors: (1) the degree of scienter involved; (2) the isolated or persistent nature of the past fraudulent acts; (3) the defendant's appreciation of his wrongdoing; and (4) the defendant's opportunities to commit future violations." Opulentica, 479 F.Supp.2d at 329; see also Colonial Investment, 659 F.Supp.2d at 500 (holding that in determining whether to issue a permanent injunction enjoining future violations of securities laws, a district court may consider: the fact that the defendant was found liable for illegal conduct; the degree of scienter involved; whether the infraction was an "isolated occurrence;" whether the defendant continues to maintain that his past conduct is blameless; and whether the defendant might be in a position to commit future violations); First Jersey Securities, 101 F.3d at 1477 (holding that an injunction is particularly appropriate "where a violation was founded on systematic wrongdoing, rather than an isolated occurrence" and the defendant's "degree of culpability and continued protestations of innocence" indicate that future violations of securities laws are likely).

Since Razmilovic was a direct participant in the pervasive fraud scheme spanning over a three (3) year period, for which he has been found liable by virtue of his default in this action; he acted with a significant degree of scienter, i.e., knowingly, intentionally and willfully; he has refused to accept responsibility, and has expressed no remorse, for his conduct; and he might be in a position to commit future violations of the securities laws, notwithstanding his physical absence

75

from the United States, there is a substantial likelihood that Razmilovic will engage in future acts

and practices in violation of the securities laws. See, e.g. Opulentica, 479 F.Supp.2d at 329.

Accordingly, the branch of the SEC's motion seeking a permanent injunction is granted and

Razmilovic is hereby permanently enjoined from violating the securities laws for which he has

been found liable, i.e., Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Sections 10(b)

13(a), 13(b)(2) and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2) and

78m(b)(5), and Rules 10b-5, 240.12b-20, 240.13a-1, 240.13a-13, 13b2-1 and 13b202 thereunder,

17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, 240.13b2-1 and 240.13b2-2.


### 2.      Officer or Director Bar

The Securities Act and Exchange Act also authorize a district court to permanently

prohibit, conditionally or unconditionally, "any person who violated section 77q(a)(1) of [the

Securities Act] [or Section 78j(b) of the Exchange Act or the rules and regulations thereunder]

from acting as an officer or director of [a public company] if the person's conduct demonstrates

unfitness to serve an as officer or director of any such [public company]." 15 U.S.C. §§ 77t(e),

78u(d)(2); see Patel, 61 F.3d at 140-41. In determining the appropriateness of such an injunction,

the following factors are appropriately considered: (1) the egregiousness of the defendant's

securities laws violations; (2) whether the defendant is a "repeat offender"; (3) the defendant's

position in, or role with, the company when he engaged in the fraud; (4) the degree of scienter

involved; (5) the defendant's economic stake in the violation; and (5) the likelihood of recurrence.

See Patel, 61 F.3d at 141 (finding the district court's application of those six (6) factors to be

"useful in making the unfitness assessment").   Nonetheless, those factors are not exclusive and

district courts are afforded "substantial discretion" in determining whether to impose an officer and

director bar.  Id.

Since Razmilovic has been found liable, *inter alia*, of violating Section 17(a) of the Securities Act, 15 U.S.C. 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, the issue is whether his conduct demonstrates his unfitness to serve as an officer or director of a public company.  In light of, *inter alia*, the seriousness and pervasiveness of the fraud scheme in which Razmilovic directly participated over a more than three (3) year period; Razmilovic's position first as COO, then as CEO of Symbol, when he engaged in the fraud; the high degree of scienter involved in the fraud scheme; the substantial economic benefits Razmilovic reaped from his fraud; and the likelihood that Razmilovic's misconduct will recur, as evidenced by his failure to answer for the fraud, to express any remorse therefor or to assure against his future violations of the securities laws, I find that Razmilovic is unfit to serve as an officer or director of a public company.  See, e.g. Posner, 16 F.3d at 521-22 (affirming officer and director bar where the defendants had committed securities law violations with a high degree of scienter and their past securities law violations and lack of assurances against future violations demonstrated that such violations were likely to continue); see also Lorin, 76 F.3d at 461 ("[P]ersistent refusals to admit any wrongdoing ma[k]e it rather dubious that [the defendant] [is] likely to avoid such violations of the securities laws in the future in the absence of an injunction.") Accordingly, Razmilovic is hereby permanently enjoined from serving as an officer or director of any public company.

III.    Conclusion

For the foregoing reasons: (1) Razmilovic is permanently enjoined from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Sections 10(b) 13(a), 13(b)(2) and 13(b)(5) of

the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2) and 78m(b)(5), and Rules 10b-5,

240.12b-20, 240.13a-1, 240.13a-13, 13b2-1 and 13b202 thereunder, 17 C.F.R. §§ 240.10b-5,

240.12b-20, 240.13a-1, 240.13a-13, 240.13b2-1 and 240.13b2-2; (2) Razmilovic is liable to

disgorge the total amount of forty-one million seven hundred fifty-three thousand six hundred

twenty-three dollars and four cents ($41,753,623.04), plus prejudgment interest determined in

accordance with the IRS rate for underpayment of taxes, 26 U.S.C. § 6621(a)(2), and this

memorandum of decision; (3) Razmilovic shall pay a civil penalty in the amount of twenty million

eight hundred seventy-six thousand eight hundred eleven dollars and fifty-two cents

($20,876,811.52); and (4) Razmilovic is permanently prohibited from serving as an officer or

director of any public company.[75]

Within thirty (30) days from the date of this memorandum of decision, the SEC shall file a

proposed judgment in accordance herewith, and calculating prejudgment interest at the IRS

underpayment rate, 26 U.S.C. § 6621(a)(2), as set forth herein through the date of entry of the

judgment.


SO ORDERED.

_____
Sandra J. Feuerstein
United States District Judge


Dated: September 30, 2011
      Central Islip, New York


---

[75] In light of this determination, Razmilovic's motion to strike (Doc. No. 276) is denied as moot.