UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION, :

               Plaintiff,         :

       -against-         :   No. 2:04-CV-02276
                        :   (SJF)(WDW)

SYMBOL TECHNOLOGIES, INC., TOMO   :
RAZMILOVIC, KENNETH JAEGGI, LEONARD  :
GOLDNER, BRIAN BURKE, MICHAEL     :
DEGENNARO, FRANK BORGHESE,       :
CHRISTOPHER DESANTIS, JAMES       :
HEUSCHNEIDER, GREGORY MORTENSON,  :
JAMES DEAN AND ROBERT DONLON,    :
                        :

           Defendants.     :

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION
FOR FINAL JUDGMENT ORDERING DISGORGEMENT,
PREJUDGMENT INTEREST AND A CIVIL PENALTY AGAINST
DEFENDANTS ROBERT DONLON AND GREGORY MORTENSON**

U.S. SECURITIES AND EXCHANGE COMMISSION
NEW YORK REGIONAL OFFICE
THREE WORLD FINANCIAL CENTER
NEW YORK, NEW YORK 10281
Todd D. Brody, Esq. (212) 336-0080
Jess Velona  (212) 336-0180

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT                                          1

II.     PROCEDURAL HISTORY                                            1

III.    STATEMENT OF FACTS                                            3

A.      THE ALLEGATIONS IN THE COMPLAINT AGAINST DONLON               3

B.      DONLON'S TESTIMONY CONCERNING HIS WRONGDOING                  8

C.      THE ALLEGATIONS IN THE COMPLAINT AGAINST MORTENSON           10

D.      MORTENSON'S TESTIMONY CONCERNING HIS WRONGDOING              13

IV.     ARGUMENT                                                     13

A.      THE COURT SHOULD ORDER DISGORGEMENT AGAINST
        DONLON AND MORTENSON                                         13

B.      THE COURT SHOULD ORDER PREJUDGMENT INTEREST
        AGAINST DONLON AND MORTENSON                                 15

C.      THE COURT SHOULD ORDER CIVIL MONETARY PENALTIES
        AGAINST DONLON AND MORTENSON                                 17

V.      CONCLUSION                                                   19

## I.    PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this Memorandum of Law in Support of its Motion for Final Judgment against Defendants Robert Donlon ("Donlon") and Gregory Mortenson ("Mortenson").

Both Donlon and Mortenson previously consented to the entry of a partial judgment imposing injunctive relief, which the Court has entered, and the only issues remaining in this action are the monetary remedies requested by this motion.  By consenting to the partial judgment, Donlon and Mortenson agreed that, for purposes of this motion, the allegations of the Complaint shall be accepted as and deemed true by the Court.  Accordingly, it is undisputed that Donlon and Mortenson played a significant role in the fraudulent conduct at Symbol that took place from at least 1998 through February 2003 and violated the securities laws.  The Court should order that the two disgorge their ill-gotten gains and pay prejudgment interest.  As described below, the appropriate disgorgement amount for Donlon is $35,516 with prejudgment interest of $29,882.18. The appropriate disgorgement amount for Mortenson is $42,461, with prejudgment interest of $38,959.79.  Moreover, based on their significant and recurrent fraudulent conduct, which resulted in substantial losses, and the risk of even greater losses, to investors, Donlon and Mortenson should pay third-tier penalties commensurate with their misconduct.

## II.    PROCEDURAL HISTORY

The Commission filed its Complaint in this action on June 3, 2004.  (See Complaint, attached as Exhibit 1 to the Declaration of Todd D. Brody, executed July 9, 2012 ("Brody Decl.")).  The Complaint charged Donlon, Mortenson, and others with a wide array of fraudulent misconduct that had a cumulative net impact of over $230 million on Symbol's reported revenue and over $530 million on its reported pre-tax earnings.  The defendants moved to stay the action

pending resolution of parallel criminal proceedings. On October 4, 2004, the Court granted the stay request. That stay was lifted by the Court on October 24, 2007.

On June 1, 2004, Mortenson and Donlon each pled guilty to the charge of conspiracy to commit securities fraud in the parallel criminal action. (Transcript of Plea, attached as Exhibit 2, 3 to the Brody Decl.). On September 21, 2009, Donlon was sentenced to three years of probation and was ordered to pay an assessment of $100. (Sentencing Document, attached as Exhibit 4 to the Brody Decl.). On October 1, 2009, Mortenson received the same sentence from the court. (Sentencing Document, attached as Exhibit 5 to the Brody Decl.).

