UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

-against-

GREGORY MORTENSON,

                Defendant.
----------------------------------------------------------X
FEUERSTEIN, J.

**ORDER**

**CV-04-2276 (SJF)(WDW)**

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   MAR 11 2013   ★

LONG ISLAND OFFICE

I.    Procedural History

On June 3, 2004, the Securities and Exchange Commission ("SEC") commenced this action against defendant Gregory Mortenson ("Mortenson"), and others[1], alleging claims, *inter alia*, for violations of Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78j(b) and 78m(b)(5), and Rules 10b-5 and 13b2-1 thereunder, 17 C.F.R. §§ 240.10b-5 and 240.13b2-1, and aiding and abetting violations by Symbol of Sections 13(a) and 13(b)(2) of the Exchange Act, 15 U.S.C. §§ 78m(a) and 78m(b)(2), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13. On June 1,

---

[1] The complaint named the following additional defendants: Symbol Technologies, Inc. ("Symbol"), Tomo Razmilovic ("Razmilovic"), Kenneth Jaeggi ("Jaeggi"), Leonard Goldner ("Goldner"), Brian Burke ("Burke"), Michael DeGennaro ("DeGennaro"), Frank Borghese ("Borghese"), Christopher DeSantis ("DeSantis"), James Heuschneider ("Heuschneider"), James Dean ("Dean") and Robert Donlon ("Donlon"). On January 27, 2012, final judgment was entered against Razmilovic. In addition, final consent judgments were entered as against the other defendants as follows: (1) Symbol on June 15, 2004, as amended on January 23, 2007; (2) Goldner on February 13, 2006; (3) Heuschneider, Jaeggi and DeSantis on November 2, 2009; (4) Borghese on February 22, 2010; (5) DeGennaro on April 6, 2010; (6) Burke and Dean on July 10, 2012; and (8) Donlon on December 12, 2012. Thus, Mortenson is the only remaining defendant in this action.

1

2004, prior to the commencement of this action, Mortenson pled guilty to the charge of conspiracy to commit securities fraud in a parallel criminal action. On October 1, 2009, Mortenson was sentenced to three (3) years probation and was ordered to pay an assessment of one hundred dollars ($100.00).

On February 11, 2008, a partial consent judgment was entered against Mortenson providing, *inter alia*: (1) that Mortenson is permanently restrained and enjoined from (a) violating Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5 and 13b2-1 thereunder and (b) aiding and abetting violations of Sections 13(a) and 13(b)(2) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder; (2) that the Court shall determine (a) whether to order Mortenson to disgorge ill-gotten gains and/or to pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and (b) the amounts of any such disgorgement or penalty; (3) that Mortenson shall pay prejudgment interest on the disgorgement amount as set forth therein; and (4) that upon any motion by the SEC seeking disgorgement, *inter alia*, (a) Mortenson is precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint and may not challenge the validity of his consent or the partial consent judgment and (b) the allegations pertaining to Mortenson in the Complaint shall be accepted as and deemed true by the Court. Pending before me is the SEC's motion for final judgment ordering disgorgement, prejudgment interest and a civil penalty against Mortenson. For the reasons set forth herein, the SEC's motion is granted in part.

II. Factual Allegations

The complaint alleges that "[f]rom at least 1998 until * * * February 2003, Symbol and the individual defendants * * * engaged in a wide array of fraudulent accounting practices and other

2

misconduct that had a cumulative net impact of over $230 million on Symbol's reported revenue and over $530 million on its reported pre-tax earnings." (Compl., ¶ 1). Upon Mortenson's express consent in the partial consent judgment, the following factual allegations pertaining to Mortenson are accepted as and deemed true by the Court:

Mortenson was employed at Symbol from 1997 to February 2003, starting as a finance analyst, then becoming a senior manager in sales finance in January 1999, the director of finance for Symbol's "The Americas Sales and Service" ("TASS") division in February 2001 and a senior director in December 2002. (Compl., ¶ 26).