On February 7, 2008, the Court in this case entered a partial judgment against Mortenson on his consent ("Mortenson Judgment"). (Brody Decl., Exhibit 6). On July 18, 2010, this Court entered a partial judgment against Donlon on his consent ("Donlon Judgment"). (Brody Decl., Exhibit 7). Both partial consent judgments contain substantially similar language. In the partial consent judgments, the Court enjoined Mortenson and Donlon from violating Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)], Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1], Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)], and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13]. (Brody Decl. Exs. 6-7). The partial consent judgments also provided that, on the Commission's motion, the Court would determine whether the defendants should be ordered to pay disgorgement and/or a civil penalty and the amounts thereof. *Id.*[1] The partial consent judgments also provided that in connection with the Commission's motion, "(a) Defendant[s] … will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant[s] … may not

---

[1] As to prejudgment interest, both partial consent judgments provide that if disgorgement is ordered, the defendant "shall pay prejudgment interest on the disgorgement amount at the rate of interest used by the Internal Revenue Service for underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." *Id.*

challenge the validity of [his] Consent or this Partial Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint that specifically pertain to defendant[s] … violative conduct shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure and without conducting an evidentiary hearing." *Id.*

## III.   STATEMENT OF FACTS

The facts relevant to this motion are derived from the Complaint's allegations and documentary evidence submitted as Exhibits to the Brody Declaration.  Because pursuant to the terms of their consent judgments, neither Donlon nor Mortenson can challenge any of the Complaint's allegations relating to their own conduct, the facts taken directly from the Complaint concerning Mortenson's and Donlon's violations are undisputed and are summarized below.

## A.   THE ALLEGATIONS IN THE COMPLAINT AGAINST DONLON

Donlon was employed at Symbol Technologies, Inc. ("Symbol") from 1989 until his termination in March 2003.  (Brody Decl. Ex. 1 at ¶ 28).  He held numerous positions in sales and related areas, including manager of the Customer Response Team ("CRT").  *Id.*  From April 2000 until his termination, Donlon was the Director of Sales Operations.  *Id.*

Donlon, together with other former Symbol executives, engaged in a wide array of misconduct that had a cumulative net impact of over $230 million on reported revenue and over $530 million on reported pre-tax earnings.  (*Id.* at ¶ 1).  To inflate sales revenue, Symbol employed classic revenue recognition schemes such as making side agreements on return rights and contingent payment terms to stuff the distribution channel, shipping the wrong product when

the product ordered was unavailable, warehousing product until an end user materialized and similar means of claiming revenue before it was earned. (*Id.* at ¶ 6). These schemes were carried out by Donlon and others. *Id.* Donlon and others also engaged in conduct that caused revenue to be recognized in several quarters on shipments that did not occur until the next quarter. *Id.* Donlon and others implemented the revenue recognition schemes (*Id.* at ¶ 33). Donlon and others handled the logistical details involved in getting the orders processed and booked in accordance with the schemes to accelerate and fabricate sales revenue. (*Id.* at ¶ 43). In one of the schemes, Symbol had one of its South American distributors place multimillion orders at the end of multiple quarters for whatever products Symbol had available at the time, even though the distributor had no use for the ordered products. *Id.* at ¶ 49. Symbol did not even ship the products to the distributor. *Id.* Instead, Symbol moved the product to a warehouse in New York where it retained the risk of loss and other indicia of ownership. *Id.* Donlon implemented this arrangement by preparing a spreadsheet identifying the available inventory, and the spreadsheet was sent to the distributor indicating the products and quantities that it should order. *Id.* at ¶ 50. Donlon did this to ensure immediate revenue recognition, because he knew that Symbol's accounting system (SAP) would not generate an invoice unless the order met certain criteria. *Id.* Among other things, the system interfaced with the inventory database and matched orders up with available inventory. *Id.* If the ordered product was not currently available, SAP put the order on hold, and would not authorize shipment or generate an invoice until the product appeared in inventory. *Id.* While engaged in the fraud, Donlon referred to the process of matching orders to existing, and often surplus or obsolete, inventory as "bowling for dollars." (*Id.* at ¶ 50).

Donlon also participated in the three-way "round trip" transactions, known at Symbol as "candy" deals, that were used to "stuff" the distribution channel. (*Id.* at ¶ 54). In these

transactions, Symbol paid off resellers to "purchase" large volumes of Symbol product from a distributor at the end of a quarter so that Symbol could induce the distributor to place a corresponding order with Symbol to increase inventory to meet this illusory demand. *Id.* As he did in the warehousing arrangement with the South American distributor, Donlon supplied spreadsheets identifying the inventory that was available at distributors so that the resellers knew what to order. *Id.* at ¶ 58. Donlon also handled the returns when the product came back, making sure they were processed as "zero dollar" returns with no adverse impact on income. *Id.*

Next, with respect to the quarter-end deals to the select group of small resellers known as "friends of Frank" (referring to Frank Borghese, Symbol's head of sales), Donlon created spreadsheets of available inventory to convey to the resellers. (*Id.* at ¶ 64). He also regularly overrode credit limits in place for these resellers. *Id.* In some cases, Donlon obtained the accounting system computer passwords belonging to credit personnel and released orders on his own. *Id.* Donlon also solicited quarter-end orders to help Symbol achieve its number. *Id.* In one instance, Donlon signed someone else's name to a side letter promising the reseller a 1% "staging fee" for placing a phony order when, in fact, there was no product staging that needed to be done. *Id.* Likewise, on December 28, 2001, Donlon caused a 1.8 million order to be released to a reseller by falsely advising credit personnel that this reseller had a valid purchase order from an end user. *Id.* at ¶ 65(a).