"From 1999 through 2001 and at other relevant times, * * * Mortenson [and his co-defendants] engaged in multiple fraudulent schemes to inflate Symbol's reported sales revenue and income in order to create the false appearance that Symbol had met or exceeded its financial projections." (Compl., ¶ 42). Specifically, Mortenson "implemented [Borghese's] revenue recognition schemes * * *[;] caused revenue to be recognized in several quarters on shipments that did not occur until the next quarter[;] * * * [and] secured backdated phony 'bill and hold' letters from customers." (Compl., ¶ 6). Mortenson, *inter alia*, "employed numerous schemes to accelerate revenue that should have been recorded in later periods, if at all[,]" (Compl., ¶ 70); " falsely described [certain financial] transactions on * * * journal entry input sheets[,] (Compl., ¶ 72); was "active[ly] involve[d]" in efforts by his co-defendants "to obtain phony 'bill and hold' letters[,] (Compl., ¶ 74); "approved of or arranged" some transactions wherein Symbol "recognized revenue on large transactions with end users as soon as the goods were shipped to an interim Symbol location known as a staging area even though Symbol retained the risk of loss until the end user received the product[,]" (Compl., ¶ 82); and approved of a fraudulent revenue recognition transaction "despite knowing its true terms" and "refused to reverse the revenue, and instead added

3

the transaction to Symbol's so-called 'credit memo' reserve" after internal auditors had deleted the transaction, (Compl., ¶ 84).

In addition, Mortenson "took steps both to cover up the fraud and interfere with government and internal investigations, * * * includ[ing] lying to internal investigators, destroying and withholding documents * * * sanitizing reports prepared for internal investigators * * * [and] manipulat[ing] the books for the fourth quarter of 2002 [in order to conceal a material difference between actual and forecasted results for TASS] after significant elements of the fraud had already been exposed and new management was in place." (Compl., ¶¶ 136, 141). Specifically, Mortenson directed an employee who had prepared schedules "reflect[ing] a recognition analysis of manual adjustments to revenue in 2000 and 2001 * * * [which] included the improper entries through which Symbol recognized [post goods issued] revenue * * * [to] create[] revised summaries of the schedules in which th[o]se entries did not appear at all or were falsely attributed to 'bill and hold' transactions[,]" (Compl., ¶ 138); and "improperly reduced certain TASS expense accruals and transferred balances from an unrelated corporate reserve account to a TASS accrual account * * * after he learned that the fourth quarter operating expenses for TASS had far exceeded the forecasted amount [which resulted in an overstatement of Symbol's reported net-income for fourth quarter and year-end results by approximately nine million dollars ($9,000,000.00)][,] * * * [then] tried to hide th[o]se improper adjustments by creating misleading documents and attempting to enlist others to do the same," (Compl., ¶ 141).

Moreover, during his plea allocution, Mortenson admitted to the following:

> "While I was employed by Symbol Technology as chief accounting officer, some other executives at the company instructed me, and I agreed, to obtain bill and hold letters with respect to certain transactions that had already taken place. I in turn gave these instructions to another employee at Symbol who obtained what I understand to be backdated bill and hold letters with respect to the transaction.

4

> Later with my knowledge journal entry summaries were altered by another employee in my group at the direction of Symbol executives. In addition, in January of 2003, I altered certain accounting entries relating to accrued expenses. I knew that the changes to these entries were without substantiation and improper. I knew at the time that these accounting practices at Symbol were not consistent with generally accepted accounting principles. I also knew that the improper and unsubstantive accounting entries I made with respect to accrued expenses were going to be included in Symbol's public filings and distributed to the investing public."

III. Disgorgement

The SEC alleges that Mortenson profited from the fraud by "receiv[ing] performance bonuses and other incentive compensation, and the proceeds of transactions in Symbol securities." (Compl., ¶ 155(i)). Specifically, the SEC seeks disgorgement in the amount of forty-two thousand four hundred sixty-one dollars ($42,461.00), plus prejudgment interest thereon in the amount of thirty-eight thousand nine hundred fifty-nine dollars and seventy-nine cents ($38,959.79).