Donlon also employed numerous schemes to accelerate revenue that should have been recorded in later periods, if at all. *Id.* at ¶ 70. From the third quarter of 1999 through the first quarter of 2001, Symbol systematically recognized revenue on orders that had attained post good issued ("PGI") status, indicating that they order was being processed by the factory but had not shipped. *Id.* at ¶ 71. After the end of the quarter, Donlon and his staff downloaded a report from

5

SAP listing the PGI orders and provided the report to sales finance. *Id.* at ¶ 72. Mortenson and his staff then manually recorded revenue on the transactions included in the report according to the "PGI" date, even where the shipment did not occur until the next quarter. *Id.* After the first quarter of 2001, an attempt was made to conceal the PGI scheme by obtaining phony "bill and hold" letters from the customers. *Id.* at ¶ 73. Donlon was actively involved in this process, telling customers that Symbol's auditors needed the letters. *Id.* at ¶ 74.

Toward the end of most quarters, Donlon and his staff engaged in another form of what he coined "bowling for dollars," by generating lists of orders scheduled for shipment early in the next quarter. *Id.* at ¶ 76. At Borghese's direction, Donlon and his staff employed various tactics to "pull in" these orders to the current quarter so that revenue could be recognized in that quarter. *Id.* At times, the customer agreed to accept an early shipment, but at other times, Donlon had the product shipped prematurely to customers who had not given their consent or had not even been consulted. *Id.* In order to release the product for early shipping and generate the desired invoice date, Donlon and his staff altered the requested ship date previously entered in SAP. *Id.*

At other times, Borghese directed Donlon and his staff to ship the product on what they called a "slow boat" or a "slow truck" to ensure that the product, though shipped and invoiced in the current quarter, arrived closer in time to the requested date in the following quarter. (*Id.* at ¶ 78) Donlon accomplished this by using ground freight or a local carrier rather than the overnight delivery service called for by the sales contract. *Id.* On some occasions, the local carrier picked up the product in one quarter and held it well into the next quarter period before forwarding it to the customer via an overnight service. *Id.*

Donlon played a key role in a similar transaction on which revenue was recorded in the second quarter of 2000. (*Id.* at ¶ 80). To recognize revenue that quarter, Donlon and others

arranged a $3.8 million shipment to a reseller at the end of June 2000, because the version of a product that an end user planned to purchase was not due to be ready until July 2000. *Id.* Donlon and the others arranged for the reseller to order an equivalent amount of the existing version of the product in June 2000 with the understanding that the reseller's order would be cancelled and replaced by a genuine order from the end user in the following quarter for the newer version. *Id.*

On occasions when the ordered product was unavailable, Donlon and his staff, acting at the direction of Borghese, deliberately shipped the wrong product without the customer's approval and manipulated the accounting system to capture the revenue that quarter. (*Id.* at ¶ 81). To enable the invoice to be generated -- and revenue to be recognized -- Donlon and his staff did one of two things. *Id.* They either altered the order information on SAP to reflect product that was available or they improperly "cycled" excess inventory into the system as the ordered product. *Id.* When the desired product later became available, Donlon processed a "zero dollar" return of the unwanted product, which left the original transaction intact and caused the expense associated with the return not to be recognized. In some cases, the unwanted product was more expensive than the ordered product. *Id.* In those cases, Donlon manipulated the accounting system to keep the total price of the order the same, reducing Symbol's actual profit. *Id.*

Symbol also improperly recognized revenue before the goods were shipped to the customer and while Symbol still retained the risks of ownership. (*Id.* at ¶ 82). During the relevant period, Symbol recognized revenue on large transactions with end users as soon as the goods were shipped to an interim Symbol location known as a staging area even though Symbol retained the risk of loss until the end user received the product. Donlon approved or arranged some of these transactions. *Id.* For example, in September 2000, Donlon capitalized on the fact that a $6 million order for another large end user required staging in order to ship incorrect product without the

customer's knowledge and recognize revenue that quarter. (*Id.* at ¶ 85). Because the product ordered by the end user was not yet available, Donlon directed an order administrator to access SAP to change the product specified in the order to whatever product was available for immediate shipment. *Id.* Donlon then had the incorrect product shipped to a staging facility, where it remained until the correct product became available. *Id.* Donlon then swapped the products, and the correct product was staged and shipped in the next quarter. *Id.*