In opposition, Mortenson points to all the policies and procedures he implemented at Symbol "to try to help Symbol fix all there [sic] [revenue recognition] problems," although he admits that he "did do some thing wrong when [he] was with Symbol * * *," (Letter from Mortenson to the Court dated July 29, 2012 ["Opp."], at 3), and indicates that he has since "tried to rebuild [his] reputation," (id.), and has worked for the same company since February 2006. In addition, Mortenson admits that he "owe[s] something" to the SEC, (Opp., at 4), but contends that the amount sought by the SEC is "too high," (id.). According to Mortenson, *inter alia*, his monthly net income is approximately equal to his monthly expenses; he has some assets, including stocks, a 401k and equity in both his marital home and his new home, totaling approximately two hundred five thousand dollars ($205,000.00); he has approximately twenty-five thousand dollars ($25,000.00) in credit card debt; and the amount sought by the SEC is disproportionate to the

amounts for which the SEC settled, or sought from, four (4) of his co-defendants who did not try to fix the problems at Symbol, who earned "much more money than [him]," (Opp., at 4), and/or against whom he fought "to get the appropriate answers to get [Symbol's] restatement right," (id.).

Disgorgement is a form of equitable relief, see SEC v. Wang, 944 F.2d 80, 85 (2d Cir. 1991); see also SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1474 (2d Cir. 1996), and is "a method of forcing a defendant to give up the amount by which he was unjustly enriched." Federal Trade Commission v. Bronson Partners, LLC, 654 F.3d 359, 372 (2d Cir. 2011) (quoting SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 102 (2d Cir. 1978)). "[T]he primary purpose of disgorgement orders is to deter violations of the [] laws by depriving violators of their ill-gotten gains." Id. (quoting SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997)); see also SEC v. DiBella, 587 F.3d 553, 572 (2d Cir. 2009); First Jersey Securities, 101 F.3d at 1474, 1475; Wang, 944 F.2d at 85, 88. The relevant inquiry is, thus, whether the defendant was unjustly enriched by his illegal conduct. See DiBella, 587 F.3d at 572.

The remedy of disgorgement "consists of factfinding by a district court to determine the amount of money acquired through wrongdoing * * * and an order compelling the wrongdoer to pay that amount plus interest to the court." SEC v. Cavanagh, 445 F.3d 105, 116 (2d Cir. 2006). Since the purpose of disgorgement is remedial, not punitive, disgorgement may not be awarded above that amount. Id. at 116, n. 25. "A district court order of disgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court * * *." Id. at 117. The SEC must first demonstrate that its calculation of disgorgement reasonably approximates the amount of the defendant's unjust enrichment, after which the burden shifts to the defendant to show that the SEC's calculation was unreasonable, i.e., that he received less than the full amount sought to be disgorged. See FTC v. Verity Intern., Ltd., 443 F.3d 48, 67

(2d Cir. 2006); SEC v. Colonial Investment Management LLC, 659 F.Supp.2d 467, 501 (S.D.N.Y. 2009), aff'd, 381 Fed. Appx. 27 (2d Cir. June 17, 2010); U.S. SEC v. Universal Exp., Inc., 646 F.Supp.2d 552, 563 (S.D.N.Y. 2009), aff'd, 438 Fed. Appx. 23 (2d Cir. Sept. 16, 2011).

"[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation." SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998) (quoting SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995)). "Any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created the uncertainty." Patel, 61 F.3d at 140 (quotation, alterations and citation omitted); see also First Jersey Securities, 101 F.3d at 1475. Where, as here, a fraud is pervasive, it is appropriate to order the defendant to disgorge all ill-gotten gains realized during the course of the fraud scheme. See, e.g. Commodity Futures Trading Commission v. British American Commodity Options Corp., 788 F.2d 92, 93-94 (2d Cir. 1986) (holding that although generally, the party seeking disgorgement must distinguish between legally and illegally derived profits where benefits result from both lawful and unlawful conduct, cases involving systematic and pervasive fraud, as opposed to isolated instances of fraud, are different); SEC v. Hasho, 784 F.Supp. 1059, 1111-12 (S.D.N.Y. 1992) ("When a defendant engages in a pervasive pattern of fraudulent conduct as opposed to isolated instances, it is unnecessary to prove a direct nexus between each instance of unlawful conduct and the disgorgement amount due.") "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." First Jersey Securities, 101 F.3d at 1474-75; see also SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996)("The decision to order disgorgement of ill-gotten gains, and the calculation of those gains, lie within the discretion of the trial court, which must be given wide latitude in these matters." (Internal quotations and citation omitted)).