The revenue recognition schemes led to large and frequent returns accompanied by customer credit requests. (*Id.* at ¶ 86). Together with others, Donlon enforced a virtual ban on returns and credits in the first and last two weeks of a quarter. *Id.* At Borghese's direction, Donlon issued a memorandum in April 2000 instructing executives in Symbol's The Americas Sales and Service ("TASS") division that, absent prior approval by sales finance, "[t]here will be no processing of credit requests or return authorizations on the last two days and the first two days of a month, and the last two weeks and the first two weeks of a new quarter." (*Id.* at ¶ 87). Borghese insisted that Donlon and others carefully manage the issuance of credits, which reduced net income, to ensure that they did not interfere with earnings targets at the last minute. *Id.* They deferred processing returns and credits during the first two weeks of a quarter to avoid raising "red flags" for auditors. As a practical matter, this blackout period often lasted much longer, and Donlon sometimes delayed credits for months. *Id.*

## B.   DONLON'S TESTIMONY CONCERNING HIS WRONGDOING

In addition to the allegations in the Complaint, which are deemed true for purposes of this motion, Donlon made the following admissions about his fraudulent actions when he pled guilty:

> Your Honor, from 2000, 2001 in my capacity as the director of sales operations for Symbol Technology, I knowingly agreed with other Symbol executives to arrange for the shipment of equipment manufactured by Symbol that did not represent true sales of the company so that Symbol could report inflated revenue figures that met

8

the expectations of Wall Street analysts and also caused Symbol to obtain
backdated bill and hold letters to conceal the true circumstances of the transactions.
In addition, I have read the information overt acts A through F and I acknowledge
that I committed those overt acts.

(Brody Decl., Ex. 2 at p.12).

At the criminal trial against several of the other defendants in this Action, Donlon again

admitted his fraudulent conduct:

> Q.     What was the criminal conduct in which you engaged that makes you guilty
>        of the crime to which you pled guilty, conspiracy to commit securities
>        fraud?
> A.     I executed schemes that allowed us to inflate the revenue of a particular
>        quarter.
> Q.     How did you go about doing that?
> A.     We shipped orders early, we shipped orders and swapped the products.  If
>        the customer wanted one type of product, we shipped a different product
>        and swapped it out at a later date.  And we entered into deals with dealers
>        and VARs where we would ship them product, give them extended payment
>        terms and the right to return the product if they couldn't sell it.

(Transcript of Trial dated January 17, 2006, at p. 1619, attached as Exhibit 8 to the Brody Decl.).

Moreover, Donlon admitted that he was not just following orders.

> Q.     Now, you testified that you participated in various schemes to meet the
>        revenue numbers.  Were those schemes all your idea?
> A.     No, they were not.
> Q.     Were some of the details implemented in the schemes your idea?
> A.     Yes.  (*Id.* at p. 1621).

And Donlon admitted that he had a significant role in these schemes.

> Q.     Who would decide, at quarter's end, pursuant to this memo, whether you
>        would issue a credit or accept return of a product?
> A.     I would.
> Q.     Who would decide at the beginning of the quarter whether you would issue
>        a credit or accept return of a product?
> A.     I would.
> Q.     On what would you base your decision?
> A.     If we had enough revenue to make the number and we could afford the
>        credit or return, we would let it go through.  If it was a small credit or
>        return, we let it go through.  (*Id.* at p. 1623).

C.      **THE ALLEGATIONS IN THE COMPLAINT AGAINST MORTENSON**

Mortenson joined Symbol in 1997 as a senior financial analyst. (Brody Decl., Ex. 1 at ¶

26). In January 1999, Mortenson became a senior manager in Sales Finance. *Id.* In February

2001, Mortenson was promoted to Director of Finance for TASS and was named Senior Director

in December 2000. *Id.* Mortenson passed the CPA exam in 1994 but was never licensed. *Id.*

As described above, Borghese and Burke developed a variety of schemes to accelerate and

fabricate sales revenue. (*Id.* at ¶ 43). Like Donlon, Mortenson handled the logistical details

involved in getting the orders processed and booked in accordance with those schemes. *Id.* At the

end of the second quarter of 2001, Symbol CEO Tomo Razmilovic negotiated what amounted to

an artificial "swap" transaction with a software company, in which Symbol improperly recognized

$4.25 million in revenue. (*Id.* at ¶ 44). After a second internal investigation began at Symbol in

2002, Mortenson was directed to handle the software company's exchanges "off line" by

surreptitiously "cycling" the original product back into Symbol's inventory rather than process

"zero dollar" returns, as had previously occurred. (*Id.* at ¶ 48). This off-line process avoided the

posting of a "return material authorization" ("RMA") on Symbol's books and records and the

original transaction was less likely to attract attention from investigators and auditors. *Id.* In

addition, Symbol's channel stuffing practices substantially increased the age of past account

receivables and, as a result, caused Symbol's Days Sales Outstanding ("DSO") figure, which

measures to the average time it takes to collect payment to balloon. (*Id.* at ¶ 66). A growing DSO

figure is often a telltale sign that there is channel stuffing or other revenue recognition issues at a

company. *Id.* In order to reduce Symbol's DSO figure, Symbol required channel partners with

large outstanding receivables to sign notes for those amounts. (*Id.* at ¶ 67). Mortenson took part

in these discussions. *Id.* Mortenson and other members of the sales and finance staffs obtained notes from resellers totaling more than $40 million. (*Id.* at ¶ 68).