Neither a defendant's cooperation with a subsequent investigation, nor his claims of

7

financial hardship, are sufficient to preclude disgorgement or reduce the disgorgement amount. See, e.g. Universal Exp., 646 F. Supp. 2d at 565 ("In deciding a motion for disgorgement, a court is not bound to consider a defendant's claims of financial hardship."); S.E.C. v. Allen, No. 3:11-cv-882-O, 2012 WL 5875623, at * 3 (N.D. Tex. Nov. 21, 2012) (holding that cooperation with an investigation "does not necessarily require a reduction in the amount of disgorgement" and that "evidence of [the defendant's] inability to pay is insufficient to support a denial of or reduction in amount of disgorgement."); S.E.C. v. Thorn, No. 2:01-CV-290, 2002 WL 31412440, at * 3 (S.D. Ohio Sept. 30, 2002) (finding no legal authority to support the defendant's position that a willingness to cooperate * * * can offset the remedy of disgorgement); S.E.C. v. Inorganic Recycling Corp., No. 99 Civ. 10159, 2002 WL 1968341, at * 4 (S.D.N.Y. Aug. 23, 2002) ("[C]laims of poverty cannot defeat the imposition of a disgorgement order * * *.") Moreover, since the amount of disgorgement represents only a defendant's ill-gotten gains, the amounts of disgorgement paid by Mortenson's co-defendants upon settlement of the SEC's respective claims against them are irrelevant, i.e., the amount any co-defendant paid for disgorgement has no bearing upon the ill-gotten gains received by Mortenson. See, e.g. Allen, 2012 WL 5875623, at * 3 (finding "no convincing authority for [the defendant's] position that the Court is required to consider comparative culpability when assessing disgorgement amounts."); S.E.C. v. Rockwell Energy of Texas, LLC, No. H-09-4080, 2012 WL 360191, at * 6 (S.D. Tex. Feb. 1, 2012) (finding no authority to support the defendant's argument "that less 'inappropriate' conduct should warrant a reduction in disgorgement" and holding that since the defendant's "disgorgement liability is calculated based on [his] own acts * * * a reduction based on his comparative blameworthiness would be not only incorrect, but illogical.")

8

A.  Bonuses

The SEC seeks disgorgement of: (1) twenty-nine thousand four hundred forty-five dollars and fifty-one cents ($29,445.51), representing "the sum of three Management by Objective ("MBO") bonus payments made to Mortenson in 2000 and 2001," (SEC Mem., at 15); (2) a seven thousand dollar ($7,000.00) award paid to Mortenson for his services in the third quarter of 2001; and (3) four thousand two hundred eighty-four dollars and fifty-eight cents ($4,284.58), "representing several other bonus awards paid to Mortenson from 1999-2001," (SEC Mem., at 15). Mortenson contends that, although he is not one hundred percent (100%) certain, he believes that the MBO bonuses "were paid on sales-out, which the revenue is only counted when it's sold to the end user" and, therefore, "none of that revenue would've been restated because it was good revenue." (Opp., at 4). Nonetheless, Mortenson indicates that he's "sure some of this revenue wasn't good due to the restatement," but he does not believe that it's "right" to "discount 100% of the bonus." (Opp., at 4-5). In addition, Mortenson contends that the one thousand dollar ($1,000.00) bonus paid to him on January 28, 2000 was a "spot bonus [he] received because [he] went above and beyond [his] job" and was "[n]ot tied to numbers at all," (Opp., at 5); and that the seven thousand dollar ($7,000.00) bonus that he received on November 2, 2001 "if [he] remember[s] correctly was also not tied to numbers," (id.).

The SEC has demonstrated that the MBO bonus payments were based upon the way Symbol recognized revenue on its sales, as opposed to being based upon real sales to end users, which is at the heart of the fraudulent scheme in which Mortenson participated, and Mortenson has not met his burden of showing that the SEC's calculation of those bonus payments is not a reasonable approximation of his ill-gotten gains. Accordingly, Mortenson must disgorge the entire amount of the MBO bonuses for 2000 and 2001, i.e., twenty-nine thousand four hundred forty-five

dollars and fifty-one cents ($29,445.51).