Mortenson and others also employed numerous schemes to accelerate revenue that should have been recorded in later periods, if at all. (*Id.* at ¶ 70). From the third quarter of 1999 through the first quarter of 2001, Symbol systematically and improperly recognized revenue on orders that had attained PGI status. (*Id.* at ¶ 71). Using a report prepared by Donlon, Mortenson and his staff made manual journal entries to the general ledger recording revenue in the total amount of the PGI orders. (*Id.* at ¶ 77). For example, on the input sheet for the first quarter of 2000, Mortenson described the entry as related to "bill and hold" sales even though he knew that the product was not being held at the customer's request and would be shipped out early the next quarter. *Id.* Mortenson also recorded a 30% profit on a transaction where Symbol prematurely invoiced a customer for product that was supposedly shipped to the customer that quarter by Symbol's third-party manufacturer, even though the shipment did not occur until the next quarter. *Id.*

In many instances, Symbol improperly recognized revenue on large transactions with end users as soon as the goods were shipped to an interim Symbol location known as a staging area while Symbol still retained the risk of loss. (*Id.* at ¶ 82). Mortenson approved some of these transactions. *Id.* In one so-called "boomerang" transaction Symbol induced a customer to advance a $1 million order to the fourth quarter of 2001 even though the customer did not need the product until 2002. (*Id.* at ¶ 84). Since the product required extensive staging, in December 2001 Symbol temporarily shipped the product to one of the customer's stores located near Symbol's staging facility. *Id.* Two weeks later, the customer then shipped the product, at Symbol's expense, to the staging facility. A side letter, labeled a "storage agreement," expressly provided that Symbol would bear the risk of loss while the product was at the staging location. *Id.* At this

time, Mortenson was responsible for reviewing and approving revenue recognition on all sales over $500,000, and he approved this transaction despite knowing its true terms. *Id.* Even after internal auditors detected the transaction, Mortenson refused to reverse the revenue, and instead added the transaction to Symbol's so-called "credit memo" reserve. *Id.*

Mortenson also took steps both to cover up the fraud and interfere with the government and internal investigations. (*Id.* at ¶ 136). These efforts included lying to internal investigators, destroying and withholding documents and sanitizing reports prepared for internal investigators. *Id.* Mortenson and others caused key portions of schedules that another employee had prepared to assist in Symbol's internal investigation to be altered. (*Id.* at ¶ 138). These schedules reflected a reconciliation analysis of manual adjustments to revenue in 2000 and 2001, and included the improper entries through which Symbol recognized "PGI" revenue. *Id.* At the direction of Mortenson and others, the employee created revised summaries of the schedules in which these entries did not appear at all or were falsely attributed to bill and hold transactions. *Id.*

In addition, Mortenson manipulated the books for the fourth quarter of 2002 after significant elements of the fraud had already been exposed. (*Id.* at ¶ 114). After senior executives Kenneth Jaeggi and Michael DeGennaro were fired and new management was installed, the cover-up began to unravel. (*Id.* at ¶ 141). Mortenson, however, engaged in further misconduct. After the end of the fourth quarter of 2002, he manipulated Symbol's reported results for that quarter in order to conceal a material difference between actual and forecasted results for TASS. *Id.* In Symbol's February 13, 2003 press release announcing unaudited fourth quarter and year-end results for 2002, the net income figures were overstated by $9 million because Mortenson improperly reduced certain TASS expense accruals and transferred balances from an unrelated corporate reserve to a TASS accrual account. *Id.* He made these adjustments after he learned that

fourth quarter expenses had far exceeded the forecast. *Id.* Mortenson tried to hide these improper

adjustments by creating misleading documents and attempted to enlist others to do the same. *Id.*

After other employees reported Mortenson's conduct to internal auditors, Symbol issued a

corrective press release and fired Mortenson. *Id.*

### D.    MORTENSON'S TESTIMONY CONCERNING HIS WRONGDOING

In addition to the allegations in the Complaint, which are deemed true for purposes of this

motion, Mortenson admitted his fraudulent conduct when he pled guilty:

> While I was employed by Symbol Technology as chief accounting officer, some
> other executives at the company instructed me, and I agreed, to obtain bill and hold
> letters with respect to certain transactions that had already taken place.  I in turn
> gave these instructions to another employee at Symbol who obtained what I
> understand to be backdated bill and hold letters with respect to the transaction.
> Later with my knowledge journal entry summaries were altered by another
> employee in my group at the direction of Symbol executives.  In addition, in
> January of 2003, I altered certain accounting entries relating to accrued expenses. I
> knew that the changes to these entries were without substantiation and improper. I
> knew at the time that these accounting practices at Symbol were not consistent with
> generally accepted accounting principles. I also knew that the improper and
> unsubstantive accounting entries I made with respect to accrued expenses were
> going to be included in Symbol's public filings and distributed to the investing
> public.