However, the SEC has not demonstrated that the additional bonuses received by Mortenson represent ill-gotten gains. Rather, the SEC contends only that those bonuses "were paid during the height of the fraud at Symbol when Mortenson committed numerous fraudulent acts" and, therefore, "[h]e should not have received any form of merit or incentive-based compensation during this time period * * *." (SEC Mem., at 15). Accordingly, the branch of the SEC's motion seeking disgorgement of a seven thousand dollar ($7,000.00) bonus award paid for Mortenson's services in the third quarter of 2001 and four thousand two hundred eighty-four dollars and fifty-eight cents ($4,284.58) for additional bonus awards paid to Mortenson from 1999-2001 is denied.

B. Stock Transactions

The SEC also seeks disgorgement of one thousand seven hundred thirty-one dollars ($1,731.00), representing "a portion of Mortenson's proceeds from his sale of Symbol stock on March 15, 2001." (SEC Mem., at 14-15). Mortenson has not addressed this branch of the SEC's motion.

Since one of the effects, if not the very purpose, of the pervasive fraud scheme at Symbol was to manipulate Symbol's earnings and, thereby, inflate the value of its stock, it is reasonable to infer that Mortenson profited from the scheme in any transaction involving Symbol securities during the fraud period. See, e.g. Lorin, 76 F.3d at 462 (holding that it was "well within the discretion of the district court * * * to reason that because the purpose and effect of the scheme was to manipulate and stabilize the prices of the [company's] stocks, [the defendants] likely profited from the scheme in all of their trades in those securities.")

With respect to insider trading, the Second Circuit has held that "where stock is purchased

10

[or sold] on the basis of inside information, the proper measure of damages is the difference between the price paid for shares at the time of purchase [or the price at which the shares were sold] and the price of the shares shortly after the disclosure of the inside information." Patel, 61 F.3d at 139-140; see also Warde, 151 F.3d at 50 (finding that the district court reasonably fixed disgorgement as the difference between the price of the defendant's warrants when purchased on inside information and their price after the disclosure of the inside information); SEC v. Drucker, 528 F.Supp.2d 450, 451-52 (S.D.N.Y. 2007), aff'd, 346 Fed. Appx. 663, 666 (2d Cir. Sept. 21, 2009) (calculating the amount to be disgorged as the difference between the amount realized by each defendant via his insider sales and the amount he would have realized if he had sold after the disclosure of the inside information concerning the company's earnings). Although this is not an insider trading case, it is reasonable to similarly calculate the amount of Mortenson's ill-gotten gains from his stock transactions during the fraud period as the difference between the inflated value of the proceeds realized by him on the date of the relevant stock transaction and the value of the proceeds he would have otherwise realized absent the fraud.

The SEC has demonstrated that Mortenson's stock transaction on March 15, 2001, during the fraud period, resulted in ill-gotten gains to Mortenson. Mortenson has not met his burden of showing that the amount of disgorgement sought by the SEC from that stock transaction is not a reasonable approximation of his ill-gotten gains. In my prior order of disgorgement against Razmilovic, I found that on March 15, 2001, the price of Symbol stock was inflated by seventeen dollars and thirty-one cents ($17.31) because of the fraud. Since Mortenson sold one hundred (100) shares of stock on that date, he received ill-gotten gains, which he must disgorge, in the amount of one thousand seven hundred thirty-one dollars ($1,731.00).

Based upon the foregoing, the branch of the SEC's motion seeking disgorgement is granted

to the extent that Mortenson must disgorge a total amount of thirty-one thousand one hundred seventy-six dollars and fifty-one cents ($31,176.51), and that branch of the motion is otherwise denied.

C. Prejudgment Interest

The SEC seeks prejudgment interest in the total amount of thirty-eight thousand nine hundred fifty-nine dollars and seventy-nine cents ($38,959.79), calculated from the date of each "ill-gotten" payment through June 29, 2012.

"The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion, * * *." First Jersey Securities, 101 F.3d at 1476 (quoting Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1071-72 (2d Cir. 1995)); see also Aimsi Technologies, 650 F.Supp.2d at 304. In light of the partial consent judgment, in which Mortenson consented to an award of prejudgment interest on any disgorgement amount, he is liable to pay prejudgment interest on the entire amount of his ill-gotten gains.