(Brody Decl. Ex. 3 at p. 12).

## IV.    ARGUMENT

### A.    THE COURT SHOULD ORDER DISGORGMENT AGAINST
### DONLON AND MORTENSON

In *SEC v. Razmilovic*, 822 F. Supp.2d 234, 253 (E.D.N.Y. 2011), this Court stated that

"[t]he district court has broad discretion not only in determining whether or not to order

disgorgement but also in calculating the amount to be disgorged." (citations omitted).  The Court

described disgorgement as follows:

> Disgorgement is a form of equitable relief and is "a method of forcing a defendant
> to give up the amount by which he was unjustly enriched." "[T]he primary purpose

of disgorgement orders is to deter violations of the [] laws by depriving violators of their ill-gotten gains." The relevant inquiry is, thus, whether the defendant was unjustly enriched by his illegal conduct. The remedy of disgorgement "consists of factfinding by a district court to determine the amount of money acquired through wrongdoing * * * and an order compelling the wrongdoer to pay that amount plus interest to the court." Since the purpose of disgorgement is remedial, not punitive, disgorgement may not be awarded above that amount. "A district court order of disgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court * * *."

*Id.* at 252 (citations omitted). And the Court described the parties' relative burdens of proof on disgorgment as follows:

The SEC must first demonstrate that calculation of disgorgement reasonably approximates the amount of the defendant's unjust enrichment, after which the burden shifts to the defendant to show that the SEC's calculation is unreasonable, i.e., that he received less than the full amount sought to be disgorged. "Disgorgement need only be a reasonable approximation of profits causally connected to the violation." "Any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created the uncertainty...." *Id.*

For Donlon, the Commission is seeking a disgorgement award of $35,516, which is comprised of the following two components:  (1) a $28,516 "commission" paid on January 26, 2001 (Brody Decl. Ex. 9); and (2) a 7,000 award paid for his services in the third quarter of 2001 (Brody Decl. Ex. 10). The $28,516 commission was explicitly based on Symbol's profits and revenues, which were inflated by the fraud in which Donlon participated.[2] The 7,000 award was paid during the height of the fraud at Symbol, and Donlon committed multiple fraudulent acts shortly before receiving that payment. (Brody Decl., Ex. 1 at ¶ 67, 74). He should not have received any form of merit or incentive-based compensation during this time period.

For Mortenson, the Commission is seeking a disgorgement award of $42,461, which is comprised of the following four components; (1) $1,731, which represents a portion of

---

[2] (Brody Decl. Ex. 11).  As this Court stated with respect to Razmilovic, "[s]ince Razmilovic's bonuses under the Executive Bonus Plan were directly tied to the financial performance of the Symbol, and the bonuses he received in 1999 and 2000 were based upon fraudulently reported financial numbers, Razmilovic is liable to disgorge the entire amount of those bonuses ...."  822 F. Supp.2d at 256.

Mortenson's proceeds from his sale of Symbol stock on March 15, 2001 (Brody Decl. Ex. 12); (2)

$29,445.51, which represents the sum of three Management by Objective ("MBO") bonus

payments made to Mortenson in 2000 and 2001 (Brody Decl. Ex. 9); (3) a $7,000 award paid for

his services in the third quarter of 2001 (Brody Decl. Exs. 9, 10); and (4) $4,284.58, representing

several other bonus awards paid to Mortenson from 1999-2001 (Brody Decl. Ex. 9).  With respect

to the proceeds from his stock sale, this Court has already found that on March 15, 2001, the price

of Symbol stock was inflated by $17.31 because of the fraud (taking into consideration stock

splits).  *Razmilovic*, 822 F. Supp.2d at 270, n. 47.  Consequently, the SEC has applied that

inflation to the proceeds Mortenson received from his sale of stock ($17.31 x 100 shares) to arrive

at the amount of his ill-gotten gain.  With respect to the three MBO bonus payments, Symbol

documents make clear that these payments were based on Symbol's profits.  (Brody Decl. Exs. 13-

15).  These profits were fraudulently inflated because of the schemes in which Mortenson

participated.  And with respect to the additional bonus awards, these amounts were paid during the

height of the fraud at Symbol when Mortenson committed numerous fraudulent acts.  (Brody

Decl. Ex. 1 at ¶¶ 67, 68, 74, 77, 88).  He should not have received any form of merit or incentive-

based compensation during this time period and should, therefore, disgorge this entire amount.