The Second Circuit has approved the use of the rate employed by the Internal Revenue Service ("IRS") for an underpayment of taxes, see 26 U.S.C. § 6621(a)(2), as opposed to the treasury-bill rate, in connection with disgorgement. First Jersey Securities, 101 F.3d at 1476; see also Aimsi Technologies, 650 F.Supp.2d at 304. Accordingly, the branch of the SEC's motion seeking prejudgment interest is granted to the extent that prejudgment interest is awarded on the disgorgement amount in the total amount of twenty-eight thousand forty-three dollars and seventy-eight cents ($28,043.78), and that branch of the motion is otherwise denied.

IV.  Civil Penalty

The SEC seeks "third-tier penalties commensurate with [Mortenson's] misconduct." (SEC Mem., at 1).

Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), authorizes a district court to impose civil monetary penalties upon any person found to have committed a violation of the Exchange Act, and provides for three (3) tiers of potential penalties to "be determined by the court in light of the facts and circumstances." See SEC v. Colonial Investment Management LLC, 381 Fed. Appx. 27, 32 (2d Cir. June 17, 2010) (summary order); Universal Exp., 646 F. Supp. 2d at 567. The first tier is generally applicable, see SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005), and provides for a penalty to be imposed in an amount, as adjusted for inflation, see 17 C.F.R. § 201.1002, not to exceed the greater of: (1)(a) five thousand five hundred dollars ($5,500.00) for each violation occurring prior to, and including, February 2, 2001, 17 C.F.R. Pt. 201, Subpt. E, Tbl. I, and (b) six thousand five hundred dollars ($6,500.00) for each violation occurring after February 2, 2001 and prior to, and including, February 14, 2005, 17 C.F.R. Pt. 201, Subpt. E, Tbl. II; or (2) "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 78u(d)(3)(B)(i). The second tier increases the penalty to be imposed where the violation(s) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" to an amount, as adjusted for inflation, see 17 C.F.R. § 201.1002, not to exceed the greater of: (1)(a) fifty-five thousand dollars ($55,000.00) for each violation occurring prior to, and including, February 2, 2001, 17 C.F.R. Pt. 201, Subpt. E, Tbl. I, and (b) sixty thousand dollars ($60,000.00) for violations occurring after February 2, 2001 and prior to, and including, February 14, 2005, 17 C.F.R. Pt. 201, Subpt. E, Tbl. II; or (2) "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 78u(d)(3)(B)(ii) . The

13

third tier further increases the penalty to be imposed where the violation(s) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and where "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," to an amount, as adjusted for inflation, see 17 C.F.R. §§ 201.1002, not to exceed the greater of: (1) (a) one hundred ten thousand dollars ($110,000.00) for each violation occurring prior to, and including, February 2, 2001, 17 C.F.R. Pt. 201, Subpt. E, Tbl. I, and (b) one hundred twenty thousand dollars ($120,000.00) for each violation occurring after February 2, 2001 and prior to, and including, February 14, 2005, 17 C.F.R. Pt. 201, Subpt. E, Tbl. II; or (2) "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 78(d)(3)(B)(iii). Although the statutory tier determines the maximum penalty allowed per violation, the actual amount of the penalty imposed is discretionary with the district court. See Kern, 425 F.3d at 153; Universal Exp., 646 F.Supp.2d at 567.

The civil penalties authorized by the Exchange Act serve a dual purpose, i.e., to both punish the individual violator for his past violations and deter future violations of the securities laws. See SEC v. Colonial Investment Management LLC, 659 F.Supp.2d 467, 503 (S.D.N.Y. 2009), aff'd, 381 Fed. Appx. 27 (2d Cir. June 17, 2010); Universal Exp., 646 F.Supp.2d at 567. The following factors are relevant in determining whether civil penalties are appropriate and, if so, in what amount: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; (5) whether the defendant has admitted wrongdoing; and (6) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." Colonial Investment, 659 F.Supp.2d at 503; see also Universal Exp., 646 F.Supp.2d at 568; SEC v. Opulentica, 479

14

F.Supp.2d 319, 331 (S.D.N.Y. 2007). However, each case must ultimately be decided upon its own particular facts and circumstances. Colonial Investment, 659 F.Supp.2d at 503; see also Opulentica, 479 F.Supp.2d at 331.