**B.     THE COURT SHOULD ORDER PREJUDGMENT INTEREST AGAINST
        DONLON AND MORTENSON**

     A court may award prejudgment interest on the amount awarded as disgorgement in order

to deprive the defendant of the time-value of the money.  *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir.

1998); *SEC v. Stone*, 06. Civ. 6258, 2009 U.S. Dist. LEXIS 2510 *6 (S.D.N.Y. Jan. 13, 2009)

("Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts

to an interest free loan procured as a result of illegal activity.")  Prejudgment interest, "like the

remedy of disgorgement itself, is meant to deprive wrongdoers of the fruits of their ill-gotten gains

from violating securities laws." *SEC v. Lorin*, 877 F.Supp. 192, 201 (S.D.N.Y. 1995), *aff'd.*, 76 F.3d 458 (2d Cir. 1996).  In SEC injunctive actions, prejudgment interest is calculated by applying the IRS tax underpayment rate, 26 U.S.C. § 6621(a)(2).  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476-77 (2d Cir. 1996). An award of prejudgment interest is appropriate for the "entire period from the time of defendants' unlawful gains to the entry of judgment." *Id.* at 1477.

Mortenson and Donlon were participants in a massive fraud that lasted several years.  The harmed Symbol investors have never been fully compensated.  Adding prejudgment interest to the money Mortenson and Donlon must disgorge will help redress this wrong.  Accordingly, Mortenson's and Donlon's partial consent judgments specifically provide that if the court orders disgorgement, the defendant "shall pay prejudgment interest on the disgorgement."

Using the IRS tax underpayment rate, the SEC has calculated Donlon's prejudgment interest at $29,882.18.  The following table demonstrates how this amount was calculated:

| Date of Payment | Amount of Payment | Interest through 6/29/12[3] |
|---|---|---|
| 1/26/01 | $28,516 | $24,634.58 |
| 11/2/01 | $7,000 | $5,247.60 |

The SEC has similarly calculated Mortenson's prejudgment interest at $38,959.79.  The following table demonstrates how interest was calculated.

| Date of Payment | Amount of Payment | Interest through 6/29/12[4] |
|---|---|---|
| 12/3/1999 | $2,067.62 | $2,166.31 |
| 1/28/00 | $1,000 | $1,034.12 |
| 2/11/00 | $14,583.00 | $14,895.20 |
| 8/25/00 | $4,371.51 | $4,085.53 |
| 1/26/01 | $10,491 | $9,063.05 |
| 3/9/01 | $608.48 | $509.41 |
| 3/23/01 | $608.48 | $509.41 |
| 11/2/01 | $7,000 | $5,247.60 |
| 3/15/01 (stock sale) | $1,731 | $1,449.16 |

[3] The SEC has calculated the prejudgment interest separately for each element of Donlon's ill-gotten gains from the date he received the money through June 29, 2012.  (Brody Decl. Ex. 16).
[4] The SEC has calculated the prejudgment interest separately for each element of Mortenson's ill-gotten gains from the date he received the money through June 29, 2012.  (Brody Decl. Ex. 17).

C.   **THE COURT SHOULD ORDER CIVIL MONETARY PENALTIES**
     **AGAINST DONLON AND MORTENSON**

Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] authorizes district courts to assess

civil penalties against violators of the Exchange Act, and to determine the amount of the penalty

"in light of the facts and circumstances." For purposes of this motion, Mortenson and Donlon

cannot contest that they violated Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5

and 13b2-1 thereunder and also aided and abetted Symbol's violations of Section 10(b), 13(a) and

13(b)(2) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder.

Section 21(d) creates three tiers of penalties applicable to natural persons like Mortenson

and Donlon. The Court should impose appropriate third tier civil penalties in this case against

both Donlon and Mortenson because their actions involved outright fraud and deceit and resulted

in substantial losses, and the risk of even greater losses, to investors.

In *Razmilovic*, 822 F. Supp.2d at 279-80, this Court stated that "[t]he civil penalties

authorized by the securities laws serve a dual purpose, i.e., to both punish the individual violator

for his past violations and deter future violations of the securities laws." The Court stated further

that "[t]he following factors are relevant in determining whether civil penalties are appropriate

and, if so, in what amount: '(1) the egregiousness of the defendant's conduct; (2) the degree of the

defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of

substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent;

(5) whether the defendant has admitted wrongdoing; and (6) whether the penalty should be

reduced due to the defendant's demonstrated current and future financial condition.'" *Id.* at 280

(citations omitted).