Mortenson was a direct participant in a pervasive fraud scheme, spanning over three (3) years and involving fraud, deceit, manipulation and deliberate, or at least, reckless disregard of regulatory requirements, which either resulted in substantial losses to Symbol investors or, at the very least, created a risk of substantial losses to Symbol investors. See, e.g. Universal Exp., 646 F.Supp.2d at 568 (finding the imposition of third-tier penalties appropriate because the defendant's dissemination of materially false information created a significant risk of substantial loss to the investing public, and his actual sale of the company's shares at artificially inflated prices actually caused those losses). Although Mortenson eventually pled guilty to the criminal charge against him, and consented to the entry of a partial judgment against him in this case, early in the investigation he actively tried to conceal the pervasive fraud scheme. Taking into account, *inter alia*, the seriousness and pervasiveness of the fraud scheme, the active role played by Mortenson in the scheme, the benefits Mortenson received from his violations of the Exchange Act, Mortenson's initial attempts to cover up the fraud, Mortenson's subsequent cooperation in the investigation, see, e.g. Inorganic Recycling, 2002 WL 1968341, at * 4 (finding the defendant's cooperation in a subsequent investigation relevant to the determination of what civil penalty to impose); Opulentica, 479 F. Supp.2d at 332; and Mortenson's current financial situation, a third tier penalty is appropriate. See, e.g. SEC v. Lines, No. 07 Civ. 11387, 2011 WL 3627695, at * 2 (S.D.N.Y. Aug. 16, 2011) (accepting recommendation to award third-tier civil penalties since, *inter alia*, the defendants had actively participated in an eight (8)-month fraud scheme to manipulate a publicly-traded stock that resulted in material losses suffered by innocent purchasers of the company's stock

15

and one defendant had recklessly published misleading reports touting the value of the company's stock while concealing his own financial interests, which artificially inflated trading of the company's shares and created a risk of substantial losses to unwitting purchasers).

Courts in this Circuit have held that in determining the amount of a third-tier civil penalty to impose, it is appropriate to "also consider[] the extent to which other aspects of the relief and/or judgment * * * will have the desired punitive effect." Universal Exp., 646 F.Supp.2d at 568; see also SEC v. Credit Bancorp, Ltd., No. 99 Civ. 11395, 2002 WL 31422602, at * 4 (S.D.N.Y. Oct. 29, 2002) (holding that although the existence of a criminal prosecution and at least seven (7) different civil actions against the defendant "do[] not vitiate [his] responsibility to pay a [penalty] * * * they certainly lessen the responsibility of the [penalty] to provide a retributive and deterrent effect.") Under the circumstances of this case, I find the appropriate third-tier civil penalty to be an amount equal to one-half of the disgorgement amount. Accordingly, the branch of the SEC's motion seeking a third-tier civil penalty is granted and a third-tier civil penalty is imposed upon Mortenson in the amount of fifteen thousand five hundred eighty-eight dollars and twenty-five cents ($15,588.25).

IV. Conclusion

For the foregoing reasons, (1) the branch of the SEC's motion seeking disgorgement is granted to the extent that Mortenson is liable to disgorge the total amount of thirty-one thousand one hundred seventy-six dollars and fifty-one cents ($31,176.51), and that branch of the SEC's motion is otherwise denied; (2) the branch of the SEC's motion seeking prejudgment interest is granted to the extent that prejudgment interest is awarded on the disgorgement amount in the total

16

amount of twenty-eight thousand forty-three dollars and seventy-eight cents ($28,043.78), and that branch of the motion is otherwise denied; and (3) the branch of the SEC's motion seeking a third-tier civil penalty is granted and Mortenson shall pay a civil penalty in the amount of fifteen thousand five hundred eighty-eight dollars and twenty-five cents ($15,588.25). The Clerk of the Court shall enter final judgment against Mortenson in accordance with this Order and close this case.

SO ORDERED.

s/ Sandra J. Feuerstein

Sandra J. Feuerstein
United States District Judge

Dated: March 11, 2013
      Central Islip, New York