On balance these factors fall in favor of the Court awarding penalties against Mortenson

and Donlon. While Mortenson and Donlon have both admitted wrongdoing, and the SEC

anticipates that Mortenson will contend that his present financial condition does not enable him to

pay a penalty (although it is important to note that Mortenson must demonstrate an inability to pay in the future as well),[5] the other factors all support the issuance of a significant penalty. As this Court has said with respect to Razmilovic, "Razmilovic was a direct participant in a pervasive fraud scheme, spanning over three (3) years and involving fraud, deceipt, manipulation and deliberate, or at least, reckless disregard of regulatory requirements, which either resulted in substantial losses to Symbol investors or, at the very least, created a risk of substantial losses to Symbol investors." *Razmilovic*, 822 F. Supp.2d at 280. While Mortenson and Donlon are not as culpable as Razmilovic, the Court's statement is true as to them as well. Their conduct, as described in the Complaint (summarized above) and in their own testimony, was egregious and they were both aware that their conduct was both wrongful and fraudulent. Their conduct was also recurrent, taking place over several years. And Mortenson not only committed fraud, but also tried covering up that fraud, hindering the efforts of both the Company and the SEC to discover what had been taking place at the Company. And their conduct also created substantial losses or the risk of substantial losses to Symbol's investors.

In this case, civil penalties can be calculated in two ways. One is for the civil penalty to match the total amount of Mortenson's and Donlon's ill-gotten gains. *See, e.g., SEC v. Interlink*

---

[5] While financial condition is a consideration in determining the amount of the penalty, a defendant's financial condition, by itself, is not grounds to avoid awarding a penalty. In *SEC v. Kane*, 97 Civ. 2931, 2003 U.S. Dist. LEXIS 5043 *12 (S.D.N.Y. March 31, 2003), for example, the court stated that "in light of the goal of deterrence, a defendant's claims of poverty cannot defeat the imposition of a civil penalty by a court. If the defendant is indeed impecunious, the SEC will ultimately not be able to collect on the judgment. As Judge Lynch observed in *SEC v. Inorganic Recycling Corp.*, to withhold a civil penalty simply because a defendant cannot pay 'would not serve the purpose of the securities laws.' While the court may take the defendant's current financial difficulties into account, these circumstances alone cannot negate the need for a severe civil penalty. Even if Kane's proffered representations concerning his bleak financial condition are complete and accurate, his financial problems, including his inability to work again as a stock broker, are the natural consequences of his fraudulent conduct. Kane's predicament is shared by many defendants in similar cases, and if given the weight that Kane urges, a defendant's impecuniosity could preclude the imposition of a meaningful penalty in even those cases involving the most egregious fraud. In addition, the court agrees with the Commission that it should not ignore the possibility that a defendant's fortunes will improve, and that one day the SEC will be able to collect on even a severe judgment." Moreover, financial condition is never a proper consideration in computing disgorgement. *See, e.g., SEC v. Integrity Fin. AZ, LLC*, 10 CV 782, 2012 U.S. Dist. LEXIS 6758 *21 (N.D. Ohio Jan. 20, 2012); *SEC v. Inorganic Recycling Corp.*, 99 Civ. 10159, 2002 U.S. Dist. LEXIS 15817 *6 (S.D.N.Y. Aug. 23, 2002) ("Financial hardship does not preclude imposition of an order or disgorgement");

*Data Network of L.A.*, No. 93 3073 R, 1993 U.S. Dist. LEXIS 20163 * 57 (C.D. Cal. Nov. 15,

1993) (pursuant to Section 21(d), court imposed civil penalty of $12,285,035 equal to the gross

amount of pecuniary gain). The other method is for the Court to multiply the number of violations

by the maximum penalty **per violation** of either $110,000 or $120,000.[6] By the first approach,

maximum civil penalties would match the total ill-gotten gains that Donlon and Mortenson

obtained through their fraud. By the second approach, the civil penalties would be a multiple of

either $110,000 or $120,000, as Donlon and Mortenson committed many violations of the

securities laws through the wide array of their fraudulent conduct described in the Complaint.

## V. CONCLUSION

For the reasons stated above, the Commission respectfully requests that the Court grant its

motion for a final judgment ordering that Donlon disgorge $35,516, pay prejudgment interest of

$29,882.18, and pay maximum third-tier penalties. With respect to Mortenson, the Commission

respectfully requests that the Court grant its motion for a final judgment ordering that Mortenson

disgorge $42,461, pay prejudgment interest of $38,959.79, and pay appropriate third-tier penalties

commensurate with their misconduct.

Dated: July 9, 2012

Respectfully submitted,

/s/ Todd D. Brody
SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center
New York, New York 10281
Of Counsel:                                    (212) 336-0080

George Stepaniuk
Jess Velona

---

[6] For violations occurring prior to, and including February 2, 2001, third tier penalties are $110,000 for each violation. For violations occurring after February 2, 2001 and prior to, and including February 14, 2005, third tier penalties are 120,000 for each violation. 17 C.F.R. Pt. 201, Subpt. E, Tbl. II.